690 A.2d 1

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ROBERT O. MARSHALL, DEFENDANT–
APPELLANT.

Argued January 16, 1996—Decided March 5, 1997.

102

104

114

116

118

120

130

*Judith L. Borman,* First Assistant Deputy Public Defender and *Joan D. Van Pelt,* Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney; *Ms.*

*Borman, Ms. Van Pelt* and *Bernadette N. De Castro,* Assistant Deputy Public Defender, on the briefs).

*Robert E. Bonpietro* and *Paul H. Heinzel,* Deputy Attorneys General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

TABLE OF CONTENTS

I. FACTS AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . 137

II. THE INTERRELATIONSHIP OF POST-CONVIC-
 TION RELIEF, THE CAPITAL PUNISHMENT
 ACT, AND HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . . 143

III. LEGAL STANDARDS GOVERNING DEFENDANT'S
 CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

IV. THE MERITS OF DEFENDANT'S PETITION FOR
 POST-CONVICTION RELIEF . . . . . . . . . . . . . . . . . . . . . . . 159
 A. ALLEGED ERRORS RELATING TO THE
 TESTIMONY OF BILLY WAYNE
 MCKINNON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
 1. McKinnon's Plea Agreement . . . . . . . . . . . . . . . . . . . 159
 2. Other Claims Relating to McKinnon's
 Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
 3. McKinnon's Telephone Call to Robert Cumber . . . . . . 171
 4. Impact on the Penalty Phase . . . . . . . . . . . . . . . . . . 172
 B. ALLEGED ERRORS RELATING TO
 DEFENSE INVESTIGATOR RUSSELL
 KOLINS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172
 C. ALLEGED ERRORS RELATING TO THE
 "SUICIDE TAPE" AND ITEMS SEIZED
 FROM DEFENDANT'S MOTEL ROOM . . . . . . . . . . . . 181
 1. Claims Based on Evidence Relevant to Whether
 the Tape Should Have Been Suppressed on
 the Ground That It Was Improperly Seized . . . . . . . 182
 2. Claims Based on Evidence Relevant to Whether
 the Tape Should Have Been Suppressed on
 the Ground That It Was Subject to the Attor-
 ney-Client Communication Privilege . . . . . . . . . . . . . . 190
 3. Claims Alleging Ineffective Assistance of Coun-
 sel in Connection With the "Suicide Tape"
 and the Items Seized at the Best Western
 Motel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195
 4. Miscellaneous Claims Associated with the
 "Suicide Tape" and Items Seized at the
 Best Western Motel . . . . . . . . . . . . . . . . . . . . . . . . . 198

D. CLAIMS RELATING TO SARANN
 KRAUSHAAR ....................................200
E. ALLEGED ERRORS THAT PRECLUDED THE
 DEFENSE FROM UTILIZING THE CRIME
 SCENE TO PORTRAY DEFENDANT AS
 THE VICTIM OF A CRIME .......................205
 1. In General........................................205
 2. The Tire ........................................206
 3. Counsel's Failure to Elicit on Cross-Examina-
 tion the Consistent Statements Made by
 Defendant to Various Police Officers About
 the Problems He Experienced with His Car.......208
 4. Position of Body and Ballistics ....................209
 5. Stopping in the Oyster Creek Picnic Area ...........211
 6. Defendant's Injuries and Treatment ................212
 7. Defendant's Demeanor ...........................213
 8. The Jewelry .....................................214
F. ALLEGED ERRORS THAT PRECLUDED THE
 DEFENSE FROM DEMONSTRATING THAT
 NEITHER DEFENDANT'S DEBT NOR IN-
 SURANCE POLICIES ON THE VICTIM'S
 LIFE WERE MOTIVES FOR MURDER ...........214
 1. Debt............................................214
 2. Victim's Life Insurance Policies ....................217
G. ALLEGED INFRINGEMENTS ON DEFEN-
 DANT'S RIGHT TO RETAIN COUNSEL ...........221
H. ALLEGED VIOLATIONS OF DEFENDANT'S
 *MIRANDA* RIGHTS ............................225
I. CLAIMS RELATING TO THE INTEGRITY OF
 THE IMPANELED JURY........................226
J. MISCELLANEOUS CLAIMS OF PROSECUTO-
 RIAL MISCONDUCT ...........................232
K. TRIAL COUNSEL'S ALLEGED FAILURE TO
 INTRODUCE EVIDENCE CORROBORAT-
 ING DEFENDANT'S TESTIMONY ................233
L. ALLEGED ERRORS INVOLVING THE USE
 OF SEARCH WARRANTS ......................239
M. ALLEGED ERRORS IN THE JURY CHARGE........241
N. CLAIMS INVOLVING THE RELIABILITY OF
 THE PENALTY-PHASE PROCEEDING ...........243
O. ALLEGED MISCELLANEOUS DISCOVERY
 VIOLATIONS ..................................258
P. ALLEGED MISCELLANEOUS CLAIMS OF IN-
 EFFECTIVE ASSISTANCE OF COUNSEL ........260
Q. CLAIMS ALLEGING THAT THE DEATH-PEN-
 ALTY STATUTE IS UNCONSTITUTIONAL
 AND THAT THE APPELLATE DEATH-PEN-
 ALTY PROCEEDINGS IN THIS CAPITAL
 CASE HAVE BEEN INADEQUATE AND
 UNRELIABLE..................................263

R. CUMULATIVE ANALYSIS OF CLAIMS .............266

V. ·CLAIMS INVOLVING THE FAIRNESS OF THE
 POST-CONVICTION RELIEF PROCEEDINGS ..........267
 A. DENIAL OF ACCESS TO THE STATE'S FILES.......268
 B. THE POST-CONVICTION RELIEF COURT'S
 DECISION NOT TO DISQUALIFY ITSELF.......275
 C. DENIAL OF DEFENDANT'S ATTEMPT TO
 INTERVIEW THE TRIAL JURORS ................279
 D. REFUSAL TO PERMIT RECONSTRUCTION
 AND SUPPLEMENTATION OF THE TRIAL
 RECORD ........................................280
 E. REFUSAL OF LAW ENFORCEMENT PER-
 SONNEL TO TALK TO THE DEFENSE ...........282
 F. MISCELLANEOUS CLAIMS THAT THE POST-
 CONVICTION RELIEF PROCEEDINGS
 WERE UNFAIR ................................284

VI. CONCLUSION ........................................286

The opinion of the Court was delivered by

STEIN, J.

Defendant, Robert Marshall, was tried before a jury and convicted of murdering and conspiring to murder his wife, Maria Marshall. After a penalty-phase hearing, defendant was sentenced to death. This Court upheld the convictions and sentence, 123 *N.J.* 1, 586 *A.*2d 85 (1991), and concluded that defendant's death sentence is not disproportionate to the sentences imposed in similar cases. 130 *N.J.* 109, 613 *A.*2d 1059 (1992).

After obtaining a stay of execution from the Law Division, defendant filed with that court a petition for post-conviction relief (PCR), see *Rule* 3:22–1, alleging more than 500 grounds for the reversal of his convictions and sentence. In an unreported opinion, the Law Division denied defendant's PCR application. Defendant appeals to this Court as of right, see *Rule* 2:2–1(a)(3), presenting to this Court the first PCR application by a defendant sentenced to death under the New Jersey Code of Criminal Justice.

I

## FACTS AND PROCEDURAL HISTORY

A detailed recounting of the evidence adduced at defendant's guilt- and penalty-phase trials is set forth in our first *Marshall* opinion. *See State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991) (*Marshall I* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). We reproduce here "a general outline of the facts that the jury could have found as drawn from the State's brief," *State v. Marshall,* 130 *N.J.* 109, 120, 613 *A.*2d 1059 (1992) (*Marshall II* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993), to facilitate the reader's understanding of our disposition of this appeal.

Defendant, a Toms River insurance agent, began an extramarital affair with Sarann Kraushaar, a married woman, in June 1983. As early as December 1983, defendant mentioned to Kraushaar the idea of killing his wife, Maria. In May 1984, defendant met Robert Cumber of Louisiana and questioned him about hiring an "investigator." Defendant later telephoned Cumber, who referred defendant to Billy Wayne McKinnon, a former sheriff's officer from Louisiana. Defendant agreed to pay McKinnon $5,000 to meet him in Atlantic City, New Jersey.

Defendant met McKinnon at Harrah's Casino in Atlantic City on June 18, 1984, and offered to pay him $65,000 to kill his wife. In addition to the $5,000 that McKinnon had already received, defendant agreed to pay him $10,000 up front and $50,000 from the expected insurance proceeds on his wife's life. At that meeting defendant paid McKinnon $7,000 and gave him a picture of his wife. Defendant told McKinnon to kill her that evening, when defendant would be present. In preparation for the killing, defendant and McKinnon discussed various ways to kill Maria. Defendant believed that he would not be considered a suspect because he was considered an outstanding citizen with influence in the community.

McKinnon did not carry out the murder at that time, but instead returned to Louisiana. Defendant communicated with him on numerous occasions and sent him additional money. Under pressure from defendant to complete the job, McKinnon returned to Atlantic City on July 19, 1984, and met with defendant, who proposed a second plan for the killing to take place that evening. Defendant told McKinnon that he would leave his wife in their car to be executed while defendant went into a restaurant under the pretense of using the bathroom facilities. However, McKinnon did not commit the murder at that time either.

Defendant, persistent in his efforts to have his wife killed, offered McKinnon an "extra fifteen" ($15,000) if he would return to New Jersey a third time to do the "job" before Labor Day. McKinnon agreed, and, on September 6, 1984, he and defendant met at a service area parking lot located south of Toms River. Together they selected a spot on the Garden State Parkway to carry out Maria's murder and

made final plans for the slaying, which was to occur that evening. The plan was to make the murder look like a robbery.

Defendant took his wife to Harrah's Casino in Atlantic City on the night of September 6, 1984, under the pretext of an evening of dining and gambling. He met McKinnon outside Harrah's at approximately 9:30 p.m. and told him that he and Maria would be leaving the casino at about midnight. Defendant also asked McKinnon for the return of the photographs of Maria and of their home that he had given him in June.

As previously arranged with McKinnon, defendant pulled into the Oyster Creek picnic area at milepost seventy-one on the Garden State Parkway at about 12:30 a.m. on September 7. While his wife lay sleeping on the front seat, defendant got out of the car under the ruse of needing to repair a flat tire. Defendant squatted down to prepare himself for being hit on the head as part of the simulated robbery. Maria Marshall was shot in the back twice. She died immediately.

When the police arrived on the scene, defendant continued to make the murder look like a robbery. The State argues that defendant showed no remorse after the crime, but pretended to join his three sons in grieving over the loss of their mother. The State argued at the trial level that he even staged a suicide attempt. Defendant protested his innocence then and continues to do so now in explanation of his conduct.

Defendant's claims of innocence soon unraveled. Telephone records traced him to McKinnon, who turned State's evidence. In exchange for a plea to conspiracy to commit murder, McKinnon implicated Marshall and identified a Louisiana man, Larry Thompson, as the triggerman.

Investigation disclosed that during his planning, defendant had been increasing the insurance policies on his wife's life. At the time of her death, Maria Marshall's life was insured for about $1,400,000. Defendant had been paying his wife's premiums while neglecting his own. Defendant hastened to complete an application for a policy for a home mortgage before the murder. On the last day of her life, Maria underwent a physical examination for that policy. The State offered proof that defendant could have been motivated to kill by rising debts incurred in his business, including a $128,000 home-equity loan and a short-term bank debt in excess of $40,000. While amassing those large insurance policies, defendant also continued his relationship with Sarann Kraushaar, with whom he had intended to live after the murder.

A jury acquitted Thompson of the murder but accepted McKinnon's version of defendant's role and found him guilty of conspiracy to commit his wife's murder and of murder-by-hire. The only aggravating factor submitted to and found by the jury was that defendant had hired another to commit murder. *N.J.S.A.* 2C:11–3c(4)(e). The two mitigating factors submitted to and found by the jury were that defendant had no history of criminal activity, [*N.J.S.A.* 2C:11–3]c(5)(f), and the catch-all mitigating factor, [*N.J.S.A.* 2C:11–3]c(5)(h). At the time of the offense defendant was forty-four years of age, and had been involved in charitable and community activities. The jury unanimously found beyond a reasonable doubt that the aggravating factor outweighed the mitigating factors. The trial court sentenced defendant to death.

[*Id.* at 121–24, 613 *A.*2d 1059.]

This Court affirmed defendant's convictions and sentence on direct appeal, rejecting his thirty-nine proffered grounds for reversal, which included allegations of ineffective assistance of counsel, improper jury instructions, prosecutorial misconduct, and discovery violations. *See Marshall I, supra,* 123 *N.J.* 1, 586 *A.2d* 85. In respect of defendant's discovery-related contentions on direct appeal, the State had conceded that it had breached its pretrial discovery obligations by failing to turn over to defendant various documents relevant to his case. *See id.* at 172, 586 *A.2d* 85. Those documents included letters discussing expenditures made by the State on behalf of Billy Wayne McKinnon and a promise of immunity made to Sarann Kraushaar by the Ocean County Prosecutor. *Id.* at 171, 205, 586 *A.2d* 85. This Court concluded that the undisclosed items were not " 'material' to defendant's guilt or punishment," *id.* at 204–05, 586 *A.2d* 85, and thus that the nondisclosures did not require the reversal of defendant's convictions or sentence. *Id.* at 205, 207, 586 *A.2d* 85.

Believing that there were additional discoverable items that the State had failed to turn over, defendant, after filing a petition for PCR in the Law Division, moved to compel the State to permit defendant to inspect the State's entire file. The Law Division denied the motion, but informed defendant that he was entitled to file discovery applications for specific items. The court explained that "before the State should be compelled to turn over items . . ., there should be some preliminary showing of the reasonable likelihood of the existence of specific items."

Based on information obtained from, among other sources, interviews conducted with witnesses, testimony adduced at defendant's trial, documents previously handed over by the State, and statements made by state officials at another trial and on "The Phil Donahue Show," defendant made numerous requests for specific discoverable materials that, defendant believed, were in the State's possession. Without conceding that its discovery obligations applied to the documents in question, the State volun-

tarily made available to defendant some of the requested items. Concerning the balance of the requested items, the State submitted the documents to the PCR court for a determination of whether defendant was entitled to the documents. In some instances, the court required the State to provide defendant with the documents in question. In other instances, the court found the documents to be work product or of no probative value and thus not subject to the State's discovery obligations.

The documents received by defendant after his initial PCR discovery motions alerted him to the existence of additional, pertinent documents, and led him to make further specific requests for discovery materials. Through the specific-request procedure, defendant received from the State approximately one hundred documents. Those documents form the foundation of defendant's PCR claim that reversal of his convictions is required because of the State's failure to fulfill its pretrial discovery obligations, see *Rule* 3:13–3, and its nondisclosure of evidence favorable to defendant, see *Brady v. Maryland*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963).

Defendant's amended petition for PCR contained a total of 548 grounds for reversal, each of which was placed by defendant into one of nine separate categories. The following chart displays the categories used by defendant and the number of claims within each category.

| Category | Number of Claims |
|---|---|
| A. Issues Relating to Discovery and Violations of *Brady v. Maryland*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963) | 102 |
| B. Issues Relating to Ineffective Assistance of Trial Counsel | 267 |
| C. Issues Relating to the Jury Selection | 74 |

D. Issues Relating to State's Procurement from Best Western Motel and Examination of Envelope Addressed to Joseph Dougherty, Esq., Containing Defendant's "Suicide Tape" and Tape's Admission into Evidence — 11

E. Issues Relating to the Conduct of the New Jersey State Police, the Ocean County Prosecutor's Office and the New Jersey Office of the Attorney General as they Affected Defendant's Rights to a Fair Trial, Appeal and Post–Conviction Proceedings — 27

F. Miscellaneous Issues — 24

G. Issues Pertaining to Appellate and Post–Conviction Review and the Effective Assistance of Trial Counsel — 9

H. Issues That Were Not Adequately Raised or Reviewed on Appeal Due to Page Restrictions Imposed by Supreme Court — 16

I. Issues Pertaining to Proportionality Review — 19

Defendant requested a complete evidentiary hearing to support the claims raised in the petition through the presentation of testimonial and documentary evidence. He planned to amend the petition based on the evidence adduced at the hearing. In response, the State moved to dismiss the petition in its entirety, asserting that defendant had failed to set forth his claims with sufficient specificity, *see R.* 3:22–8, and that the claims were all procedurally barred, *see R.* 3:22–4 (providing, with exceptions, that

any claim that could have been, but was not, raised in prior proceeding is barred on post-conviction review); *R.* 3:22–5 (providing that prior adjudication upon merits of claim precludes raising claim on post-conviction review).

The PCR court granted in part and denied in part the State's motion to dismiss the petition. On procedural grounds, the court dismissed approximately three-quarters of defendant's Category B claims, all of the Category C claims, all of the Category D claims, all but one of the Category E claims, all but one of the Category F claims, all but one of the Category G claims, all of the Category H claims, and all of the Category I claims. The court found that each of those claims was barred by either *Rule* 3:22–4 or *Rule* 3:22–5.

Turning to defendant's request to present witnesses and documents to develop his petition, the court determined that defendant was entitled to a complete evidentiary hearing on only five of the remaining 174 claims. Those five claims pertained to defense counsel's opening-statement representation that defendant would testify, and to defendant's competence to take part in the penalty-phase proceeding after a post-verdict physical collapse.

The PCR court stated that, on the other 169 claims, defendant would be entitled only to a "non-evidentiary hearing," at which he could present documentary evidence but not live testimony. The court explained:

> The rules of court do not require that evidentiary hearings be conducted on post-conviction relief applications. The hearing court has discretion to conduct evidentiary hearings when appropriate, an evidentiary hearing meaning a hearing at which witnesses will testify.... [In this case, t]here's been no showing that the hearing will necessarily involve the resolution of disputed questions of fact material to constitutional violations which can only be resolved in an ... evidentiary hearing. In fact, it is apparent that for the court and for the litigants to undertake such a hearing on the basis of the allegations in the amended petition for post-conviction relief application would be to venture into a legal morass essentially in the nature of a discovery proceeding with no ascertainable parameters and limits.

The court heard four days of testimony and received 177 defense exhibits in support of the petition for PCR. During the hearings, defendant moved to add nine more claims to his petition.

The court denied the motion to amend "at this very late date," and further noted that the additional claims were without merit.

At the conclusion of the hearings, the court denied defendant's petition. The court found his legal arguments to be without merit and concluded that "[d]espite the undeniably prodigious efforts of [defense] counsel in this proceeding, [the evidence presented by the State at trial] remains intact and undiminished in weight."

Defendant's execution has been stayed pending his appeal to this Court as of right.

## II

## THE INTERRELATIONSHIP OF POST–CONVICTION RELIEF, THE CAPITAL PUNISHMENT ACT, AND HABEAS CORPUS

This is the first appeal taken to this Court from the denial of a post-conviction relief application seeking to set aside a murder conviction and death sentence imposed pursuant to this State's Capital Punishment Act. *L.* 1982, *c.* 111 (codified at *N.J.S.A.* 2C:11–3). The voluminous size of the petition and its constituent documents—including a forty-five volume appendix and fifteen volume supplemental appendix, together encompassing in excess of 8000 pages—combined with the 548 claims of error on which it relies, presents the Court with a gargantuan appellate record. The issues presented initially were addressed in the Public Defender's 215 page primary brief and answered by the Attorney General's primary brief of comparable dimension. The Public Defender filed a supplemental brief, at the Court's request, consisting of 250 pages and accompanied by an eleven volume index setting forth record and brief citations in support of each of the post-conviction relief claims. The State's responding supplemental brief comprises 244 pages.

The Court acknowledges the enormous effort and professional dedication reflected by the Public Defender's submissions, as well as the burden it imposed on the remaining resources of that office.

Similarly, the Court acknowledges the comparable effort and dedication reflected by the Attorney General's submissions.

An appeal based on so vast a record and implicating so many distinct issues obviously imposes an enormous institutional burden on this Court, diverting time and resources from the Court's other adjudicative and administrative responsibilities. We know that defendant faces the death penalty. Nevertheless, we question both the wisdom and the necessity for so massive a presentation.

We assume that the vastness of the petition and its supporting documents reflects strategic considerations. We infer that one of those strategic considerations was the desire to avoid the very procedural bars to the petition imposed by the trial court pursuant to *Rule* 3:22–4 and –5. *Rule* 3:22–4 essentially bars all grounds for post-conviction relief that reasonably could have been raised in a prior proceeding. *Rule* 3:22–5 bars all grounds for relief that previously were adjudicated on the merits. Presumably, the Public Defender's office reasoned that dividing the post-conviction relief claims into discrete and narrow components would dissuade the post-conviction relief court from categorically imposing the *Rule* 3:22–4 and –5 procedural bars, and would add weight to the argument that the cumulative effect of all claims required that the petition be granted.

That strategy was unsuccessful in the post-conviction relief court, and we intend that our disposition of this appeal emphatically will discourage the artificial fragmentation of claims for post-conviction relief purposes, even in capital cases. Such fragmentation elevates form over substance, and unduly burdens the litigants, the post-conviction relief court, and this Court. Post-conviction relief issues should be categorized broadly but coherently, and to the extent necessary illustrated by pertinent examples. No valid purpose is served when every minute example of trial counsel's alleged ineffectiveness is offered as a separate ground for post-conviction relief.

We do not underestimate the potential significance of a post-conviction relief strategy that is designed to avoid the imposition

of procedural bars to post-conviction relief. In *State v. Preciose,* 129 *N.J.* 451, 464–78, 609 *A.*2d 1280 (1992), we explored in detail the effect of the federal practice to deny habeas corpus review of state court judgments that rest on adequate or independent state grounds, whether substantive or procedural. See *Wainwright v. Sykes,* 433 *U.S.* 72, 81–87, 97 *S.Ct.* 2497, 2503–07, 53 *L.Ed.*2d 594, 604–08 (1977). In *Harris v. Reed,* the Supreme Court established the principle that a state court's imposition of a state procedural bar would not preclude federal habeas review unless the state court's disposition expressly stated its reliance on the state procedural bar. 489 *U.S.* 255, 266, 109 *S.Ct.* 1038, 1045, 103 *L.Ed.*2d 308, 319 (1989). In decisions subsequent to *Harris,* however, the Court clarified that the *Harris* presumption against finding a procedural default " 'applies only ... where a federal court has good reason to question whether there is an independent and adequate state ground for the decision.' " *Preciose, supra,* 129 *N.J.* at 471, 609 *A.*2d 1280 (quoting *Coleman v. Thompson,* 501 *U.S.* 722, 739, 111 *S.Ct.* 2546, 2559, 115 *L.Ed.*2d 640, 662 (1991)). Thus, defendant's efforts to avoid the procedural bar imposed by the post-conviction relief court with respect to 374 claims can be understood in part as a strategy designed to obtain substantive review of his claims in federal habeas corpus proceedings.

Another factor that may have influenced defendant to present such an extensive number of individual post-conviction relief claims is the exhaustion doctrine, pursuant to which a state prisoner must normally exhaust state judicial remedies before a federal court will entertain that prisoner's petition for habeas corpus. *Picard v. Connor,* 404 *U.S.* 270, 275, 92 *S.Ct.* 509, 512, 30 *L.Ed.*2d 438, 443 (1971). Codified by Congress in 1948, *see* 28 *U.S.C.* § 2254, the exhaustion doctrine contemplates that federal claims have been fairly presented to the state courts. Thus, a federal court should inquire "whether, on the record and argument before it, the [state court] ... had a fair opportunity to consider the ... claim and to correct the asserted constitutional defect in respondent's conviction." *Picard, supra,* 404 *U.S.* at 276, 92 *S.Ct.*

at 513, 30 *L.Ed.*2d at 444. In *Rose v. Lundy,* the Supreme Court held that the exhaustion principle mandated that a federal district court dismiss a petition for a writ of habeas corpus that contained both exhausted and unexhausted claims for relief. 455 *U.S.* 509, 510, 102 *S.Ct.* 1198, 1199, 71 *L.Ed.*2d 379, 382 (1982). The Court offered this guidance to potential habeas litigants: "before you bring any claims to federal court, be sure that you first have taken each one to state court." *Id.* at 520, 102 *S.Ct.* at 1204, 71 *L.Ed.*2d at 388.

■ Despite the preclusive effect of the exhaustion doctrine, it does not mandate presentation to a state court of every claim that *conceivably* might be asserted in the anticipated habeas petition, but only presentation to the state court of claims *intended* to be asserted in the habeas petition. Selectivity in the presentation of claims on post-conviction relief is not precluded by the exhaustion rule. If certain claims are obviously without merit and highly unlikely to succeed in the habeas petition, no purpose is served or interest advanced by including those claims in support of either the state post-conviction relief petition or the federal habeas petition. Thus, the exhaustion doctrine neither requires nor excuses the indiscriminate assertion of meritless claims in a post-conviction relief petition.

■ The principle bears repeating that post-conviction relief proceedings are "not a substitute for direct appeal." *State v. Cerbo,* 78 *N.J.* 595, 605, 397 *A.*2d 671 (1979). As our ·opinion discloses, we find numerous claims to be totally lacking in merit. Apart from defense counsel's purpose in avoiding the imposition of a procedural bar, we consider the inclusion of many such claims to constitute an unjustified burden on the post-conviction relief process. Based on our disposition of the procedural bar issue, we anticipate that that imposition will not be repeated in future post-conviction relief proceedings, even in capital cases.

In *State v. Mitchell,* 126 *N.J.* 565, 589, 601 *A.*2d 198 (1992), we emphasized that the procedural bars contained in the rules governing post-conviction relief are "imposed for a purpose." Al-

though not "endors[ing] their rigid, mechanical application," we expressed our expectation that the procedural rules and their exceptions will "be conscientiously applied to the unique circumstances of each case. . . ." *Ibid.*

In the unique circumstances of *this* case, however, we question the wisdom and the practicality of the PCR court's broad-brush application of the *Rule* 3:22–4 and –5 procedural bars. In view of the substantial number of claims dismissed under *Rule* 3:22–5's admonition that "a prior adjudication upon the merits of any ground for relief is conclusive . . .," a question fairly raised by defendant is whether the adjudication by this Court on direct appeal or proportionality review concerned the "same ground for relief" now asserted in the post-conviction relief petition. Similarly, dismissal of claims on the ground that they could reasonably have been raised on direct appeal, *see R.* 3:22–4, raises the question whether the additional facts disclosed in the post-conviction relief record sufficiently augment the scope of such claims to preclude the conclusion that a substantially similar claim could have been advanced on the basis of the trial record. The issue of reliance on the procedural bars is made more complex by the recognition that the claims now raised invariably are as readily resolved on their merits as by application of the procedural bar.

We illustrate the problem by considering the PCR court's disposition of post-conviction relief claims of ineffective assistance of trial counsel in the context of the ineffectiveness issues raised on direct appeal and our disposition of those issues. The PCR court essentially relied on this Court's disposition of the ineffectiveness challenge asserted on direct appeal, *Marshall I, supra,* 123 *N.J.* at 164–65, 586 *A.*2d 85, noting that "this contention was raised before the Supreme Court on the appeal," and concluding: "[E]xcept for the claims not dismissed it may be said that all claims are barred under *R.* 3:22–5 as having been previously adjudicated. If any claims are viewed as not having been previously adjudicated because not raised in specific terms on the appeal, then the claims are barred under *R.* 3:22–4."

However, the specific allegations of ineffective assistance of counsel asserted in defendant's direct appeal brief include only a fraction of the claims asserted on post-conviction relief. In his direct appeal brief defendant raised only the following ineffectiveness claims relating to the guilt phase:

> Specifically, Mr. Marshall was prejudiced by counsel's failure to pursue the possibility that Maria Marshall was sitting up and awake when shot through cross-examination of the medical examiner, independent investigation and summation; his failure to call his tire expert to testify about the inconclusiveness of the State's chemist's findings, his failure to request an adequate remedy for the tire's destruction and failure to object to the prosecutor's summation remarks about the tire; his failure to call as witnesses the individuals flagged down for aid by Marshall just after the murder; counsel's failure to attempt to obtain the September 6th medical report for Mr. Marshall through *N.J.S.A.* 2A:81–18, *et seq.;* counsel's failure to object to the prosecutor's blatantly improper questions of Oakleigh DeCarlo; his withdrawal of his objection to Maria Marshall's statement, "What's this for?"; his failure to object to Zillah Hahn's inadmissible hearsay testimony discrediting defense witness Paul Rakoczy; his failure to seek a remedy for the prosecutor's informing the jury and relying on the fact of Kraushaar's father's death; counsel's failure to object to most of the prosecutor's summation; and counsel's failure to request an opportunity to interview McKinnon upon learning he placed a call to Cumber after testifying.... The cumulative effect of the foregoing errors was a trial that was fundamentally unfair and unreliable from start to finish.

Responding to the specific allegations of ineffectiveness in defendant's direct appeal brief, this Court observed:

> The contention that defendant was denied effective assistance of counsel in the guilt phase is utterly without merit. Defense counsel, a certified criminal trial attorney, *see Rule* 1:39, provided a zealous and conscientious defense of his client throughout this protracted trial. Counsel was obviously well-prepared, thoroughly familiar with the record, and persistently and forcefully advocated his client's interests throughout the guilt-phase proceedings. The examples of the deficiencies relied on by defendant represent no more than a fraction of the strategic decisions with which counsel was confronted in the course of this lengthy and sharply-contested proceeding. With hindsight, it is not difficult to suggest different trial strategies that counsel might have pursued, but the law is settled that "[i]n assessing the adequacy of counsel's performance, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Burger v. Kemp,* 483 *U.S.* 776, 819, 107 *S.Ct.* 3114, 3139, 97 *L.Ed.*2d 638, 673 (1987) (Powell, J., dissenting) (quoting *Strickland [v. Washington],* 466 *U.S.* [668,] 690, 104 *S.Ct.* [2052,] 2066, 80 *L.Ed.*2d [674,] 695 [ (1984) ] ). Nor can the quality of counsel's effectiveness fairly be assessed by focusing on a handful of issues, while ignoring the totality of counsel's performance in the context of the State's compelling evidence of defendant's guilt. Based on our close scrutiny

of the entire record, we reject defendant's contention that counsel's performance was deficient under the *Strickland/Fritz* standard.

[*Id.* at 164–65, 586 *A.*2d 85.]

We cannot accurately discern from the PCR court's abbreviated disposition of the post-conviction relief ineffectiveness claims the extent to which the court simply accorded preclusive effect to this Court's disposition of the issue on direct appeal. Although our resolution of the issue on direct appeal reflected our familiarity with the entire record, our disposition should not have been understood to extend beyond the issues specifically raised in defendant's direct appeal brief. Our direct appeal opinion reflects our impression, based on the record, that trial counsel was skilled, diligent, and thorough, but our disposition could not fairly be understood to encompass an evaluation on the merits of numerous claims of ineffectiveness of which this Court was then completely unaware.

Scant caselaw exists on the question of whether a prior adjudication of an issue should be considered an adjudication "on the same ground" as that asserted in support of a subsequent post-conviction relief claim. In *State v. Bontempo*, 170 *N.J.Super.* 220, 406 *A.*2d 203 (Law Div.1979), the trial court in a murder prosecution employed an unusual and unauthorized procedure, permitting the defendant to make an unsworn statement before the jury after the conclusion of the summations by the attorneys. Following the defendant's statement, the prosecutor was allowed a second summation during which he referred to the defendant's failure to deny specifically his complicity in the crimes charged. On direct appeal, the defendant argued that his Fifth Amendment right to remain silent was violated by the unusual procedure authorized by the trial judge, including allowing the prosecutor to rebut his statement, thus denying him his right to a fair trial. The defendant's argument on direct appeal was held to be "clearly without merit." *Id.* at 234, 406 *A.*2d 203. Noting that he did not "expressly articulate the manner in which the procedure was said to be violative of the Fifth Amendment [in his appellate brief]," and finding that the thrust of his direct appeal argument was that

the *structure* of the process was the root of the Fifth Amendment violation, Judge Baime ruled that the defendant's post-conviction claim of a Fifth Amendment violation resulting from the prosecutor's rebuttal to defendant's statement had not been raised on direct appeal. *Ibid.* Thus, *Rule* 3:22–5 did not bar petitioner's claim.

Judge Baime explained:

> Under these circumstances, it would be unfair to bar defendant from advancing the Fifth Amendment claim presented in his petition. To be sure, the argument advanced here and that presented in defendant's Appellate Division brief are similar. Nevertheless, the United States Supreme Court has held in a somewhat related context that federal judicial review of constitutional questions on *habeas corpus* should be denied only where it is clear that the identical issues or "substantially equivalent" arguments were not presented initially in the state courts. *See Picard v. Connor,* 404 *U.S.* 270, 92 *S.Ct.* 509, 30 *L.Ed.2d* 438 (1971). *See also United States ex rel. Trantino v. Hatrack,* 563 *F.2d* 86 (3d Cir.1977), *cert. den.* 435 *U.S.* 928, 98 *S.Ct.* 1499, 55 *L.Ed.2d* 524 (1978); *Zicarelli v. Gray,* 543 *F.2d* 466 (3d Cir.1976). By analogy, that rule should be applied with equal force here. Preclusion of consideration of an argument presented in post-conviction relief proceedings should be effected only if the issue raised is identical or substantially equivalent to that adjudicated previously on direct appeal. Applying that standard, defendant's oblique reference in his Appellate Division brief to the prosecutor's rebuttal to his unsworn statement should not bar judicial resolution of the issue presented in his petition for post-conviction relief.
>
> [*Bontempo, supra,* 170 *N.J.Super.* at 234, 406 *A.2d* 203.]

Judge Baime then rejected the defendant's post-conviction relief claim on the merits, concluding that he had waived his Fifth Amendment right by electing to address the jury. *Id.* at 238–49, 406 *A.2d* 203.

Similarly, in *State v. Rosen,* 110 *N.J.Super.* 216, 265 *A.2d* 152 (App.Div.1969), *aff'd,* 56 *N.J.* 89, 265 *A.2d* 142 (1970), an issue raised on direct appeal of the defendant's burglary conviction was whether the fact that his retained trial counsel had been appointed to a judgeship before the trial deprived him of his opportunity to be represented by counsel of his choice, a contention rejected by the Appellate Division. In a post-conviction relief application, the defendant for the first time asserted that he had permitted the substitute trial counsel to represent him against his will because counsel had warned him that his bail would be revoked if he

requested an adjournment to seek new counsel. Although the PCR court dismissed the post-conviction relief petition, the Appellate Division majority concluded that an evidentiary hearing on the claim should have been held, but that the failure to do so was harmless. *Id.* at 219, 265 *A.*2d 152. Dissenting, Judge Conford concluded that the lack of an evidentiary hearing was reversible error because the claim asserted on post-conviction relief had not previously been adjudicated:

> The decision of the Appellate Division on the appeal from the conviction did not decide the issue presented to the post-conviction court. On that appeal the record as it then stood precluded any determination of more than whether the trial transcript demonstrated deprivation of defendant's right to counsel of his choice. While the remarks of the trial judge were of a coercive tenor, the record seemingly demonstrated unequivocal acquiescence by defendant in the directions of the court. Defendant did not, nor could he properly, argue to the appellate court on that appeal that Mr. Kmiec's representations to him during the recess combined with the trial court's initial strictures made his agreement to go to trial involuntary, since the former facts were not in the record then before the court. Consequently the adjudication in the prior appeal was not a "prior adjudication upon the merits" of the specific grounds for relief asserted in the instant post-conviction petition, within a proper application of *R.R.* 3:10A–5.
>
> [*Id.* at 223, 265 *A.*2d 152 (Conford, J.A.D., dissenting).]

The question whether a ground for relief in a post-conviction relief petition constitutes the "same ground" as was adjudicated on direct appeal takes on added significance because it implicates the strict application of the exhaustion doctrine by federal courts considering habeas applications. Thus, in *Santana v. Fenton*, 685 *F.*2d 71 (1982), *cert. denied*, 459 *U.S.* 1115, 103 *S.Ct.* 750, 74 *L.Ed.*2d 968 (1983), the Third Circuit rejected the defendant's habeas petition on exhaustion grounds. The court concluded that the defendant's habeas contention that the state PCR court's refusal to reopen the case had denied him his constitutional right to testify on his own behalf had not been asserted before the state courts. On direct appeal, the defendant had argued only that the trial court had abused its discretion in refusing to allow his testimony. Relying on *Bontempo, supra*, the Third Circuit concluded that "the argument presented to the state courts was not the substantial equivalent of the constitutional argument he now poses in federal court...." *Santana, supra*, 685 *F.*2d at 75.

Similarly, in *Gibson v. Scheidemantel*, the Third Circuit also denied the defendant's habeas petition on exhaustion grounds, concluding that "[t]o the extent that Gibson's claim of ineffective assistance of counsel is now considered by him to encompass also a contention that trial counsel failed to protect his juvenile status, that aspect of his claim [is not a ground for relief that has been] previously adjudicated." 805 *F*.2d 135, 140 n. 2 (1986); *see also Zicarelli v. Gray*, 543 *F*.2d 466 (3d Cir.1976) (en banc) (holding that defendant's habeas claim that jury had not represented a fair cross-section of community was not fairly presented to state courts that considered and adjudicated other jury-related issues).

We do not imply that the federal exhaustion doctrine constitutes a mirror image of the *Rule* 3:25–5 bar based on prior adjudications on the merits, but simply observe that both doctrines seek to vindicate the State's interest in the finality of its criminal judgments. Moreover, both doctrines are applied on the basis of an inquiry into whether a ground for relief has fairly been adjudicated by or presented to the state courts. That potential interrelationship suggests that we modify our *dicta* in *Preciose, supra,* when we observed in a different but related context that the use of post-conviction relief procedural bars "should not be shaped or influenced in the slightest by the federal court's restrictive standards for allowing or disallowing habeas review." 129 *N.J.* at 477, 609 *A.*2d 1280. Obviously, neither state nor federal interests would be served by so broad an application of our procedural bars as to deny a defendant post-conviction relief on the ground that a claim previously had been adjudicated and, as a result of that ruling, also preclude habeas relief because of the defendant's inability to satisfy the exhaustion doctrine.

Moreover, the PCR court's blanket reliance on *Rule* 3:22–4 as a ground for dismissal of all dismissed ineffectiveness claims not previously adjudicated appears to be overbroad. In its letter brief of April 26, 1994, to the post-conviction relief court, defendant offered numerous examples of ineffective assistance of counsel claims neither specifically adjudicated on direct appeal nor based

solely on facts and evidence contained in the trial record. In addition, numerous items of documentary evidence were obtained for the first time in the post-conviction relief proceeding, and ineffective-assistance-of-counsel claims implicating those documents cannot fairly be characterized as claims that could have been raised on direct appeal. Finally, we noted in *Mitchell, supra,* that *Rule* 3:22-4(c) "has been interpreted to allow courts to consider petitions for post-conviction relief when the defendant alleges that his constitutional rights were seriously infringed during the conviction proceedings." 126 *N.J.* at 585-86, 601 *A.*2d 198. Because defendant's post-conviction relief petition relies heavily on the contention that trial counsel's ineffectiveness deprived him of his constitutional rights, aggressive application of the *Rule* 3:22-4 bar to those claims appears to be unwarranted.

Our familiarity with the record and the proceedings on direct appeal facilitates our disposition on the merits of virtually all of defendant's post-conviction relief claims. To eliminate the concerns about ambiguous state court rulings addressed in *Ylst v. Nunnemaker,* 501 *U.S.* 797, 802-04, 111 *S.Ct.* 2590, 2594-95, 115 *L.Ed.*2d 706, 716-17 (1991), we expressly overrule the post-conviction relief court's reliance on the *Rule* 3:22-4 and -5 procedural bars to dismiss defendant's claims. We are satisfied that many, if not most, of those rulings overstate the effect of our direct appeal opinion or underestimate the significance of the enhanced factual basis for the claims asserted in the PCR petition. Moreover, the question whether a claim buttressed by added facts fairly could have been raised on direct appeal often involves an analysis that is peculiarly subjective. Ironically, in most instances the analysis required for disposition on the merits is less intricate than that required to decide whether a claim should be precluded because of a procedural bar. Moreover, a state court adjudication on the merits of a federal constitutional claim generally assures that that claim will qualify for federal habeas review, and as we stated in *Preciose, supra,* we do not "deem federal habeas review an undesirable intrusion on our adjudications." 129 *N.J.* at 475, 609 *A.*2d 1280. That observation has special force in the context of

habeas corpus petitions to review death sentences imposed pursuant to our Capital Punishment Act. Finally, we reiterate that "when meritorious issues are raised that require analysis and explanation, our traditions of comprehensive justice will best be served by decisions that reflect thoughtful and thorough consideration and disposition of substantive contentions." *Id.* at 477–78, 609 *A.*2d 1280.

## III

### LEGAL STANDARDS GOVERNING DEFENDANT'S CLAIMS

Most of defendant's claims allege either that the State improperly withheld exculpatory evidence from defendant or that defense counsel did not adequately represent defendant at trial. Accordingly, we proceed to discuss the legal standards that will be applied to those two types of allegations.

In *State v. Knight,* 145 *N.J.* 233, 678 *A.*2d 642 (1996), we summarized the scope of the State's constitutional obligation to provide criminal defendants with exculpatory evidence in the State's possession:

> In *Brady v. Maryland,* 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196–97, 10 *L.Ed.*2d 215, 218 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Subsequent Supreme Court cases significantly expanded the scope of the *Brady* rule. For example, in *United States v. Agurs,* 427 *U.S.* 97, 107, 96 *S.Ct.* 2392, 2399, 49 *L.Ed.*2d 342, 351–52 (1976), the Court stated that the rule applies where the defendant has made only a general request for all "*Brady* material" and even where the defendant has not made any request at all. In *United States v. Bagley,* 473 *U.S.* 667, 676, 105 *S.Ct.* 3375, 3380, 87 *L.Ed.*2d 481, 490 (1985), the Court confirmed that *Brady* encompasses evidence that the defendant might have used to impeach government witnesses.... Most recently, in *Kyles v. Whitley,* 514 *U.S.* 419, ——, 115 *S.Ct.* 1555, 1560, 131 *L.Ed.*2d 490, 498 (1995), the Court emphasized that where multiple items of evidence have been suppressed, the prosecution's *Brady* obligation "turns on the cumulative effect" of such evidence. Thus, courts are obligated to consider the State's non-disclosures "collectively, not item-by-item." *Id.* at ——, 115 *S.Ct.* at 1567, 131 *L.Ed.*2d at 507.

[*Id.* at 245–46, 678 *A.*2d 642.]

■ The focus of the *Brady* analysis often is whether evidence is sufficiently "material" to the defendant's case to come within the State's *Brady* obligation. In *Knight, supra,* we recounted the evolution of the test used by the United States Supreme Court to determine whether suppressed evidence is "material" for *Brady* purposes:

In *Agurs, supra,* 427 *U.S.* at 104–112, 96 *S.Ct.* at 2398–2402, 49 *L.Ed.*2d at 350–55, the Court stated that the standard for ascertaining whether suppressed evidence is material depends on the specificity of the defendant's initial request for the evidence in question. In cases where a specific request has been made, reversal would be required if the suppressed evidence "might have affected the outcome of the trial." *Id.* at 104, 96 *S.Ct.* at 2398, 49 *L.Ed.*2d at 350. If the defendant has made only a general request for "*Brady* material" or no request, reversal would be necessary "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 *S.Ct.* at 2402, 49 *L.Ed.*2d at 355. However, the Court subsequently abandoned the distinction set forth in *Agurs,* and held that, regardless of the specificity of the defendant's request, evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494 (plurality opinion of Blackmun, J.); *id.* at 685, 105 *S.Ct.* at 3385, 87 *L. Ed.*2d at 496 (White, J., concurring); *see Kyles, supra,* 514 *U.S.* at ——, 115 *S.Ct.* at 1565, 131 *L.Ed.*2d at 505.

[145 *N.J.* at 246, 678 *A.*2d 642.]

In respect of whether New Jersey state law calls for a "materiality" test less demanding than that set forth in *United States v. Bagley,* 473 *U.S.* 667, 105 *S.Ct.* 3375, 87 *L.Ed.*2d 481 (1985), we have stated:

We look to the standard set forth in *Bagley, supra,* to resolve th[e materiality] issue. In *State v. Marshall [I],* 123 *N.J.* 1, 199–200, 586 *A.*2d 85 (1991), this Court declined to apply the *Bagley* materiality test where the defendant had made a specific request for the suppressed evidence, applying instead the specific-request standard found in *Agurs. See also State v. Florez,* 134 *N.J.* 570, 593, 636 *A.*2d 1040 (1994) (noting, in *dicta,* two-tier approach that this Court has taken in *Brady* cases). However, the record in this case indicates that [the defendant] made no specific request for the *Brady* materials at issue. Accordingly, we need not resolve whether, as a matter of state law, we will continue to apply the less demanding *Agurs* test to the State's non-disclosures in a specific-request context. We recognize, however, that *Bagley*'s unitary standard is simpler to apply and that the difference between the *Agurs* and *Bagley* materiality standards may not be sufficiently substantial to justify retention of two different materiality tests for *Brady* violations. To the extent that *Marshall [I]* is inconsistent with that

> recognition, *Marshall [I]* may be understood to reflect our view that the defendant in that case had not established the materiality of the *Brady* violation even under the less demanding standard imposed by *Agurs* in specific-request situations. [*Knight, supra,* 145 *N.J.* at 247, 678 *A.*2d 642.]

We continue to adhere to the views we expressed in *Knight* concerning the advantages of the unitary *Bagley* standard, and we perceive no state-law basis on which to depart from the use of that standard in *Brady* cases. Thus, in this case we apply the *Bagley* test to all of the State's nondisclosures, including those that relate to documents that defendant had specifically requested before trial. In all instances, evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494 (plurality opinion of Blackmun, J.); *id.* at 685, 105 *S.Ct.* at 3385, 87 *L.Ed.*2d at 496 (White, J., concurring).

Defendant's ineffective-assistance-of-counsel claims are evaluated under the standards set forth in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). In that case, the United States Supreme Court explained that a "convicted defendant's claim that counsel's assistance was so defective as to require a reversal of a conviction or death sentence has two components." *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. "First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense." *Ibid.; see State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting *Strickland* test and "recogniz[ing] the soundness and efficacy of both the substance and formulation" of that test in defining state constitutional guarantee of effective assistance of counsel).

To establish that defense counsel was constitutionally "deficient," the defendant must persuade the court that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. More specifically, the defendant must show that "counsel's

representation fell below an objective standard of reasonableness."
*Id.* at 687–88, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. The *Strick-land* Court emphasized that "[j]udicial scrutiny of counsel's perfor-mance must be highly deferential." *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. A court evaluating a claim of ineffective assistance of counsel must avoid second-guessing defense counsel's tactical decisions and viewing those decisions under the "distorting effects of hindsight." *Ibid.* Because of the inherent difficulty in evaluating defense counsel's performance solely on the basis of the circumstances existing at the time of trial, the *Strickland* Court admonished courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Ibid.*

The second prong of a meritorious *Strickland* claim, the prejudice component, "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. Specifically, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional er-rors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. In making that evaluation, the court must consider the quantum and quality of evidence. As the *Strickland* Court noted, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 699.

Before turning to the merits of the claims raised in defendant's petition for PCR, we also address the preliminary showing that a defendant must make to obtain an evidentiary hearing on PCR claims. Although no PCR rule requires that evidentiary hearings be held on PCR petitions, *Rule* 3:22–10 recognizes that the PCR court may exercise its discretion to conduct evidentiary hearings at which oral testimony is taken.

See *Preciose, supra,* 129 *N.J.* at 462, 609 *A.*2d 1280. Post-conviction relief "courts ordinarily should grant evidentiary hearings ... if a defendant has presented a *prima facie* [case] in support of post-conviction relief." *Ibid.* To establish such a *prima facie* case, the defendant must demonstrate a reasonable likelihood that his or her claim will ultimately succeed on the merits. *See id.* at 463, 609 *A.*2d 1280.

Thus, in determining the propriety of an evidentiary hearing, the PCR court should ascertain whether the defendant would be entitled to post-conviction relief if the facts were viewed "in the light most favorable to defendant." *See id.* at 462–63, 609 *A.*2d 1280. If that inquiry is answered affirmatively, then the defendant generally is entitled to an evidentiary hearing in order to prove the allegations. We observe, however, that there is a pragmatic dimension to the PCR court's determination. If the court perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to post-conviction relief, see *State v. Flores,* 228 *N.J.Super.* 586, 590, 550 *A.*2d 752 (App.Div.1988), *certif. denied,* 115 *N.J.* 78, 556 *A.*2d 1220 (1989), or that the defendant's allegations are too vague, conclusory, or speculative to warrant an evidentiary hearing, see *Preciose, supra,* 129 *N.J.* at 462–64, 609 *A.*2d 1280; *State v. Odom,* 113 *N.J.Super.* 186, 192, 273 *A.*2d 379 (App.Div.1971), then an evidentiary hearing need not be granted.

In response to an argument made by defendant in this case, we further note that an evidentiary hearing should not be granted for the purpose of permitting a defendant to investigate whether the State has failed to deliver discoverable materials to the defendant. The purpose of an evidentiary hearing is to permit the defendant to prove that he or she was improperly convicted or sentenced; it is not an occasion for the defendant to question witnesses in an indiscriminate search for additional grounds for post-conviction relief. In Section V, *infra,* we explain the proper means for obtaining discovery in PCR proceedings.

IV

## THE MERITS OF DEFENDANT'S PETITION FOR POST–CONVICTION RELIEF

### A. ALLEGED ERRORS RELATING TO THE TESTIMONY OF BILLY WAYNE MCKINNON

We observed in *Marshall I, supra,* that the testimony of co-defendant Billy Wayne McKinnon "was the most incriminating evidence against Marshall," 123 *N.J.* at 28, 586 *A.*2d 85, and that McKinnon's credibility was the "most critical issue at trial," *id.* at 156, 586 *A.*2d 85. McKinnon directly contradicted Marshall's claim of innocence by testifying that Marshall had hired him not to investigate his wife but to kill her. McKinnon's testimony provided a detailed account of his dealings with Marshall and the prearranged plan to kill Maria Marshall under circumstances that would create the appearance of a robbery gone awry. *See id.* at 28–30, 41–49, 586 *A.*2d 85. We determined that "the evidence at trial indisputably established that McKinnon, who had been hired and paid by Marshall and had met with Marshall at Harrah's on the night of the murder, had been present at the crime scene and had participated in the murder of Marshall's wife." *Id.* at 30, 586 *A.*2d 85. Defendant now raises thirty-two claims that allege errors relating to McKinnon's testimony and defense counsel's impeachment of that testimony.

### 1. McKinnon's Plea Agreement

#### (A.72, A.76–77, A.83, B.5, E.23)

The six claims in this subcategory include four alleged *Brady* violations consisting of the State's failure to disclose certain documents concerning expenses incurred by the State on behalf of McKinnon or his family. Also included is one claim of ineffective assistance of counsel relating to counsel's failure to renew, prior to McKinnon's testimony, defendant's motion for discovery after the State had failed to disclose any discovery concerning financial accommodations made on McKinnon's behalf. The final claim

addressed in this subcategory alleges that McKinnon's plea agreement itself violated defendant's constitutional rights, because it gave McKinnon "irresistible reasons to provide perjured testimony against his co-defendants."

As we recounted in *Marshall I*, McKinnon, indicted for conspiracy to murder Maria Marshall and for purposely or knowingly causing the death of Maria Marshall as an accomplice, pled guilty only to conspiracy to commit murder, and was sentenced to five years imprisonment in exchange for his testimony at trial. See 123 *N.J.* at 27, 41, 586 *A.*2d 85.

> The [plea] agreement was introduced in evidence and read to the jury. McKinnon agreed to give a full statement identifying everyone involved in the murder of Maria Marshall, to waive immunity, and to testify before a grand jury and at the ensuing trial. In return, McKinnon would be permitted to plead guilty to conspiracy to commit murder, stipulated to be a non-Graves Act offense, the State would recommend a term not in excess of five years without parole ineligibility to be served for security purposes at the State Prison in Clinton, and the prosecutor's office would recommend that he be paroled at the earliest possible date. The State also agreed to relocate his family to a safe location for their protection, and to support their entry into the witness-protection program.
>
> [*Id.* at 41, 586 *A.*2d 85.]

We also observed that

> McKinnon was subjected to extensive cross-examination, defense counsel emphasizing particularly the generous terms of his plea bargain, which would allow McKinnon to be paroled soon after the completion of the trial. [Co-defendant] Thompson's counsel pressed McKinnon to concede that the State would not have offered McKinnon such generous terms if he had been the "shooter," and McKinnon acknowledged that no evidence other than his testimony implicated Thompson in the murder. Thompson's counsel questioned McKinnon persistently about his explanation of Thompson's role in the homicide, implying that McKinnon himself had murdered Mrs. Marshall and had fabricated Thompson's involvement in order to negotiate a favorable plea bargain.
>
> [*Id.* at 49, 586 *A.*2d 85.]

In *Marshall I*, we considered the materiality of the nondisclosure of certain documents concerning expenses incurred by the State on behalf of McKinnon's family and determined that "there [wa]s no reasonable possibility that the further impeachment of McKinnon by reference to the financial support his family received from the State would have affected the verdict." *Id.* at 207, 586 *A.*2d 85. We briefly recount the circumstances leading to our

adjudication of that issue on direct appeal to provide context for our consideration of defendant's similar claims before us on PCR review.

Defendant's pretrial discovery motion included a demand that the State disclose

[a]ny and all considerations or promises of consideration given to or on behalf of the witnesses or expected or hoped for by the witnesses. By "consideration", defendant refers to absolutely anything, whether bargained for or not, which arguably could be of value or use to a witness or to persons of concern to the witness, including but not limited to * * * criminal, civil or tax immunity grants; and anything else which could arguably reveal an interest, motive or bias in the witness in favor of the plaintiff or against the defense or act as an inducement to testify or color testimony.

[*Id.* at 171, 586 *A.*2d 85.]

Approximately three years after the trial concluded, we granted defendant's motion for a hearing to determine whether the State's failure to disclose certain documents had violated the strictures of *Brady, supra.* See *Marshall I, supra,* 123 *N.J.* at 171–72, 586 *A.*2d 85. During the course of that hearing, the trial court ordered that the State produce its entire correspondence file for inspection. Defense counsel reviewed the file and discovered what appeared to be additional *Brady* material concerning expenses incurred by the State on behalf of McKinnon and his family. *See id.* at 181, 188–89, 205, 586 *A.*2d 85. Specifically, counsel found two letters in which the Ocean County Chief of Detectives had requested reimbursement from the New Jersey State Police for monies to house and to otherwise assist McKinnon's family during the trial (the "McKinnon letters"). *See id.* at 205, 586 *A.*2d 85. Defendant argued that had the letters been produced prior to McKinnon's testimony, they could have been used to impeach his credibility, which conceivably could have affected the outcome of the trial. *See ibid.*

We determined that

there [wa]s no reasonable possibility that the further impeachment of McKinnon by reference to the financial support his family received from the State would have affected the verdict. McKinnon's fundamental interest in testifying was to obtain a reduction of charges against him from capital murder to conspiracy, thereby reducing his maximum possible punishment from a death sentence to a five-year

prison term with no parole disqualifier. Those facts were clearly conveyed to the jury during defense counsel's cross-examination of McKinnon. Any possible incremental effect on McKinnon's credibility from the additional revelation that financial accommodations were made to support his family would have been merely cumulative.... McKinnon's plea bargain included an undertaking by the prosecutor to recommend McKinnon's acceptance in the Federal Witness Protection program, see 18 *U.S.C.A.* §§ 3521 to –28, which specifically authorizes the payment of basic living expenses for an immediate family member of a protected witness. 18 *U.S.C.A.* § 3521(b)(1)(D). We conclude that there was no reasonable possibility that a different verdict would have arisen had the letters been disclosed. We therefore reject defendant's claim that the State's failure to have disclosed the McKinnon letters requires reversal of defendant's conviction. *See* [*State v.*] *Carter,* ... 91 *N.J.* [86,] 114–15 [449 *A.*2d 1280 (1982) ].

[123 *N.J.* at 207, 586 *A.*2d 85.]

■ As noted above, defendant's petition for post-conviction relief includes four *Brady* claims relating to the nondisclosure of certain documents concerning expenses incurred on behalf of McKinnon and his family. Two of those claims allege the nondisclosure of the McKinnon letters; those claims are dismissed under *Rule* 3:22–5. The remaining two claims allege the nondisclosure of an internal memorandum from State Investigator Susan Brandt to Prosecutor Edward Turnbach concerning lodging and meals provided to McKinnon's family on May 23 and 24, 1985 (the "Brandt memorandum"), and an accounting of the expenses incurred by Investigator Brandt on those dates and referred to in the Brandt memorandum. We reject those two claims for the same reasons that we rejected, in *Marshall I, supra,* defendant's claims based on the nondisclosure of the McKinnon letters: "[T]here [i]s no reasonable possibility that a different verdict would have arisen had the [documents] been disclosed." 123 *N.J.* at 207, 586 *A.*2d 85. As we explained in *Marshall I,* "[a]ny possible incremental effect on McKinnon's credibility from the additional revelation that financial accommodations were made to support his family would have been merely cumulative." *Ibid.*

■ Defendant also argues, based on the belated discovery of the McKinnon letters and the Brandt memorandum, and the fact that the State has never provided the expense accounting referred to in the Brandt memorandum, that he is entitled to an evidentia-

ry hearing at which he "can subpoena the testimony of [Ocean County Prosecutor's Office] representatives ... [to] establish the extent of benefits McKinnon received which were hidden by the State." We reject defendant's claim as speculative, and we note that the alleged nondisclosure would be immaterial. See *ibid.* We also reject defendant's claim of ineffective assistance of counsel based on counsel's failure to renew defendant's discovery motion seeking disclosure of financial accommodations made on behalf of McKinnon after the State failed to furnish any such discovery to defendant prior to McKinnon's testimony. We conclude that any failure by counsel in that regard was immaterial to the outcome of the trial, in view of the immateriality of the nondisclosure of such information.

■ The final claim in this subcategory contends that the State's plea agreement with McKinnon violated defendant's due-process rights because it allegedly "provided McKinnon irresistible reasons to provide perjured testimony against his co-defendants." We determine that that claim is wholly without merit. That McKinnon may have been motivated to lie does not establish that McKinnon in fact perjured himself concerning material aspects of his testimony against Marshall. In addition, defendant cites no legal precedent that would preclude the State from entering into a plea agreement with one co-defendant in exchange for his or her truthful testimony against other co-defendants, nor are we aware of any. In that regard, we note that the State's plea agreement with McKinnon was conditioned on McKinnon's "truthful cooperation ... and ... truthful testimony."

## 2. Other Claims Relating to McKinnon's Credibility

(A.14, A.75, A.80, A.82, A.99–101, B.6, B.10, B.41, B.74–77, B.84–88, E.15, F.6, F.23–24)

Defendant raises a myriad of other claims alleging that various errors precluded the effective impeachment of McKinnon's credibility. The twenty-three claims in this subcategory include seven alleged discovery violations, one claim of prosecutorial misconduct,

twelve allegations of ineffective assistance of counsel, and three "miscellaneous" claims. We determine that all of the claims lack merit.

Defendant's *Brady* claims include an allegation that the State failed to disclose information in its possession concerning McKinnon's cooperation with federal law-enforcement authorities in connection with unrelated criminal investigations in other jurisdictions. Defendant argues that the fact of McKinnon's cooperation with federal authorities, whether or not based on charges filed against him, was discoverable and improperly suppressed. We disagree. We conclude that such information, if it existed, would have been immaterial to the outcome of the trial. We also note that Lieutenant James Churchill, who supervised the investigation into the murder of Maria Marshall, stated in an affidavit prepared at the direction of the PCR court that he was "not aware that there were any charges or criminal investigations pending against McKinnon at the time of his cooperation with the FBI, or at the time of his entry into the federal witness program." We are satisfied, therefore, that the State did not suppress other-crimes evidence that could have been used to impeach McKinnon. We therefore reject defendant's claim and related request for an evidentiary hearing. We also reject as speculative defendant's claim that the State suppressed evidence that McKinnon was dangerous, and we observe that such evidence would not have affected the outcome of the trial in view of the jury's knowledge that McKinnon was a co-conspirator in a plot to commit murder.

Defendant also alleges that the State failed to produce the "original notes" prepared by Lieutenant Churchill and Detective John Petracca during their interrogations of McKinnon in December 1984. In view of the State's certification to the PCR court that Churchill and Petracca did not take contemporaneous notes while interrogating McKinnon and that such notes therefore do not exist, we dismiss defendant's claim as wholly without merit. We likewise reject defendant's suggestion that trial counsel was remiss in not seeking production of the original interrogation

notes prior to cross-examining McKinnon, because defendant cannot have been prejudiced by a failure of counsel to request what did not exist.

Defendant's remaining discovery claims in this subcategory relate to the State's investigation of other co-conspirators and suspected co-conspirators. Defendant alleges that the State failed to disclose the Louisiana criminal records of co-defendant Larry Thompson's brother, Steven Thompson; its request to the FBI in October 1984 to compare the fingerprints of Steven Thompson and one James Otis Howard with latent fingerprints lifted from Marshall's car; and other information in the State's possession in October 1984 causing it to suspect the involvement of James Otis Howard in the Marshall murder. The essence of those claims is that the State allegedly suppressed information casting doubt on McKinnon's testimony that Larry Thompson was the triggerman, and that if defendant had possessed such information at trial, he could have demonstrated that McKinnon lied about Thompson's involvement in the murder, which would have cast doubt on McKinnon's testimony against Marshall. We determine that defendant's claims are patently without merit. The jury's acquittal of Thompson reveals that it did not accept McKinnon's account of Thompson's involvement in the murder. That disbelief, however, apparently did not lead the jury to reject McKinnon's account of Marshall's involvement. We are satisfied that further impeachment of McKinnon on the subject of Thompson's involvement would have been immaterial to the outcome of the trial.

We likewise dismiss defendant's claims of ineffective assistance of counsel relating to counsel's failure to move for severance of defendant's trial from that of co-defendant Larry Thompson, his failure to request full discovery from the State concerning Steven Thompson, his failure to conduct his own investigation into Steven Thompson, and his failure to elicit evidence concerning Steven Thompson's presence in New Jersey. We regard as meritless defendant's speculation that counsel's failure to move for severance was based on a desire not to interfere with Larry Thomp-

son's defense strategy. We also find meritless defendant's argument that severance would have facilitated cross-examination of McKinnon concerning his relationship with other law-enforcement agencies and his information about Steven Thompson.

Defendant also claims that the State's suppression of the complete report of its interviews with Larry Thompson's alibi witnesses deprived defendant of information critical to his defense. Specifically, defendant alleges that the State improperly withheld information pertaining to the credibility of Thompson's alibi witness Angela Gallien. Defendant argues that he was entitled to such information on the theory that evidence discrediting Thompson's alibi witnesses had the effect of bolstering McKinnon's credibility, while evidence enhancing the credibility of alibi witnesses had the effect of discrediting McKinnon. Defendant therefore argues that the failure to provide such information deprived him of the ability to prepare his defense. We are satisfied that defendant's claim is without merit. As noted, the jury apparently rejected McKinnon's testimony against Thompson and accepted Thompson's alibi defense while convicting Marshall. Thus, the nondisclosure of additional information pertaining to the credibility of Angela Gallien or Thompson's other alibi witnesses would not have affected the outcome of the trial in respect of Marshall. For the same reasons, we dismiss defendant's related claims of prosecutorial misconduct and trial error in connection with the State's impeachment of Gallien.

Defendant asserts two claims of ineffective assistance of counsel alleging that counsel failed to cross-examine McKinnon adequately concerning McKinnon's preparation for trial and the length of McKinnon's interrogation prior to giving a taped statement to investigators. Defendant argues that those areas of inquiry would have demonstrated that McKinnon's taped statement to investigators and his trial testimony consisted of coached and rehearsed statements tailored to the State's theory of the case. We conclude that both claims should be dismissed on the merits without an evidentiary hearing. Direct and cross-examina-

tion of McKinnon established that McKinnon had met with State investigators on three or four separate occasions prior to giving his taped statement, and counsel for both defendant and Thompson cross-examined McKinnon at length concerning the circumstances leading up to his formal statement. In addition, Thompson's counsel questioned McKinnon specifically about the amount of time he had "spen[t] with the law enforcement people going over the story and smoothing it out before it was finally reduced" to the form of a formal statement, and repeatedly suggested that the investigators had tailored McKinnon's statement by asking him leading questions. Concerning the extent of McKinnon's pretrial preparation, Marshall's counsel elicited that McKinnon had reviewed his plea agreement, taped statement, and grand jury testimony prior to testifying, and Thompson's counsel insinuated that McKinnon's testimony was well-rehearsed. Thus, the jury was informed of the circumstances of McKinnon's taped statement and the nature of his pretrial preparation.

Defendant also alleges that counsel's failure to request and obtain prior to trial the tape recording of McKinnon's taped statement, to compare it with the written version supplied in discovery, and to interview McKinnon prior to trial concerning his taped statement, demonstrate a lack of adequate preparation for trial. Defendant argues that had counsel listened to the nuances of speech on the tape recording, he would have been better prepared to cross-examine McKinnon and the State's investigators concerning whether McKinnon's statement was the product of prompting by the investigators. We are satisfied that any alleged ineffectiveness of counsel in that regard was immaterial to the outcome of the trial and we therefore dismiss the claims without an evidentiary hearing. As noted, counsel for both defendant and Thompson cross-examined McKinnon at length about his statement. Both lawyers inquired whether the State's investigators had supplied McKinnon with information prior to taking his statement or had coached or prompted him during that statement.

Four of defendant's claims concern the admission into evidence of the transcripts of McKinnon's taped statement and grand jury testimony. Defendant asserts that neither item of evidence was admissible and that counsel's failure to object to their admission prejudiced defendant because the transcripts improperly bolstered McKinnon's testimony and credibility. Defendant also asserts that he is entitled to an evidentiary hearing to establish that counsel had no strategic reason for failing to object to the admission of those items. Defendant's claims are without merit.

As we have noted, at various times throughout McKinnon's cross-examination counsel for both defendant and Thompson attempted to establish that McKinnon's taped statement, grand jury testimony, and trial testimony were coached. During questioning by Thompson's counsel, the prosecutor objected, arguing that if counsel sought to introduce portions of McKinnon's taped statement to demonstrate the leading nature of the investigators' questions, then the whole statement should be admitted. Although counsel for both Thompson and defendant objected to the statement being admitted into evidence as a defense exhibit, neither objected to admitting the statement into evidence at that time as a State exhibit. Similarly, when Thompson's counsel cross-examined McKinnon concerning his grand jury testimony, the State offered the transcript of that proceeding into evidence without objection by either defense counsel.

In our view, admitting into evidence McKinnon's grand jury testimony and taped statement was entirely proper because of the extent to which counsel for both defendants sought to elicit McKinnon's testimony at trial concerning parts of both of those documents. *See State v. James*, 144 *N.J.* 538, 554, 677 *A*.2d 734 (1996) ("When a witness testifies on cross-examination as to part of a conversation, statement, transaction or occurrence, under the doctrine of 'completeness' the party calling the witness is allowed to elicit on redirect examination 'the whole thereof, to the extent it relates to the same subject matter and concerns the specific matter opened up.'") (quoting *Virgin Islands v. Archibald*, 987

*F.*2d 180, 188 (3d Cir.1993)); *United States v. Walker,* 421 *F.*2d 1298, 1299 (3d Cir.), *cert. denied,* 399 *U.S.* 931, 90 *S.Ct.* 2261, 26 *L.Ed.*2d 799 (1970). We are therefore satisfied that defendant's claims of ineffective assistance of counsel in that regard are without merit and we also reject defendant's related claims that the admission of the documents constituted reversible error.

The last set of claims in this subcategory includes four allegations of ineffective assistance of counsel arising from counsel's alleged failure to investigate and obtain independent evidence impeaching McKinnon's testimony or credibility. We determine that all four claims are without merit.

■ One claim involves counsel's failure to produce at trial evidence demonstrating that McKinnon could not have purchased rubber gloves from a hardware store in the Atlantic City area late in the evening on the night of the murder, because such stores closed by 5:00 or 5:30 p.m. We note that McKinnon's testimony concerning the time and place of purchase of the gloves was vague. Thus, it is unlikely that investigation by counsel in that regard would have been useful. We also note that counsel for Thompson effectively cross-examined McKinnon regarding his purchase of the gloves and remarked in summation that McKinnon's story about the gloves was not believable. We are therefore satisfied that defendant has failed to establish a *prima facie* case of ineffective assistance in view of the clear lack of prejudice of any failure of counsel in regard to the gloves.

■ Defendant's second claim involves counsel's failure to present the testimony of James Rikeman, who had told State Police investigators that he observed a car bearing an out-of-state license tag exit the Oyster Creek Picnic Area at a high rate of speed on the night of the murder. Rikeman's statement to investigators contradicted McKinnon's testimony that McKinnon had pulled out of the picnic area slowly and then had proceeded onto the Garden State Parkway at "normal speed, 55 miles" per hour. Had Rikeman testified at trial, however, his testimony would have been merely cumulative, in view of the testimony of

State's witness Christine Hilton indicating that she had observed a white Cadillac come "flying out of the rest area" at about 1:00 a.m. on September 7th. We note also that trial counsel relied on Hilton's testimony in summation to argue that McKinnon had lied, not only about the significant events in his story, but also about the less important facts. Thus, defendant's claim of ineffective assistance is without merit.

We also reject defendant's claim of ineffective assistance concerning counsel's attempt to cross-examine McKinnon about his alleged involvement in unrelated fraudulent acts. On direct appeal, we determined that the trial court properly had excluded counsel's cross-examination of McKinnon in that regard. See *Marshall I, supra,* 123 *N.J.* at 105, 586 *A.*2d 85. Defendant now argues that counsel's failure to establish an adequate foundation for the proposed cross-examination and his failure to provide discovery to the State concerning McKinnon's involvement in the alleged fraud constitutes ineffective assistance of counsel. We disagree. The proposed cross-examination was not excluded because of a failure of discovery or a failure of foundation; it was excluded because the alleged fraud was neither the subject of a criminal conviction nor part of a common plan or scheme involving the murder of Mrs. Marshall, and also because that line of questioning had the capacity to mislead the jury. See *ibid.* Defendant has presented no new information that would change our earlier determination.

Defendant's final claim in this subcategory alleges that counsel was ineffective for failing to obtain a statement from Ransdell Keene, attorney for co-conspirator Robert Cumber, concerning an alleged discussion between Keene and McKinnon about immunity. Other than the fact that counsel elicited during cross-examination of McKinnon that McKinnon had met with Keene while in jail in Louisiana, defendant fails to present any documentation, such as a statement from Keene, to support defendant's claim. Thus, we conclude that defendant has failed to establish a *prima facie* case of ineffective assistance of counsel.

### 3. McKinnon's Telephone Call to Robert Cumber

(B.68, F.4)

After the conclusion of McKinnon's testimony, counsel and the court learned that McKinnon had placed a telephone call to co-defendant Robert Cumber an hour or so after being excused from the witness stand. Cumber's counsel provided counsel and the court with an affidavit by Cumber setting forth the content of the conversation. According to Cumber's affidavit, a person identifying himself as Billy Wayne McKinnon had called Cumber and said that he "was sorry for all the trouble" he had caused, and encouraged Cumber to "make a deal." Cumber told the caller "that [Cumber] had been used and that McKinnon had told lies about [Cumber's] involvement." The caller "then said that he was sorry but that he was now telling the truth and he has already stated in Court that [Cumber] did not know anything" about the plan to kill Maria Marshall.

Counsel for both defendant and Thompson made a motion before the trial court to recall McKinnon to the stand for cross-examination concerning the call to Cumber. The court agreed with counsel that the telephone call was relevant to McKinnon's credibility, but declined to recall McKinnon for further cross-examination. Instead, the court ruled that defense counsel could call McKinnon as a witness at the conclusion of the State's case. Counsel for both defendant and Thompson then sought a ruling concerning whether they would be permitted to ask McKinnon leading questions or treat him as a hostile witness. The court declined to make a prospective ruling about the manner of questioning on the ground that it was possible that the examination of McKinnon would proceed without objection. Neither defendant's counsel nor Thompson's counsel called McKinnon as a witness.

Defendant now raises two claims related to McKinnon's call to Cumber. First, defendant claims that counsel's failure to request a hearing to examine McKinnon concerning the call constituted ineffective assistance of counsel. Second, defendant

claims that the trial court's failure to conduct such a hearing constituted reversible error. We regard those claims as wholly without merit in view of counsel's motion to recall McKinnon for further cross-examination, the court's ruling that counsel was free to call McKinnon as a witness, and counsel's failure to do so. We also note that Cumber's affidavit concerns only McKinnon's testimony about Cumber's involvement in the murder and is silent regarding the truthfulness of McKinnon's testimony concerning defendant's involvement. We are therefore satisfied that the failure to examine McKinnon either at trial or at a separate hearing regarding his call to Cumber was immaterial to the outcome of the trial.

### 4. Impact on the Penalty Phase

(E.10)

Defendant's final claim in this category alleges that the State's failure to disclose all of the evidence that could have been used to impeach State's witnesses McKinnon and Kraushaar violated defendant's right to a fair and reliable penalty-phase trial "[b]ecause of the jury's inherent right to reject a death sentence on the basis of 'lingering' or 'residual' doubt." We have determined, both in this appeal and on direct appeal, that the State's suppression of evidence related to the impeachment of McKinnon, *see supra* at 159–65, 690 *A*.2d at 36–38; *Marshall I, supra,* 123 *N.J.* at 205–07, 586 *A*.2d 85, and the impeachment of Kraushaar, *see infra* at 200–05, 690 *A*.2d at 56–59; *Marshall I, supra,* 123 *N.J.* at 199–205, 586 *A*.2d 85, was immaterial to the outcome of defendant's trial. We are satisfied that that finding applies to the penalty phase of the trial as well as to the guilt phase.

### B. ALLEGED ERRORS RELATING TO DEFENSE INVESTIGATOR RUSSELL KOLINS

(A.10, B.12, B.70–73, B.80–83, B.143, B.183, B.195, B.212, B.223)

The fifteen claims in this category concern trial counsel's employment of Russell Kolins as a private investigator on behalf of

defendant. Adjudicating the claims on the merits, we conclude that all of them should be dismissed without an evidentiary hearing. We recount the circumstances of Kolins's involvement in the case to provide context for our discussion of defendant's claims.

Marshall testified on direct examination that Kolins had been retained by defendant's trial counsel, Glenn Zeitz, to conduct an investigation on Marshall's behalf. According to Marshall, "[s]ometime after [September] 22nd it was decided that [Kolins] should go down to spend the day [in Louisiana] to, I guess, just investigate or to check around, see what was going on down there." Marshall testified that he had spoken with Kolins by telephone on September 26 and learned during that conversation that Robert Cumber had been arrested and that the person Marshall knew as "Jimmy Davis" was actually Billy Wayne McKinnon. In response to defense counsel's question whether "it [was] ever agreed or suggested by you or anyone that the purpose for [Kolins] being down there was to in any way, shape or form get together with McKinnon or anyone on McKinnon's behalf to create any kind of story," Marshall testified, "Absolutely not."

The State cross-examined Marshall about his telephone conversation with Kolins. The prosecutor suggested that Kolins had read Marshall a statement prepared by McKinnon that purported to explain McKinnon's activities in New Jersey without implicating either McKinnon or Marshall in Maria Marshall's murder. Marshall denied that Kolins had read McKinnon's statement to him during the September 26 telephone call.

Kolins testified on Marshall's behalf. According to Kolins, he had flown to Louisiana on September 26 for the purpose of interviewing the person Marshall had hired to investigate his wife. Kolins testified that he had met "Jimmy Davis" and had been informed that he was Billy Wayne McKinnon. Kolins spoke with Marshall by telephone at 6:30 p.m. on September 26 to inform him of the developments in the investigation and to request permission to extend his stay in Louisiana. According to Kolins, about an

hour or two after he ended his conversation with Marshall, Kolins received from McKinnon's attorney the exculpatory statement prepared by McKinnon. Kolins testified on both direct and cross-examination that he had not discussed the contents of McKinnon's statement with either Marshall or Zeitz on September 26.

During the State's cross-examination of Kolins, Kolins read McKinnon's statement into evidence. According to the statement, Marshall hired McKinnon in April or May 1984 to conduct an investigation of his wife, and McKinnon travelled to New Jersey twice, once in June and once in September, to conduct the investigation. The statement related that Marshall had sent McKinnon two money orders totalling $5500 early in the investigation, and paid him $800 in cash at their last meeting, at which time Marshall told McKinnon that "things were fine" and that Marshall could not afford to pay McKinnon any more money. McKinnon left New Jersey the next day, and later learned that New Jersey law-enforcement authorities were in Louisiana investigating Maria Marshall's death. The final paragraph of McKinnon's prepared statement exculpated both McKinnon and Marshall:

> Since the night I saw Rob Marshall at [Harrah's] Marina Casino in Atlantic City at approximately 8:30 or 9:00 o'clock p.m., I have not seen or heard from him since. At no time during any conversation that Rob Marshall and I had concerning his or her activities was it ever requested, suggested or intimated that he would like to dispose of his wife. He related to me quite the opposite. He appeared to me to be a well-organized, settled individual who is happy with his lifestyle and family ties but had a suspicion that his wife might have been having an affair which would cause [him] to seek someone outside of the community to conduct an unbiased and impartial investigation of her activities.

Following the admission into evidence of McKinnon's statement, counsel for co-defendant Thompson made an application to the court to recall McKinnon for cross-examination on the statement. The prosecutor objected on the ground that the State had not had an opportunity to conduct a direct examination of McKinnon concerning the statement. A lengthy colloquy ensued concerning the failure of Zeitz to produce the statement at an earlier point in the trial. Zeitz explained that he had not had the statement

earlier and that "from the beginning, [he had] been making every effort to try and get it." The court declined to rule at that time on the application to recall McKinnon and ordered the State to continue its cross-examination of Kolins.

The State proceeded to question Kolins about the whereabouts of McKinnon's prepared statement from the time that Kolins had received the document in September 1984 until the time that Kolins testified at trial. Kolins testified that the document was kept in a box that had been misplaced when he moved from one residence to another in February or March 1985, and that he had not found it until a few days prior to his testimony. Kolins also stated that he did not recall giving a copy of McKinnon's statement to Zeitz after returning from Louisiana, although he acknowledged that counsel may have seen the statement. Kolins denied that he had intentionally hidden the statement.

At the close of all testimony, the court again heard argument on Thompson's application to recall McKinnon. The State argued that if Thompson were given the opportunity to cross-examine McKinnon on the statement, the State should be permitted to recall Marshall for further cross-examination concerning the similarity between McKinnon's statement and Marshall's "suicide tape." Zeitz objected to having either McKinnon or Marshall recalled, contending that whether McKinnon's statement and Marshall's tape were similar was a matter of argument and that the jury, having received both statements in evidence, could draw its own conclusions.

Defense counsel also explained that Kolins had shown him McKinnon's prepared statement "a long time ago, over a year ago, and I've been asking him to locate the thing since then and I said it over and over again, and I don't think I have to continue defending myself about it." The prosecutor pointed out that even if that were true, Kolins had testified that he located the statement on the Monday prior to his testimony, which would have been when Marshall was testifying. The State therefore contended that Marshall's counsel had effectively withheld the statement

until after Marshall was finished testifying. The court ruled that because Thompson's counsel and Thompson were faultless, they should have the opportunity to pursue further cross-examination of McKinnon on the subject of his prepared statement and that, in the interest of justice, the State would be permitted to conduct further cross-examination of Marshall on that subject. Despite that ruling, however, neither Thompson's counsel nor the State recalled McKinnon or Marshall.

We address first defendant's claims involving defense counsel's failure to obtain and produce in a timely manner the statement that McKinnon gave to Kolins in September 1984. Defendant argues that counsel's failure to obtain the statement precluded a full and adequate cross-examination of McKinnon, and demonstrates his "pervasive lack of preparation" for trial. Defendant also argues that counsel's failure to provide the State a copy of the statement in timely fashion compromised counsel's integrity.

We conclude that defendant's claims are without merit and do not warrant an evidentiary hearing. In our view, any ineffectiveness of counsel in connection with the misfiling or misplacement of McKinnon's statement could not have had a material effect on the outcome of defendant's trial. The trial record reveals that, although a copy of McKinnon's statement was not produced by Zeitz until after both McKinnon and Marshall had testified, both Marshall's counsel and the State already knew of or had seen the statement. McKinnon had testified that after he learned that New Jersey law-enforcement authorities were in Louisiana investigating the murder, he fabricated an exculpatory statement purporting to explain his presence in New Jersey. He also testified that that statement was given to Kolins. On cross-examination, Zeitz had elicited from McKinnon that the statement was entirely McKinnon's creation and that McKinnon had not collaborated with anyone in creating it. In view of that testimony, and because the statement was ultimately placed in evidence and read into the record, we are satisfied that its late admission into evidence was immaterial. The jury had the benefit of the state-

ment itself, and counsel had the opportunity to present arguments concerning McKinnon's statement to the jury in summation.

We also dismiss defendant's claims alleging that the State engaged in a strategy of impugning Kolins's integrity by suggesting that Kolins was involved in a conspiracy to cover up Maria Marshall's murder and that Kolins's receipt of McKinnon's fabricated statement was in furtherance of that conspiracy. Defendant first contends that his counsel should have moved *in limine* to exclude evidence of McKinnon's statement because the statement was prepared after the dates of the murder conspiracy as charged in the indictment. Defendant also contends that counsel was ineffective in his response to the alleged efforts by the State to impugn Kolins's integrity. One such claim alleges that Zeitz should have requested a mistrial in response to the inference that Kolins travelled to Louisiana to arrange a cover story for Marshall. Another claim alleges that counsel should have called Kolins as a witness prior to calling Marshall and should have elicited from Kolins rather than Marshall the nature of Kolins's instructions and the purpose of Kolins's trip to Louisiana. In a third claim, defendant contends that Zeitz should have removed himself from the case to testify that he personally had directed the scope of Kolins's investigation and that it had not been his or Kolins's intention to secure a cover story for Marshall. A fourth claim concerns a comment by the prosecutor to defense counsel in the presence of the jury regarding whether Zeitz had instructed Kolins to conduct an investigation in Louisiana. And a fifth claim alleges that counsel should have called McKinnon's sister as a witness to establish that she had given McKinnon's statement to Kolins after Kolins spoke by telephone with Marshall.

We determine that all of those claims are without merit and that defendant has failed to establish by any of those claims a *prima facie* case of ineffective assistance of counsel. The trial record reveals that, during the State's examination of McKinnon, both Marshall's and Thompson's counsel objected on the ground that McKinnon's statement had been prepared subsequent to the dates

of the alleged conspiracy. In addition, both counsel vigorously objected to the inference that McKinnon had given Kolins the fabricated statement in furtherance of a conspiracy to cover up the murder. Zeitz argued that the State's examination of McKinnon could not be used "to cast some kind of shadow over the head of the defense investigator." In response, the prosecutor stated that he intended to elicit from McKinnon only that "[McKinnon] made up a story. He gave it to [Kolins] and that's it. I am not alleging that [Kolins] told him to make up the story." Following that colloquy, the court ruled that there was no showing that the proffered testimony was inadmissible. We conclude that the court's ruling was unquestionably correct and that defendant has failed to establish ineffective assistance of counsel in connection with the proffer of testimony concerning McKinnon's statement.

In addition, we decline to second-guess counsel's tactical decisions to call Marshall as a witness prior to calling Kolins, to elicit from Marshall the purpose of Kolins's investigation in Louisiana, and to decline to call McKinnon's sister as a witness. We also reject as wholly without merit the allegation that counsel could somehow have prevented the prosecutor from making an inappropriate remark concerning Kolins's trip to Louisiana, and we note that that remark was both fleeting and insignificant. The allegation that Zeitz should have taken the extreme measure of removing himself as counsel to testify about Kolins's role as defense investigator is equally without merit. We discern nothing in the record to support defendant's suggestion that counsel should have ended his representation in order to testify.

We also reject defendant's allegation of ineffective assistance of counsel involving counsel's failure to move for a mistrial or seek other relief following a comment by the prosecutor allegedly intended to denigrate Zeitz and Kolins. During defense counsel's cross-examination of the insurance examiner who examined defendant and Maria Marshall on the morning of September 6, 1994, counsel asked whether the witness knew the location of the original medical screening form that he had completed for defen-

dant. Upon learning that the form was in Sioux Falls, South Dakota at the offices of the insurance company, counsel paused to request the Court's assistance in obtaining the document. At that point the prosecutor remarked in the hearing of the jury, "Why don't you send Russ Kolins." Defendant contends that counsel's failure to seek relief following the prosecutor's remark constituted ineffective assistance of counsel. We disagree. The prosecutor's fleeting remark, although inappropriate, could not have materially affected the outcome of the trial.

Another allegation of ineffective assistance of counsel involves Zeitz's elicitation during cross-examination of McKinnon that McKinnon had tampered with a car rented by New Jersey State law-enforcement authorities who were in Louisiana to investigate the murder. McKinnon testified that while he was in a restaurant with his wife and Kolins, State Investigators Murphy and Church-ill had entered the restaurant. McKinnon then went outside to the parking lot and let the air out of the tires of the car he believed was rented by the State Investigators. Defendant argues that Zeitz's elicitation of that testimony diminished Kolins's credibility and therefore constitutes ineffective assistance of counsel. We disagree. McKinnon did not testify that Kolins was involved in the tampering, and we decline to question counsel's tactical decision to elicit McKinnon's admission that he had tampered with the State's car. We also note that during both direct and cross-examination of Kolins, Kolins emphatically denied any involvement in McKinnon's tampering with the State's car.

Defendant also contends that counsel should not have permitted Kolins to perform investigative work on behalf of co-defendant Thompson, because Thompson's interests were adverse to Marshall's. We reject that claim as wholly without merit. Kolins testified that during his investigation on behalf of Marshall he learned information that ultimately would be helpful to Thompson's defense. Kolins explained that at the request of Thompson's counsel and with the permission of Zeitz, he later shared that information, which concerned Thompson's alibi witnesses, with

Thompson's counsel. We will not second-guess counsel's decision to share information useful to the impeachment of defendant's chief accuser, McKinnon, and helpful to a co-defendant being jointly tried with defendant. A tactical decision of that nature does not, in our view, constitute deficient performance of counsel.

Two of defendant's claims concern a pretrial investigation of Kolins that was conducted by State law-enforcement officers after they learned that Kolins had been retained as a private investigator on behalf of defendant. The claims include an allegation of a discovery violation based on the State's failure to produce the police reports of that investigation, and an allegation of ineffective assistance of counsel based on Zeitz's failure to request or obtain prior to trial those police reports. We conclude that both of those contentions are entirely without merit. The State's investigative reports on Kolins disclose no information materially affecting Kolins's credibility, and the mere fact that Kolins was investigated by the State reveals no more than that the State engaged in thorough preparation for trial. Defendant could not have been prejudiced by counsel's failure to request that which had no capacity to affect the trial.

Lastly, we address defendant's allegations of ineffective assistance of counsel relating to Zeitz's continued reliance on Kolins as an investigator and witness for the defense despite Kolins's misplacement of McKinnon's statement, the State's alleged efforts to impugn Kolins's integrity, and McKinnon's testimony concerning the tampering with the State's car. Even assuming, *arguendo*, that Zeitz's continued reliance on Kolins was unreasonable in view of those facts and circumstances, we would conclude that defendant has failed to establish a *prima facie* case of ineffective assistance of counsel. Defendant fails to demonstrate either that Zeitz's continued reliance on Kolins had a material detrimental effect on the outcome of the trial or that Zeitz's retention of a different investigator probably would have led to a different result.

## C. ALLEGED ERRORS RELATING TO THE "SUICIDE TAPE" AND ITEMS SEIZED FROM DEFENDANT'S MOTEL ROOM

Defendant has raised thirty claims concerning the admission into evidence of an audio tape defendant recorded during an apparent suicide attempt and related issues concerning the seizure of items from his motel room. The factual context for those claims has been set forth in a prior opinion of this Court, *see Marshall I, supra,* 123 *N.J.* at 39–41, 62–73, 586 *A.*2d 85, and need be summarized only briefly here. We address the claims on their merits and determine that they should be dismissed without an evidentiary hearing.

On September 27, 1984, approximately one week after police had confronted defendant with their knowledge of his connection to McKinnon, police were informed that defendant had checked into the Best Western Motel in Lakewood, New Jersey. Investigators immediately established surveillance at the motel. At 11:30 p.m., defendant left his room and went to the front office of the motel. Investigator Mohel followed defendant and observed him at the front desk. After defendant returned to his room, Mohel spoke to the clerk who said that defendant had deposited letters in the outgoing mail tray. Mohel testified that he looked into the tray and saw two letters there. One was addressed to Joseph Dougherty, Esq. On the outside of the envelope, Mohel observed the writing: "To be opened only in the event of my death."

Mohel immediately seized the letters and telephoned for assistance. When uniformed officers arrived, they entered defendant's room and found him there asleep. Mohel woke defendant and asked him if he had taken anything. Defendant said that he had put a lethal dose of a sleeping medicine in a cup of soda, but that he had fallen asleep before drinking it. Defendant said that it had been his intention to commit suicide at the exact time his wife had been murdered, but that he had overslept.

The State obtained a search warrant to open the envelopes. Inside the envelope addressed to Dougherty, investigators found a

letter, a contract to sell some real estate, and an audio tape. The tape was dictated by defendant, and we previously have set forth its substance.

> The tape discussed Marshall's relationship with Kraushaar, his intention to leave Maria "within a month," his "spiral" of debt that "accelerated to almost * * * two-hundred thousand dollar[s] * * * that I was determined to pay off, but just couldn't seem to climb out," and his reasons for hiring [McKinnon] to investigate Maria. On the tape Marshall acknowledged that he had sent McKinnon $5,500 in two installments and had given him an additional $800 at Harrah's the night of the homicide. Marshall instructed Dougherty on the tape with respect to how various business, financial, and personal matters should be handled. Marshall expressed his intention to take his own life because he expected to be indicted and convicted for his wife's murder, even though he was innocent.

> [*Id.* at 40–41, 586 *A.*2d 85 (first alteration in original.) ]

### 1. Claims Based on Evidence Relevant to Whether the Tape Should Have Been Suppressed on the Ground That It Was Improperly Seized

### (A.74, A.78, B.17, D.6–8, D.10–11)

The trial court held a pretrial suppression hearing to determine the admissibility of the contents of the seized envelope, including the audio tape. A crucial issue was whether the initial seizure of the envelopes by Mohel was proper. The State attempted to show that the envelopes were in plain view when Mohel saw them, and that their evidentiary importance was apparent to the officers based on the writing on the outside of the letter addressed to Dougherty. Defendant challenged the State's version of the facts, claiming that the mail receptacle into which Marshall had placed the envelopes was a closed box with a slot, and that the officers could not have seen the envelopes inside the box. The warrantless seizure of the envelopes, according to defendant, violated his Fourth Amendment rights and the evidence they contained should have been suppressed.

Mohel and Zillah Hahn, the front desk manager of the motel, testified for the State that the motel's mail depository was " 'an open box that sat up on the counter' at the front desk." *Id.* at 64–65, 586 *A.*2d 85. Another investigator at the scene described it as

an "open tray." Hahn testified that the motel later began using a closed box with a slot on the top to collect outgoing mail. Mohel and Investigator Edward Murphy revisited the motel in 1985 and the owner, Henry Tajfel, retrieved the tray described by Mohel from a storage shed. Both the tray and the box that replaced it were admitted into evidence at the suppression hearing.

Defendant presented the testimony of Paul Rokoczy, the night manager who was on duty on the night of September 27th. Rokoczy testified that the closed box with the slot was the only mailbox that the motel had ever used. The mailman also testified. He stated that he had been delivering mail to the motel since 1978, that he had never seen the open tray, and that the closed box was the only depository he had ever used. Defendant also testified that the closed box was the one he had used on September 27. On cross-examination, Rokoczy admitted that Marshall may have placed his two envelopes on top of the mailbox. Investigator Murphy testified that Rokoczy had told him that the envelope with the tape would not fit through the slot. Lieutenant James Churchill testified that he had experimented with the closed box and the audio tape, and found that neither the original package nor the tape by itself would fit through the slot in the closed box.

The trial court resolved the conflict in the testimony in favor of the State. The court found that the open tray retrieved from the storage shed by Tajfel, or one very similar to it, was the one into which Marshall had placed the envelope containing the audio tape. The record shows that the court attached little weight to the testimony of the motel employees, relying instead on the testimony of the investigators because of their greater opportunity and motive to observe what type of mail receptacle had actually been used by Marshall. In particular, Rokoczy was found not to be a credible witness. This Court upheld the trial court's factual determination, finding that it was "amply supported" by the evidence in the record. *Id.* at 66, 586 *A.*2d 85.

Defendant's challenge to those determinations centers on two police memoranda, prepared in connection with the investigation,

that the State failed to disclose in response to defendant's discovery requests. One was written by Ocean County Police Chief P.J. Herbert, who was the officer in charge of the scene at the motel. Herbert left the motel before the events that give rise to defendant's claims took place. Thus his memorandum contains no evidence relevant to the legal issues raised by the petition and it need not be considered further.

The second was prepared by Investigator Murphy on August 23, 1985. It is addressed to Assistant Prosecutor Kelly and summarizes additional investigation undertaken by Murphy and Mohel. The existence of Murphy's memorandum was discovered by defense counsel during cross-examination of Mohel at the suppression hearing. The prosecutor refused to produce the memorandum, claiming that it was protected by the work-product doctrine. The trial court conducted an *in camera* review and agreed with the State's position. The memorandum was supplied to counsel on post-conviction relief pursuant to court order in July 1993, and the PCR court acknowledged that its prior ruling at trial was erroneous.

The Murphy memorandum recounts the visit to the motel by Murphy and Mohel on August 21, 1985, to collect evidence about the type of mail receptacle that was in use on the night Marshall's letters were seized. The officers first interviewed Zillah Hahn who indicated that the current mailbox was the closed box with the slot to insert mail. Hahn stated that the box had been built and installed by the owner of the motel, and that prior to the installation of that box a tray was used. Hahn could not say when the box replaced the tray.

According to the memorandum, Murphy and Mohel returned to speak with the owner, Tajfel, the next day. Tajfel told the officers that the closed box was put into use approximately two years previously, one year before the night Marshall attempted to mail his letters. Tajfel told the officers that, before the box had been put into use, a tray had been used to collect outgoing mail. Tajfel contacted a friend who had constructed the box for him. That

person confirmed Tajfel's recollection that the box had been made about two years previously. Tajfel was able to locate the tray, and the officers took possession of it. The officers also interviewed Rokoczy, who told them that the box had been in use on the night that Marshall was at the motel. Rokoczy recalled that Marshall had placed his letters on top of the box because they were too thick to fit through the slot. Rokoczy also stated that he had initially picked up the letters and handed them to Mohel after Marshall had placed them on the box.

After defendant received the disputed memoranda in 1993, he sent his own investigator to the Best Western motel to interview Tajfel. The defense investigator learned from Tajfel that the box builder, Ben Bogart, was a former employee, but that Tajfel believed that Bogart was deceased. Tajfel no longer remembered the details of his conversation with the investigators in 1985, but he recalled that he had answered their questions truthfully at the time. Defendant's trial counsel certified to the PCR court that if he had been permitted to see the Murphy memorandum he would have interviewed Tajfel and the box builder and produced them as witnesses at the suppression hearing.

Defendant claims that the failure to turn over the memoranda constituted a violation of the State's duty under *Brady, supra,* to provide to defendant material, exculpatory evidence. Whether evidence is material and thus subject to disclosure under the *Brady* rule is a mixed question of law and fact. *United States v. Pelullo,* 14 *F.*3d 881, 886 (3d Cir.1994); *United States v. Perdomo,* 929 *F.*2d 967, 969 (3d Cir.1991); *Carter v. Rafferty,* 826 *F.*2d 1299, 1306 (3d Cir.1987), *cert. denied,* 484 *U.S.* 1011, 108 *S.Ct.* 711, 98 *L.Ed.*2d 661 (1988). The lower court's decision in deciding what legal standard governs a *Brady* claim is reviewed *de novo. Pelullo, supra,* 14 *F.*3d at 886. If the correct standard is applied, the court's factual determination will be reversed only if clearly erroneous. *Ibid.*

The sole issue is whether the evidence provided by the memoranda was material for purposes of the *Brady* rule. In the typical

case, the trial court must weigh the probable impact of the withheld evidence on the jury's determination of guilt to determine whether it was material under *Brady*. As the Third Circuit has noted in the context of a direct appeal, the trial court's "weighing of the evidence merits deference ... especially given the difficulty inherent in measuring the effect of a non-disclosure on the course of a lengthy trial covering many witnesses and exhibits." *United States v. Price*, 13 *F*.3d 711, 722 (3d Cir.), *cert. denied*, 511 *U.S.* 1096, 114 *S.Ct.* 1863, 128 *L.Ed.*2d 485 (1994).

In this case, however, the evidence at issue is relevant to a collateral issue raised in a suppression hearing: whether Marshall's envelopes were in plain view and thus properly seized by the police. The finder of fact was the trial judge, not a jury. The same judge decided the *Brady* claim raised in the petition for PCR. We are thus faced with an unusual situation in which the original finder of fact has the opportunity to rule on the materiality of the withheld information, and thus whether there was a "reasonable probability that, had the [suppressed] evidence been disclosed to the defense, the result of the proceeding would have been different." *Knight, supra*, 145 *N.J.* at 244, 678 *A.*2d 642 (1996) (quoting *Bagley, supra*, 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494 (1985)). We believe that the PCR court's finding that the withheld information would not have changed its original determination is entitled to special weight in those circumstances.

Defendant would have us find that, because the trial judge ruled against him in the first proceeding, he has exhibited bias and should be disqualified from ruling on any claims concerning the suicide tape on PCR review. Defendant points to the court's ruling on the status of the Murphy memorandum as work-product and the court's refusal to give credence to defendant's attempts to impeach Churchill's testimony as evidence of the court's bias. However, bias is not established by the fact that a litigant is disappointed in a court's ruling on an issue. Beyond that argu-

ment, defendant makes no showing of bias on the part of the trial court, and we therefore reject that claim.

On post-conviction relief, the court again reviewed the Murphy memorandum. It found that the statements of Hahn and Rokoczy were consistent with their testimony at trial. Assuming that the testimony of Tajfel and Bogart would have been consistent with the statements recorded in the memorandum, the court found that the memorandum would have been merely cumulative, and less specific than the testimony of the defense witnesses who did testify.

Accordingly, the PCR court found that "[t]he evidence at the suppression hearing clearly led to the conclusion ... that [the tray] was the mail receptacle present and nothing contained in the memorandum of August 23, 1985, had the capacity to have affected that determination." Regarding defendant's argument that disclosure of the memorandum would have led to additional, favorable evidence from Tajfel, the court stated that Tajfel's testimony "could not have conceivably changed the result of the hearing."

We are satisfied that the standard of materiality applied by the PCR court was at least as protective of defendant's right under *Brady, supra,* to disclosure of the memo as the standard set forth in *Bagley, supra,* and *Knight, supra.* The lower court made clear that there was *no* chance that the result would have been different had defendant had access to the memorandum, and certainly not a "reasonable probability" that he would have prevailed at the suppression hearing.

The factual component of the judge's finding—that he would not have ruled differently had defendant had access to the withheld information—is not "clearly erroneous." At the suppression hearing, the court found that the conflicting evidence could support the conclusion that the motel's use of the tray and the mailbox could have overlapped, and that both might have been present at the front desk at the same time. Therefore, even if Bogart were available, the best defendant could hope for would be that Bogart

would testify authoritatively that he had built the slotted box for Tajfel before the night of September 27, 1984. That testimony would not directly contradict the testimony that Marshall had placed his letters into a tray. Defendant contends that he has also been deprived of Tajfel's testimony, because he no longer remembers the relevant details. However, like the hypothetical testimony of Bogart, even if Tajfel had testified that the box was placed in service before Marshall's stay at the Best Western, that testimony would have merely duplicated other testimony, and it would have been contradicted by other evidence that the trial court found to be credible.

Justice Handler's dissenting opinion asserts that "the only witnesses who consistently professed that the mail receptacle was an open tray were the two officers who had seized the tape." *Post* at 346, 690 *A.*2d at 130. That assertion ignores Zillah Hahn's trial testimony that the mail depository on the night in question had been an open box. That testimony was not contradicted by the Murphy memorandum, which states only that Hahn could not recall the date when the tray was replaced by the mailbox. That same assertion understates the significance of the Murphy memorandum's detailed reference to Paul Rakoczy's recollection that "the letters were on top of the mailbox because they were too thick to fit into the mail slot" and that to his best recollection "he actually picked up the letters and handed them to Investigator Mohel."

Finally, defendant has failed to undermine the testimony of Lieutenant Churchill, who stated that neither the envelope as it was retrieved from the motel with the tape and the letter inside, nor the tape by itself would fit through the slot in the closed mailbox. Defendant claims that Churchill wrongly performed his experiment with the tape inside its plastic cover, thus increasing its width so that it would not fit through the slot. Marshall testified that he had put the tape in the envelope without a cover, and defendant notes that the police inventory of the envelope did not mention a cover. However, Churchill testified concerning the chain of possession of the envelope and its contents, and stated

that when he tried to fit it through the mail box's slot the envelope was exactly as it had been retrieved from the motel. The trial court was entitled to disbelieve Marshall's testimony that there had been no cover on the tape and to conclude that the cover had been omitted from the police inventory. Churchill's testimony further undermines defendant's claim that the withheld memorandum was material for *Brady* purposes.

Accordingly, we uphold the ruling of the PCR court that the failure to turn over the memoranda did not violate defendant's *Brady* rights, on the ground that the withheld evidence was not material. Our finding on the *Brady* issue causes several of defendant's other claims to fall as well. Defendant claims that the failure to turn over the memoranda constituted substantive violations of his rights under the Fourth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution, and Article I, Paragraphs 1, 7, 10, and 12 of the New Jersey Constitution. Assuming that the failure to turn over the memoranda constituted a direct violation of those constitutional provisions, our conclusion that disclosing the memoranda would not have materially influenced the outcome of the suppression hearing indicates that those alleged violations would have been harmless.

Defendant also claims that his counsel was ineffective when he failed to have the Murphy memorandum held as an exhibit for appellate review of the trial court's decision that the memorandum was privileged work-product. That failure prejudiced defendant, he claims, because, if the work-product ruling had been reversed on direct appeal, defendant could have interviewed Tajfel when his memory was fresher and Bogart was still alive. This claim also fails on the ground that the lost testimony would not have affected the outcome of the hearing.

Finally, two of defendant's claims that fall within this category assert that the cumulative effect of the other violations entitles him to relief. In view of the lack of merit in the underlying allegations, we reject defendant's cumulative claims.

## 2. Claims Based on Evidence Relevant to Whether the Tape Should Have Been Suppressed on the Ground That It Was Subject to the Attorney–Client Communication Privilege

(A.87–88, D.1–4)

Defendant makes a series of claims based on the common premise that the seizure and search of the envelope and the admission of the audio tape into evidence violated defendant's right to the assistance of counsel and his privilege against disclosure of attorney-client communications. Defendant relies on the fact that Dougherty was an attorney and that the tape and the other enclosures in the envelope addressed, in part, matters in which Dougherty was to act on his behalf. The attorney-client relationship between Marshall and Dougherty concerned real estate and financial matters unrelated to defendant's criminal litigation. *Marshall I, supra*, 123 *N.J.* at 69, 586 *A.*2d 85. By the time of the incidents at the Best Western Motel, investigators were aware that defendant had retained attorney Glenn Zeitz to handle the impending criminal charges. Dougherty had expressly declined to represent defendant in the criminal case, agreeing that his law firm would assist defendant's criminal counsel with legal research only. *Ibid.*

In upholding the search warrant to open the envelope containing the tape, we held that the investigator's failure to include in the supporting affidavit that Dougherty was defendant's attorney was not improper because the record indicated that the officers believed that Dougherty, who was defendant's brother-in-law, was not representing defendant in the murder case. *Id.* at 70, 586 *A.*2d 85. We held that "[t]o whatever extent an attorney-client relationship between defendant and Dougherty may have existed at the time of the seizure, we are unpersuaded that the seizure of the envelope violated the attorney-client privilege." *Ibid.* Any attorney-client relationship was "undisclosed." *Id.* at 73, 586 *A.*2d 85. With regard to the content of the tape itself, we affirmed the trial court's holding that, "defendant was communicating with

Dougherty primarily as a trusted friend and relative, not as an attorney." *Ibid.*

A note was seized from defendant's motel room that read: "My name is Rob Marshall. Please contact my attorney Joseph Dougherty," and set forth a telephone number. At the suppression hearing, Mohel denied having seen the note previously. The record does not indicate which officer seized the note from defendant's motel room. The existence of the note was memorialized in an inventory of items seized from the motel room prepared by Investigator Daniel Mahoney on February 15, 1985, approximately five months after the incidents at the Best Western. Mahoney's inventory was not turned over to defendant until 1993 pursuant to a discovery request during the PCR proceeding.

Defendant argues on PCR review that the failure to turn over the inventory before trial deprived him of the opportunity to show that the investigators were aware of the existence of the note, and consequently that they knew the Dougherty envelope contained protected attorney-client communications. Defendant also claims that the omission of any reference to the existence of the note from Mahoney's search warrant affidavit invalidated the warrant. Based on the discovery of the inventory, defendant reasserts in PCR filings that the seizure of the envelope from the Best Western's mailbox, the failure to mention the note naming Dougherty as defendant's counsel in the search warrant affidavit, the issuance of the search warrant itself, and the admission of the tape into evidence violated his privilege against disclosure of an attorney-client communication and thus his constitutional right to the assistance of counsel. Defendant also claims that the failure to turn over the inventory before trial was a violation of the State's discovery obligations.

Several of defendant's claims based on attorney-client privilege fail because the content of the tape has been held not to constitute a privileged attorney-client communication. The fact that defendant wrote "Please contact my attorney Joseph Dougherty," might offer support to the argument that a professional

relationship existed between defendant and Dougherty, and the existence of the inventory would be relevant to the investigators' awareness of that relationship. However, the trial court noted, and we affirmed the proposition, that not every communication to one's attorney is a privileged attorney-client communication. *Marshall I, supra,* 123 *N.J.* at 73, 586 *A*.2d 85.

Obviously, the details of defendant's affair with Kraushaar and the sums he had paid McKinnon were not communicated in furtherance of any legal representation of defendant. Moreover, because Dougherty had declined to represent defendant in the criminal matter, defendant could have had no reasonable expectation that communications relevant solely to the murder were in furtherance of their professional relationship. Thus, even if it were conceded that defendant's instructions to Dougherty concerning the disposition of his financial affairs were pursuant to an attorney-client relationship, the admissions on the tape relevant to the criminal charges against defendant were not within the scope of the representation, and, therefore, were not privileged. *See also McCormick on Evidence* § 88, 322–24 (Strong ed., 4th ed.1992) (noting that consultation of attorney as business advisor or agent is not necessarily protected attorney-client communication).

The existence of the note and its implications concerning the subjective awareness of the officers of an attorney-client relationship between defendant and Dougherty cannot change the content or character of the communication recorded on the audio tape. Because it has been determined that there was no breach of confidentiality of a protected communication, admission of the tape into evidence did not violate defendant's attorney-client privilege. Because no attorney-client confidence was exposed, defendant's claim that seizing the tape and admitting it into evidence violated his right to counsel is also rejected.

Defendant argues that the omission from the affidavit in support of the warrant of the fact that police found the note naming Dougherty as defendant's attorney violated his Fourth

Amendment right against unreasonable searches. Defendant maintains that access to the inventory before trial would have helped him to establish that Mahoney intentionally had omitted the existence of the note from the affidavit and, furthermore, that Mahoney had notice of defendant's attorney-client relationship with Dougherty. Obviously, our holding in *Marshall I, supra,* that the warrant was not tainted by the failure to indicate in the supporting affidavit that there was a professional relationship between Dougherty and defendant, *see* 123 *N.J.* at 72–73, 586 *A.*2d 85, did not take into account the then-undisclosed inventory of the items found in the motel room. Furthermore, the fact that the content of the tape was later determined not to be a privileged attorney-client communication is not dispositive of whether the search warrant was properly issued. *See State v. Hutchins,* 43 *N.J.* 85, 100–01, 202 *A.*2d 678 (1964) (holding that search cannot be made lawful by product of search).

To mount a successful challenge to the warrant's supporting affidavit, defendant must prove by a preponderance of the evidence that the affiant intentionally or with reckless disregard for the truth included material, untrue information. *Franks v. Delaware,* 438 *U.S.* 154, 171, 98 *S.Ct.* 2674, 2684, 57 *L.Ed.*2d 667, 682 (1978). Material omissions in the affidavit may also invalidate the warrant. *State v. Stelzner,* 257 *N.J.Super.* 219, 235, 608 *A.*2d 386 (App.Div.), *certif. denied,* 130 *N.J.* 396, 614 *A.*2d 619 (1992). When a search intrudes on the attorney-client relationship, the special expectation of privacy in that relationship leads to heightened Fourth Amendment scrutiny. *See United States v. Mittelman,* 999 *F.*2d 440, 445 (9th Cir.1993); *National City Trading Corp. v. United States,* 635 *F.*2d 1020, 1025–26 (2d Cir.1980). However, a defendant's premises or possessions are not immune from search merely because they are associated with an attorney. *See Mittelman, supra,* 999 *F.*2d at 445 (noting that "[l]aw offices are not immune from search"). Instead, as with the examination of any warrant, we consider the totality of the circumstances to determine whether a warrant was issued consistently with the

dictates of the Constitution. See *State v. Novembrino*, 105 *N.J.* 95, 122, 519 *A.*2d 820 (1987).

Defendant claims that the discovery of the inventory entitles him, at a minimum, to a hearing before the PCR court to establish that Investigator Mahoney knew of the note when he prepared the warrant affidavit, and that the warrant is therefore invalid due to a material, intentional omission by the swearing officer. We reject that claim because we find that, even assuming that Mahoney knew of the existence of the note when he signed the affidavit, such an omission would not have been material. The fact that in the note defendant named Dougherty as "my attorney" would not have established that Dougherty was defendant's attorney for the purposes of the impending criminal proceedings. In view of the fact that defendant had already retained criminal counsel, Mahoney reasonably could have assumed that the envelope contained admissions beyond the scope of whatever attorney-client relationship defendant had with Dougherty.

Moreover, because of the "attenuated" nature of defendant's attorney-client relationship with Dougherty, *Marshall I, supra*, 123 *N.J.* at 72, 586 *A.*2d 85, even if Mahoney had disclosed the contents of the note in the warrant affidavit, a correct weighing of the totality of the circumstances would have mandated that a search warrant issue. Mahoney's affidavit informed the judge who issued the warrant that Dougherty was an attorney and defendant's brother-in-law. The affidavit established the strong probability that the envelope contained important evidence in a capital-murder case. Given the existence of separately retained counsel for the criminal matter, it was equally likely that any relevant evidence would be outside the scope of whatever attorney-client relationship existed between defendant and Dougherty. On those facts, even if the warrant judge knew of the note found in defendant's motel room, the totality of the circumstances would have required the issuance of the search warrant.

▮ Defendant claims that the failure to turn over the Mahoney inventory until the PCR discovery request was a violation of the State's discovery obligations. We are unable to determine from the record, however, the exact circumstances of this alleged violation. Defendant alleges the inventory was "withheld" from discovery, but does not state whether, for example, the State failed to produce it pursuant to a specific request, or whether the State claimed that the inventory was privileged. Thus we are unable to evaluate defendant's claim of a willful violation. However, because we find that defendant suffered no prejudice from the State's failure to turn over the inventory, defendant's claim that the State violated its discovery obligations is without merit. Defendant also claims that he was entitled to discovery of a report prepared contemporaneously with the search of the motel room detailing the circumstances of the seizure of the note. The State denies that such a reports exists, and defendant has made no showing to contradict that representation. Accordingly, that claim also must be denied.

▮ Finally, defendant asserts that the warrantless seizure of the envelope by Mohel violated defendant's right to assistance of counsel. We have already ruled on that issue. *Id.* at 70, 586 *A.*2d 85. The existence of the note and Mohel's knowledge of its contents are irrelevant to the seizure of the envelopes, because the envelopes were seized before any law enforcement official entered defendant's motel room where the note was found. Therefore this claim is without merit.

### 3. Claims Alleging Ineffective Assistance of Counsel in Connection With the "Suicide Tape" and the Items Seized at the Best Western Motel

(B.13–18, B.24–25, B.147–150, B.206)

Defendant raises a number of claims alleging that his counsel was constitutionally ineffective in failing to prevent the admission into evidence of the suicide tape and in failing to raise various other claims in connection with items seized at the Best Western

Motel. The *Strickland/Fritz* standard that governs those claims has been set forth above. *See supra* at 156–157, 690 *A.2d* at 34–35.

Several of the ineffective assistance of counsel claims fail because the substantive claims that defendant alleges were inadequately pursued have already been found to lack merit. Thus, even if counsel's performance were constitutionally inadequate, defendant cannot establish the requisite prejudice under the *Strickland/Fritz* standard. Those include defendant's claims that trial counsel was constitutionally ineffective in not establishing that the police or the prosecutors knew of the note found in defendant's motel room. The alleged deficiencies are: 1) failure to call Mohel for direct examination concerning what he observed in the motel room and the items seized there; 2) failure to argue that the cross-examination was within the scope of the direct examination after counsel was precluded from cross-examining Mohel regarding items seized from defendant's briefcase, including the note; and 3) failure to establish who seized the note and the circumstances of its seizure. The preceding subsection demonstrates that establishing knowledge of the existence of the note on the part of law-enforcement personnel would not have affected the outcome of the proceedings.

Defendant makes other claims based on counsel's alleged shortcomings in developing favorable evidence in the suppression hearing. Defendant claims that counsel's failure to establish on the record the dimensions of the cassette tape without a cover constituted ineffective assistance of counsel. However, the State, through the testimony of Lieutenant Churchill, offered proof that the tape was mailed inside its cover and that the cover is too wide for the slot in the mailbox. The State never contested whether the tape by itself would fit through the slot. Thus counsel's alleged error was inconsequential. Likewise, trial counsel's failure to mark the Murphy memorandum into evidence and to preserve it for direct appellate review of the trial court's ruling that the memorandum was work product is not significant, because we

have found that the failure to produce the memorandum itself was not prejudicial.

Two of defendant's claims concern his counsel's handling of witnesses at the suppression hearing in connection with the defense theory that the mailbox at the motel was a closed, slotted box. Both of those claims are without merit. First, defendant alleges that trial counsel was constitutionally deficient in failing to call defendant's sister, Oakleigh DeCarlo, who was prepared to testify that Zillah Hahn had made a prior statement inconsistent with her testimony that the mailbox was an open tray. However, defendant's sister was obviously susceptible to impeachment for bias, and deciding not to call her would be a reasonable tactical choice, especially when the essence of her testimony was available from other sources. At the suppression hearing the defense had the testimony of Rokoczy and the mailman to contradict Hahn and to establish that the mail receptacle was a closed box.

Second, defendant alleges that trial counsel failed to meet with Rokoczy before he testified for the defense at the suppression hearing. Although the preferred practice might be to meet with such an important witness before he testifies, defendant has not explained how the failure to do so harmed his case. Rokoczy's testimony on cross-examination that defendant might have placed the letters on top of the mailbox caused no prejudice because the trial court disbelieved it, expressly finding that defendant placed the letters in an open tray. Therefore, both claims that trial counsel was constitutionally ineffective in his handling of witnesses on the closed mailbox issue must be rejected.

Several of the claims assert that counsel allegedly was ineffective in arguing that the tape represented an attorney-client communication. However, the failure of trial counsel to move for a protective order prohibiting the opening of the envelope containing the tape cannot support a claim of ineffective assistance of counsel. Such a motion would have been futile in light of our ruling that the search of the envelope was proper. Likewise, trial counsel cannot be faulted for failing to establish that defendant's

relationship with Dougherty was primarily professional, and that Dougherty was not a trusted friend whom defendant would have consulted on a personal basis. The content of the tape demonstrates that defendant perceived Dougherty to be a close friend who could be entrusted to carry out the important and highly personal instructions contained in the tape. Nor does the alleged failure at pretrial hearings to elicit the extent of Dougherty's legal representation of defendant, or what Dougherty would have done with the tape had he received it, support the ineffective-assistance claim. We are satisfied that the legal and professional aspects of defendant's relationship with Dougherty have been fully developed before this Court, and that the relationship does not support defendant's claims based on attorney-client privilege.

Finally, defendant claims that the fact that Zeitz did not review the content of the suicide tape with him until immediately before it was played to the jury is additional evidence that counsel was unprepared. Defendant does not argue that failing to review the tape with counsel sufficiently prejudiced his case to constitute ineffective assistance of counsel. Instead, he raises the claim in support of his argument that the many minor errors of counsel cumulatively amount to ineffectiveness. However, in the absence of a colorable argument that the alleged lack of preparation affected the proceedings, this claim is rejected both on its own merits and cumulatively.

### 4. Miscellaneous Claims Associated with the "Suicide Tape" and Items Seized at the Best Western Motel

(A.71, A.89–90, D.5, D.9)

Defendant maintains that the audio tape contained uncounselled, post-indictment statements, and that their admission into evidence violated his right to counsel under *State v. Sanchez*, 129 *N.J.* 261, 609 *A.*2d 400 (1992). Although defendant was actually indicted some time after the night he made the tape at the motel, he claims that he was "to all intents and purposes" indicted before then. Defendant relies on the fact that he was named as one who had

conspired with Cumber in the affidavit of September 22, 1984, in support of the application for a warrant for Cumber's arrest. Defendant claims that he was the unnamed co-conspirator "A.B." in the indictment charging Cumber with conspiracy to commit murder, issued the day before the tape was seized.

We need not reach the issue of whether defendant had been the subject of a *de facto* indictment, or whether anything short of a formal indictment would trigger the constitutional protections of *Sanchez*. In *Sanchez, supra,* we held that interrogation of an indicted defendant initiated by law-enforcement representatives without the consent of defense counsel violated the defendant's right to counsel under Article I, Paragraph 10, of the New Jersey Constitution. 129 *N.J.* at 277, 609 *A.*2d 400. The *Sanchez* rule, however, is inapplicable to the facts of this case. The content of the tape was not the product of interrogation; indeed, it was not even a statement made to law enforcement officials. Rather, it was a voluntary, non-privileged communication to a private third party that happened to fall into the hands of the authorities. Accordingly, this claim is without merit.

Defendant also claims that the seizure of his communication to his attorney chilled his First Amendment rights. The First Amendment provides no basis for suppressing incriminating statements by a defendant that the authorities have obtained by lawful means. Defendant's claim that his right of access to the courts has been impaired fails on the same ground as his claim based on attorney-client privilege. Because no privilege was violated, there has been no interference with defendant's access to the legal system.

Defendant further claims that he is entitled to any report that accounted for the disposition of the contents of the glass of Coca-cola into which defendant told the investigators he had placed a lethal dose of sleeping medicine. Defendant claims that a chemical analysis of the Coca-cola would have shown that he had been telling the truth about the sleeping medicine, which would have supported his claim that he had intended to commit suicide.

However, there has been no showing that such a report ever existed or that any chemical analysis was ever prepared. Moreover, we are unpersuaded that evidence that the Coca-cola contained sleeping medicine would have been favorable to defendant. Even if the Coca-cola were "spiked" with a lethal dose of medicine, the fact remains that defendant did not drink it. Thus, the presence of the sleeping medicine would not have negated the inference that the suicide attempt was a sham. In any event, whether the suicide attempt was real or feigned is not probative of the real issue that confronted the jury: whether or not defendant was guilty of murdering his wife. As the State points out, a guilty person is perhaps even more likely to attempt suicide than an innocent one who fears an unjust conviction.

██ Finally, defendant asserts as an independent claim that he was entitled to receive property receipts for the tape recorder, cassette tape and batteries, as well as the report of the F.B.I. Technical Services Division that analyzed the tape. He claims no specific prejudice in connection with the failure to receive this material, but asserts it in support of his argument that the State's disregard of its discovery obligations worked a cumulative prejudice against the defense. However, in light of defendant's concession that there was no prejudice caused by the failure to produce that material, it cannot have added to the cumulative prejudice caused by other alleged discovery violations. Therefore, we deny this claim as well.

## D. CLAIMS RELATING TO SARANN KRAUSHAAR

(A.2, A.45, A.58–60, B.109–32, B.138, B.199, E.9–13, E.19–20, E.24)

The claims in this subsection include claims asserting discovery violations relevant to the testimony of Sarann Kraushaar, claims of ineffective assistance of counsel relating primarily to trial counsel's cross-examination of her, and allegations of prosecutorial misconduct also relating to Kraushaar's testimony. We address the claims on their merits and conclude that all of the claims

relating to Kraushaar's testimony are meritless and should be dismissed without a hearing.

The claimed significance of the alleged discovery violations is difficult to discern. The items allegedly withheld include Kraushaar's signed *Miranda* form dated September 7, 1984. Its purported relevance is that, although on September 7 the State was sufficiently suspicious of Kraushaar's possible involvement in the homicide to require submission of *Miranda* warnings before her interrogation, at trial the State was prepared to vouch for her credibility. We reject defendant's argument and conclude that the Kraushaar *Miranda* form was an immaterial document. Similarly irrelevant were receipts from E & B Coins and Stamps dated March 23 and 25, 1983, reflecting silver purchases made by defendant and Kraushaar, their significance allegedly deriving only from the fact that defense counsel questioned Kraushaar concerning the date she rented a safe deposit box to hold the silver. The subject and the document obviously are too tangential to the central issues at trial to have had any effect on the result.

Defendant next contends that the State's failure to produce two affidavits and related search warrants dated September 10 and 27, 1984, for Kraushaar's telephone toll records tainted the integrity of the remand hearing ordered by this Court concerning the Kraushaar immunity agreement. We exhaustively addressed the issues raised in the remand hearing in our direct appeal opinion, *Marshall I, supra,* 123 *N.J.* at 171–207, 586 *A.*2d 85, and that discussion and analysis serves as the foundation for our rulings on PCR issues related to the substance of the remand hearing. Concerning the search warrants and the supporting affidavits, the PCR court correctly determined that those documents were not included within the scope of the trial court's discovery order governing the remand hearing. Contrary to defendant's contention that the affidavits supporting the warrants contained information suggesting that Kraushaar was still a suspect on September 10 and 27, and therefore even more vulnerable to cross-examination about her trial testimony and the immunity

agreement, examination of the September 10th affidavit (the September 27th affidavit is undoubtedly similar but is not contained in the PCR *appendix*) reveals that it consists of relatively boilerplate allegations, summarizing the investigation to date and Marshall's relationship with Kraushaar, and alleging that access to Marshall's and Kraushaar's telephone toll records would lead to the identification of the persons responsible for Maria Marshall's death. The affidavit is silent regarding suspicions of Kraushaar's direct involvement and, in our view, its usefulness in cross-examination would have been minimal. The State's failure to produce the affidavits and warrants had no capacity to affect the result of the trial.

The final document consists of the prosecutor's notes of preparatory interviews with Kraushaar, allegedly significant because they refer to the potential interest of the prosecutor's office in any link between the Marshall homicide and the murder of Vincent Craparotta in July 1984. We doubt that the notes were discoverable, and are convinced that their content had no capacity to affect the result of the trial.

Defendant asserts several claims of prosecutorial misconduct. Two of the claims based on the State's failure to disclose the promise of immunity to Kraushaar and its failure to disclose details of financial obligations incurred in connection with McKinnon's testimony, were properly dismissed by the trial court under *Rule* 3:22–5. We addressed and resolved those specific contentions in detail in our direct appeal opinion. *Marshall I, supra,* 123 *N.J.* at 199–207, 586 *A.2d* 85. In addition, defendant contends that the prosecutor's questioning of Kraushaar concerning her accompanying defendant to consult with counsel on September 22, 1984, was intended to denigrate defendant's right to counsel and to imply that such consultation had a bearing on guilt. We addressed a related issue on direct appeal, *id.* at 121–25, 586 *A.2d* 85, and we dismiss this claim on the merits on the same grounds.

Defendant alleges prosecutorial misconduct arising from the prosecutor's failure to inform the court that Kraushaar

did not comply with a court order, to which the prosecutor consented, that Kraushaar read no press reports about witnesses who testified during a break in her testimony. Defendant alleges, on the basis of a book about the murder and trial (Joe McGinniss, *Blind Faith* (1989)), that Kraushaar violated the order. In our view, the allegation is insufficiently substantiated and, even if true, had no capacity to affect the trial result. Nor is there any merit to the contention that the prosecutor improperly elicited from Kraushaar testimony that she terminated her relationship with defendant because she thought he was guilty of murder. Kraushaar testified that she terminated the relationship because she "could no longer believe what [defendant] was telling me." Neither the prosecutor's questioning nor Kraushaar's response had the capacity materially to affect the outcome of the trial.

Another claim of prosecutorial misconduct relates to the allegedly wrongful failure to provide copies of the affidavits and related search warrants for Kraushaar's telephone toll records. We have already addressed the substance of that claim in connection with the alleged discovery violations, and order it dismissed on the same grounds.

Defendant asserts two other claims of misconduct that allegedly undermined the reliability of the remand hearing ordered by this Court. First, defendant asserts that representatives of the Ocean County Prosecutor's Office lied at the remand hearing when they testified that Investigator Murphy of that office was responsible for compiling and forwarding discovery material in the *Marshall* case. Defendant bases that allegation on a record maintained by the prosecutor's office entitled "Death Investigations 1981–1984," in which Investigator Mahoney was designated as the case agent in the *Marshall* investigation. Defendant asserts that because Mahoney had signed one of the Kraushaar immunity agreements, his status as case agent would have made him directly responsible for delivering that agreement to defense counsel, whereas the testimony at the remand hearing naming Murphy as case agent purported to relieve Mahoney of

that responsibility. Second, defendant asserts a related claim of misconduct premised on the failure of the prosecutor's office to produce for discovery a report by Investigator Mahoney dated February 15, 1985, detailing an inventory of items found in defendant's Best Western Motel room. Defendant alleges that the withholding of that report inhibited defense counsel from adequately cross-examining Mahoney at the remand hearing concerning his responsibility for discovery.

After the PCR court dismissed as procedurally barred the claim of misconduct based on the "death ledger," defense counsel moved for a new trial, or for an evidentiary hearing, to permit defendant to offer proof of his allegation that Investigator Mahoney was responsible for discovery in the *Marshall* case. In opposing defendant's motion, the State argued that the primary function of the "death ledger" was to keep track of homicides and their victims and not to designate case agents, noting that the ledger's case-agent designation in the *Accetturo* prosecution (the case in which the existence of the ledger was first disclosed) was found to be inaccurate. The State contended that the reliability of the ledger was outweighed by the testimony at the remand hearing, tested by cross-examination, demonstrating that Murphy and not Mahoney had been responsible for discovery. Without attempting to resolve the factual dispute, the PCR court determined that, based on this Court's holding that the nondisclosure of the State's non-prosecution agreement with Kraushaar was not "material" to defendant's guilt or punishment, *Marshall I, supra*, 123 *N.J.* at 199–205, 586 *A.*2d 85, to hold a new hearing to redetermine the question of willfulness "would be an exercise in futility, and not in the interest of justice." We agree with the PCR court's determination and dismiss on the merits those claims of misconduct.

Defendant asserts numerous claims of ineffectiveness of counsel relating to the manner in which Zeitz prepared for and conducted the cross-examination of Kraushaar. Included within this category are the following claims: that trial counsel should have withdrawn as counsel in order to provide testimony contra-

dictory to Kraushaar's; that counsel should have objected to Kraushaar's testimony that she accompanied defendant on September 22, 1984, to meet with Zeitz; that counsel should have objected to Kraushaar's conclusory statement that defendant was in "dire financial straits"; that counsel should have cross-examined Kraushaar on the reason she resigned her position as vice principal; that counsel should have cross-examined Kraushaar concerning her retention of counsel and the details of her conversations with her attorneys on September 7, 1984, the date of her first statement to the prosecutor's investigators; that counsel should have interviewed Kraushaar's attorneys prior to trial and should have called them as defense witnesses; and that counsel failed to develop a coherent strategy for the cross-examination of Kraushaar. Irrespective of whether counsel's performance was deficient in those areas, defendant has failed to demonstrate any probability that counsel's alleged deficiencies would have affected the outcome of the trial. Accordingly, we dismiss those claims on the merits.

In addition, defendant asserts a number of miscellaneous and obviously meritless claims relating to other possible areas of cross-examination or impeachment of Kraushaar's testimony that are alleged to have constituted ineffective assistance of counsel. We dismiss those claims on their merits as well because there is absolutely no demonstration that counsel's conduct, even if deficient, could have affected the trial result.

## E. ALLEGED ERRORS THAT PRECLUDED THE DEFENSE FROM UTILIZING THE CRIME SCENE TO PORTRAY DEFENDANT AS THE VICTIM OF A CRIME

### 1. In General

(A.12, B.4, B.21, B.62)

The claims in this subcategory include one alleged *Brady* violation, consisting of the State's apparent failure to comply with a court order to preserve tapes and logs of police actions on the night of the homicide. Also included are three

allegations of ineffective assistance of counsel, the first relating to counsel's alleged failure to obtain and review the tapes and logs after previously moving to compel their preservation, and the other two relating to counsel's alleged failure to elicit from Trooper Sink and Detective Petracca that at the crime scene they initially considered defendant to be a victim of whoever had committed the murder of Maria Marshall. Adjudicating those four claims on the merits, we conclude that they should be dismissed. Notwithstanding the unavailability of the police tapes and logs, and the omission of counsel to interrogate Sink and Petracca on whether defendant was considered a victim at the crime scene, we are satisfied that any alleged *Brady* violation or ineffectiveness of counsel was immaterial to the outcome of the trial. The prosecutor's opening statement acknowledged, and the State's police witnesses verified, that at the crime scene defendant's forehead was cut and his face was bloodstained. Trooper Sink described a puddle of blood near the right rear tire of defendant's car and Detective Petracca acknowledged that when he interviewed defendant, his head was bandaged and blood was visible on his shirt and trousers. Whether police officers at the crime scene considered defendant a victim or a suspect is irrelevant. What is relevant is that the jury received a full and graphic description of defendant's injuries.

## 2. The Tire

**(A.3–9, B.37–38, B.47–52, B.139, B.152–156, B.219, H.10)**

The claims in this subcategory include alleged discovery violations based on the State's failure to provide in discovery the substance of all expert opinions it would elicit at trial, the qualifications of its experts, the laboratory notes of its experts, and photographs and literature on which its experts relied. This subcategory also includes claims of ineffective assistance of counsel arising from trial counsel's failure to demand that the State produce adequate expert reports, and his failure to demand production of laboratory notes, qualifications of the experts, or photographs and literature on which they relied. Defendant argues

that trial counsel failed to challenge the experts' qualifications, and failed to challenge the admissibility of their testimony on the ground that the experts' reports were inadequate. Moreover, defendant also challenges trial counsel's delay in engaging a tire expert, and failure to arrange to have the car and the remaining tires examined to ascertain the source of the mechanical problems that allegedly prompted defendant to stop the car at the Oyster Creek Picnic Area. Defendant also relies on counsel's failure to attempt to bar any evidence concerning the right rear tire based on the State expert's excision of a portion of the tire, an argument that defendant asserts had been proffered in defendant's rejected direct appeal brief.

On direct appeal we discussed at length and rejected defendant's contention that the State's excision of part of the right rear tire in order to photograph the slit from the inside surface of the tire had violated defendant's constitutional right of access to evidence. *Marshall I, supra,* 123 *N.J.* at 105–10, 586 *A.2d* 85. Except to the extent that that specific contention is reasserted here, we consider the discovery and ineffectiveness claims in this subcategory as not having been adjudicated on direct appeal and as claims that could not reasonably have been asserted on direct appeal. See *R.* 3:22–4 and –5.

We conclude that all claims in this subcategory should be dismissed on the merits, without an evidentiary hearing. We regard as meritless the suggestion that the State's experts were inadequately qualified or that their expert testimony lacked an adequate foundation. To the extent that the State was deficient in providing the experts' qualifications, laboratory notes, and source material in discovery, that deficiency could easily have been overcome by trial counsel insisting on their production prior to trial or in advance of the experts' testimony. Accordingly, we conclude that the State's discovery violations, if any, were harmless.

Counsel's failure to demand the discovery, to retain an expert in advance of trial, and to arrange for an examination of the

car and all four tires appears on its face to reflect inadequate preparation on his part. On the other hand, as we noted in our direct appeal opinion, "[t]he fact that defendant made no effort to have an expert inspect the tire until well into the trial suggests that defense counsel attached little significance to the possibility that the tire had damage other than the slit." *Marshall I, supra,* 123 *N.J.* at 110, 586 *A.*2d 85. Although hindsight might suggest the wisdom of a trial strategy designed to prove that the car had other defects in order to counter the State's proof that the slit administered at the picnic area was the only cause of the car's immobility, hindsight cannot substitute for the strategic decisions of counsel informed of both the strengths and weaknesses of his client's case. Counsel may have been insufficiently prepared on this issue, or may have consciously decided that his efforts and defendant's resources could more effectively be expended in other areas. No proffer is made by defendant to suggest that there was or is now available proof, other than defendant's testimony, that defendant drove into the picnic area because of car trouble. On this record, we are satisfied that any deficiencies in counsel's performance were not "so serious as to deprive the defendant of a fair trial. . . ." *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L. Ed.*2d at 693.

3. **Counsel's Failure to Elicit on Cross–Examination the Consistent Statements Made by Defendant to Various Police Officers About the Problems He Experienced with His Car**

**(B.57–59, B.61, B.64, B.218)**

Defendant contends that a point at issue at trial, whether the right rear tire was flat or half-flat when defendant pulled into the picnic area, could easily have been clarified if defense counsel had cross-examined the police officers to establish that defendant had consistently stated that the tire was half-flat when he drove into the picnic area. The ineffectiveness claims include the failure to cross-examine Lieutenant Churchill, Investigator Mahoney, Investigator Murphy, Detective Joo, and Investigator Belitrand, all of whom allegedly had taken statements from defendant to the effect

that the tire was half-flat when defendant examined it in the picnic area. This subcategory also includes a claim of ineffectiveness based on trial counsel's unawareness that Detective Petracca had taken defendant to Bass River State Police Barracks after questioning him at home, as well as on counsel's questioning that led to testimony unnecessarily informing the jury about defendant's early retention of counsel.

We evaluate all claims in this subcategory on their merits and conclude that they should be dismissed. We noted on direct appeal inconsistencies in defendant's statements to various officers about when he first detected a problem with his car, *Marshall I*, *supra*, 123 *N.J.* at 32, 586 *A.2d* 85, but considered too inconsequential to mention any alleged inconsistencies in defendant's statements about whether the tire was totally or half-flat. Unquestionably, the more important issues concerning this aspect of the trial were whether the alleged car trouble had been feigned, and whether defendant had decided to stop at the Oyster Creek Picnic Area to inspect his car or to facilitate the homicide. The alleged ineffectiveness of counsel that supports the claims in this subcategory could not conceivably have had a material effect on the jury verdict.

## 4. Position of Body and Ballistics

### (A.66–67, A.70, B.37, B.38, B.42, B.46, B.53–56, B.78, B.89, E.22)

The claims in this subcategory relate to trial issues of limited significance, including the following: whether the victim was shot while awake or asleep (germane to defendant's contention that the victim was awake when shot to prevent the robbers' identification); whether the shots were fired at close range; and whether a police officer found the glove compartment in defendant's car open or closed at the crime scene, defendant having told investigators that immediately prior to the shooting he had asked his wife to open the glove compartment in order to unlatch the car's trunk. Included are claims of discovery violations, consisting of the State's failure to produce documents reflecting the qualifications of three expert witnesses. Also included are claims of ineffective assis-

tance of counsel, consisting of claims that trial counsel failed to demand adequate experts' reports and statements of experts' qualifications; failed to retain or produce testimony of independent experts; inadequately cross-examined experts and improperly stipulated to the qualifications of expert witness Hillman; improperly questioned McKinnon on cross-examination about whether the victim was shot at close range; and failed to elicit testimony from the victim's sons to the effect that the victim was a light sleeper. Also included is a claim of prosecutorial misconduct based on the production of testimony by Trooper Mathis that he found the glove compartment in defendant's car closed at the crime scene, whereas the same officer gave contradictory testimony at the trial of Robert Cumber.

 We address all claims on their merits and conclude that they should be dismissed. The discovery claims are obviously insignificant, the State's experts being amply qualified to offer the testimony elicited from them. Dr. Sinha, a board-certified pathologist and the medical examiner who performed the autopsy, offered testimony about the victim's entry and exit wounds, opining on the basis of those wounds that the victim had been shot while lying down with her left arm under her body. *Id.* at 34, 586 A.2d 85. Initially, Dr. Sinha expressed the view that the victim had been asleep, but on cross-examination he conceded that he had no way of determining whether she was awake or asleep when shot. Other testimony on that question was elicited from McKinnon, who stated that both occupants of defendant's car had been sitting upright when the car passed the toll plaza preceding the picnic area, and from Detective Petracca who testified that defendant had told him that his wife had been asleep with her head on his lap when he pulled into the picnic area, but that she had been "seated" when he turned to her and asked her to unlatch the trunk. We find no merit to the claims that counsel's alleged ineffectiveness either in preparing for Dr. Sinha's cross-examination or in failing to retain an independent expert on that issue materially affected the outcome of the trial. The trial evidence provided scant support for the theory that the homicide had been

committed to prevent the victim from identifying the perpetrators of a robbery. The claim of ineffectiveness based on counsel's failure to elicit testimony from her sons that the victim was a light sleeper is similarly meritless.

The claims of ineffectiveness relating to the cross-examination of witnesses Hillman and Liber and counsel's failure to retain experts to rebut their testimony are without merit. Hillman was a ballistics expert with qualifications adequate to support his testimony about the caliber of the bullets and shells and the type of weapon from which they had been fired. *Ibid.* Detective Liber provided relatively insignificant testimony about the path of one of the bullets after exiting the victim's body. Defendant offers no showing that independent experts would have reached materially different conclusions. Finally, we cannot conclude that Trooper Mathis's testifying inconsistently in defendant's and Cumber's trial about whether the glove compartment was ajar constituted prosecutorial misconduct. An equally plausible explanation is that Trooper Mathis inaccurately recalled the contents of his report at one of the two trials. Moreover, the issue was of minor importance and clearly not capable of affecting the jury verdict.

## 5. Stopping in the Oyster Creek Picnic Area

### (B.3, B.181, B.221, H.2)

The claims in this subcategory include claims of ineffective assistance of counsel concerning counsel's alleged failure to produce evidence relating to the crime scene. The alleged ineffectiveness includes counsel's failure to offer into evidence a videotape of the crime scene made shortly after the homicide, his failure to offer independent evidence that defendant's decision to pull into the picnic area had been motivated by a desire to avoid the fate of a Toms River physician, known to defendant, who was killed while attending to his disabled vehicle along the side of the Garden State Parkway, and his failure to produce evidence of the noise level at the picnic area to rebut the inference that defendant should have heard the opening of the door on the perpetrator's

car. Defendant also claims that the trial court violated defendant's constitutional right to an impartial jury trial by permitting the jury to view the crime scene, a contention that defendant asserts to have been advanced in defendant's rejected brief on direct appeal.

We address all claims on their merits and conclude that they should be dismissed. The trial court's decision to permit the jury to view the crime scene was a permissible exercise of the court's discretion. *See State v. Coleman*, 46 *N.J.* 16, 25–26, 214 *A.*2d 393 (1965), *cert. denied*, 383 *U.S.* 950, 86 *S.Ct.* 1210, 16 *L.Ed.*2d 212 (1966). Contrary to defendant's contentions, the trial testimony of Trooper Mathis verified that the changes in the crime scene between the date of the homicide and the jury's visit resulted in less underbrush and greater visibility from the Garden State Parkway, lending support to trial counsel's decision not to offer into evidence a videotape of the crime scene made shortly after the murder. Counsel's discretionary determination not to offer expert testimony about the noise level at the picnic area could not conceivably rise to the level of ineffective assistance. Finally, counsel's decision not to offer direct evidence of Dr. Klausner's untimely accident may have reflected counsel's prudent recognition that such evidence would have been unpersuasive in view of the abundant proof elicited by the State about the substantial number of safe locations along defendant's route at which he could have checked out his vehicle. *See Marshall I, supra,* 123 *N.J.* at 52, 586 *A.*2d 85.

### 6. Defendant's Injuries and Treatment

**(A.81, A.98, B.21, B.32, B.43–45, B.140)**

The claims in this subcategory include claims of discovery violations based on the State's alleged failure to turn over to trial counsel copies of the report of the physician who examined defendant on the night of the homicide and copies of defendant's treatment records from the hospital emergency room. Also included are claims of ineffective assistance of counsel generally alleging that trial counsel failed to produce adequate testimony

demonstrating that defendant had received a head wound at the crime scene that required five stitches, thereby depriving defendant of the benefit of testimony corroborating that defendant had been the victim of a robbery, and that counsel failed to request before trial the second page of the report of the medical examination of defendant performed on September 6, 1984.

We address all claims in this subcategory on their merits, and we conclude that all of them should be dismissed for the same reasons that we dismissed the general claims in this category, namely, that the evidence at trial incontrovertibly established the extent of defendant's injuries at the crime scene. The critical issue was not how badly defendant was injured, but whether the assault on defendant was staged to avert suspicion of a motive for homicide.

## 7. Defendant's Demeanor

### (B.31, B.63, B.207–10, B.225)

This subcategory includes claims of ineffective assistance of counsel, all of which are based on trial counsel's alleged ineffectiveness in failing to contact and call as witnesses five men from California who saw defendant immediately after the homicide and telephoned for police assistance, and in failing to contact and present testimony from a woman who observed defendant on the roadway and described to police the "horrified" expression on his face. Defendant acknowledges that trial counsel unsuccessfully attempted to elicit proof about the observations of the men from California through direct examination of Detective Petracca.

We consider all claims in this subcategory on their merits and conclude that they should be dismissed. Although testimony about defendant's demeanor immediately after the homicide might have been marginally helpful to defendant, counsel's decision not to elicit that testimony does not on this record approach the level of materiality required under the *Strickland/Fritz* standard to establish that defendant's representation was constitutionally deficient.

### 8. The Jewelry

(A.68, B.37, B.92–96, B.180)

The claims in this subcategory include one alleged discovery violation, based on the State's failure to turn over to trial counsel the qualifications of the State's expert witness on the value of the victim's jewelry. Also included are claims of ineffective assistance of counsel alleging that trial counsel was deficient in failing to have the victim's jewelry appraised, in failing to interview the State's expert, and in failing to produce independent evidence of the jewelry's value.

We address all claims on their merits and conclude that all of them should be dismissed. That the victim's jewelry was undisturbed diminished the persuasiveness of defendant's contention that the homicide was incidental to a robbery. Trial counsel effectively cross-examined the State's expert to establish that stolen jewelry often can be traced to its owner, and rebutted the expert's estimate of the value of the victim's engagement ring by offering proof through defendant that the actual cost of the ring was substantially lower than the expert's estimate of value. Additional testimony on the point would have been merely cumulative. Any ineffectiveness by trial counsel in addressing that issue could not conceivably have been sufficiently material to affect the verdict.

### F. ALLEGED ERRORS THAT PRECLUDED THE DEFENSE FROM DEMONSTRATING THAT NEITHER DEFENDANT'S DEBT NOR INSURANCE POLICIES ON THE VICTIM'S LIFE WERE MOTIVES FOR MURDER

### 1. Debt

(A.17–23, A.29–33, A.35–46, A.48–55, B.103–05, B.111, B.173–77, B.190–92)

Defendant alleges numerous discovery violations and ineffective assistance of counsel claims relating to the issue of whether his

financial condition prior to the murder could have constituted a motive for him to have hired McKinnon to kill his wife. Defendant alleges that the State was far better prepared than the defense to offer evidence on that issue at trial because the State had compiled detailed documentary evidence concerning defendant's finances, but had failed to turn over those documents to the defense. Moreover, defendant alleges that his counsel was ineffective in failing to prepare for trial and to present evidence to demonstrate that defendant had been capable of paying his debts and that his indebtedness could not have constituted a motive for the homicide. We address all of those claims on the merits and conclude that they should be dismissed without an evidentiary hearing.

The most persuasive evidence that defendant's debt was burdensome and difficult to manage was contained in defendant's so-called "suicide tape" that was played for the jury. In the course of that tape defendant stated:

> I guess my problem began long before that, though, really, because ... for some reason ... and I'm to blame ... whatever we wanted ... to do or to buy, we just went ahead and did it.... If it meant borrowing to do it, we did it anyway. And I always assured Maria that it was okay, that there was enough, that ... even if there wasn't. I think she knew, but ... she knew that I wanted it, and I know that she wanted it, whatever it was, and we did it. And that created a spiral ... a spiral that accelerated to almost a two-hundred thousand dollar debt ... not including the mortgage on the house, a debt that I was determined to pay off, but ... just couldn't seem ... to climb out.

In addition, the tape included defendant's fairly detailed description of his specific debts, with instructions concerning the debts that should first be repaid.

> [T]he big loan is a ready-equity loan with New Jersey National Bank that's ... somewhere between a hundred twenty-eight, a hundred twenty-nine thousand dollars, I think.... That should be paid off as soon as possible, because of the high interest rate. There is, or are, two notes at First National Bank, one for fifteen, and one for, uh, just under twenty-thousand. One of them is currently due, should be paid off ... I guess they both should be ... as soon as possible. There is an installment loan with Navy Federal Credit Union for thirty thousand ... or less than thirty thousand.... There is, uh, a ready-equity type thing, uh, with the City Bank ... for about twelve thousand ... and there's five thousand due on a checking plus with First National Bank ... twenty-one hundred dollars due on Master Card, and ... a small amount due on American Express.

Defendant alleges numerous discovery violations in this subcategory of claims, most involving copies of the loan documents, applications, notes, mortgages and similar documents relating to the specific loans and credit obligations outlined by defendant on the "suicide tape." Some of the documents related to defendant's assets or to his income from his insurance business. The State contests the significance of the documents, arguing essentially that the debt that they evidenced was undisputed, but does not explain why the documents were not produced. Based on defendant's detailed knowledge of his financial condition, to infer that he retained copies of most of the applications, notes, and mortgages relating to his indebtedness would not be unreasonable, although defendant neither acknowledges nor denies that he maintained such records. Defendant argues essentially that he was prejudiced because the State failed to deliver them to his counsel.

Notwithstanding the likelihood that defendant either had in his possession or could have obtained directly from the lending institutions the loan documents not produced by the State, defendant has failed to demonstrate any prejudice that materially affected the trial result. Defendant does not contend that the loan documents inaccurately reflected his financial condition, nor that the disclosure of the documents materially would have enhanced his ability to demonstrate that his debts were not burdensome. To the limited extent that the documents not produced by the State related to defendant's income and assets and evidenced his ability to meet his financial obligations, this information was cumulative; defendant produced trial witnesses who testified to his success as an insurance agent, and his direct testimony, emphasizing his substantial income and assets, demonstrated his complete familiarity with his financial resources and obligations. In addition, counsel for defendant Thompson, during cross-examination of defendant, questioned defendant extensively about his income and assets to illustrate his ability to manage his debt. Consequently, we cannot conclude that the State's failure to produce documents concerning defendant's indebtedness or re-

sources possessed the slightest capacity to affect materially the trial result.

 We reach the same conclusion with respect to defendant's various claims of ineffectiveness of counsel relating to defendant's finances. Defendant faults counsel generally with failing to object to the State's use on defendant's cross-examination of financial documents not produced in discovery, and in failing to interview defendant's accountant and bank officials and otherwise to prepare adequately and comprehensively to demonstrate at trial that defendant's income and assets were sufficient to meet his obligations. Irrespective of counsel's effectiveness at trial on this issue, the source of the strongest evidence that defendant's debt was burdensome was the suicide tape, in which defendant had acknowledged his struggle to meet his financial obligations. Defendant is unable to demonstrate how trial counsel's more comprehensive preparation and different trial strategy could persuasively have overcome defendant's own perception that his debt was difficult to manage.

 Other alleged claims of ineffectiveness concern collateral matters such as counsel's alleged ineffectiveness in examining witnesses concerning defendant's casino debt, counsel's failure to object to Kraushaar's testimony about defendant's dire financial straits, and counsel's failure to object to questions on cross-examination inferring that trial counsel would benefit financially from defendant's acquittal. Whether or not counsel's performance on those collateral issues was ineffective, defendant has failed to demonstrate any likelihood whatsoever that counsel's actions materially affected the trial result.

## 2. Victim's Life Insurance Policies

(A.13, A.24–28, A.34, A.47, A.56, A.57, A.69, B.37–38, B.97, B.98, B.106–08, B.133–37, B.141–42, B.160–62, B.179)

Defendant asserts various discovery violations and ineffective-assistance-of-counsel claims that allegedly precluded the defense

from demonstrating that the insurance policies on Maria Marshall's life did not constitute a motive for her murder. We address those claims on their merits and conclude that their dismissal without an evidentiary hearing was appropriate.

■ Several claims of discovery violations relate to the State's failure to provide in discovery most of the contents of the files of Edwin O'Malley, the attorney whom Mrs. Marshall had retained to advise her concerning problems in her marriage. Defendant contends that that file contained lists of insurance policies and other references to financial matters in Mrs. Marshall's handwriting, and that its production would have assisted defense counsel in rebutting the State's contention that defendant had amassed life insurance coverage on his wife without her knowledge and consent. Although the State's proofs sought to establish Mrs. Marshall's unfamiliarity with the amount of insurance on her life, that issue was contested. Indeed, on direct appeal we had occasion to review the admissibility of hearsay testimony intended to establish Mrs. Marshall's lack of knowledge about a specific insurance policy, and we concluded that the admission of the testimony was harmless error because "the record strongly suggests that Mrs. Marshall must have been aware that the examination and application form related to life insurance." *Marshall I, supra,* 123 *N.J.* at 112, 586 *A.*2d 85. Moreover, defendant testified extensively about the capital-needs analysis that he had prepared to ascertain his and the victim's insurance requirements, asserting that the amount of insurance that had been acquired was reasonable, necessary, and consistent with sound insurance practice. He readily acknowledged that he had made the decisions about insurance purchases, and that he had been authorized by Mrs. Marshall to make those decisions and to sign her name to applications for insurance. Finally, our examination of the handwritten notes in attorney O'Malley's file persuades us that, although they contain numerous references, without context, to various insurance companies and insurance policies, the notes would not have been useful

to establish whether or not Mrs. Marshall actually was knowledgeable about the details of the family's life insurance portfolio.

■ Other alleged discovery violations relate to documents concerning accidental-death policies on the lives of defendant and Mrs. Marshall issued by Minnesota Mutual Life Insurance Company as a result of a solicitation of mortgagors of Jersey Shore Savings and Loan, the bank that held the mortgage on the Marshalls' home. Defendant contends that the State's failure to produce in discovery documents concerning the acquisition of those policies impeded defense counsel's ability to cross-examine an employee of Minnesota Mutual Life Insurance Company who testified at trial about the issuance of the policies. We have examined the documents and conclude that defense counsel's cross-examination of that witness would not have been materially enhanced by the documents in question.

■ Equally without merit is defendant's allegation of prejudice based on the State's failure to produce the qualifications of or any expert's report from Richard Tidey, an assistant director of a State Police laboratory who allegedly had examined the signatures on some of Mrs. Marshall's life insurance policy applications but offered no testimony at trial concerning them.

■ A number of the ineffective-assistance-of-counsel claims raised by defendant in this claim category relate to defense counsel's failure to object to the testimony of Tidey on the basis of the State's failure to produce his expert report or a statement of his qualifications as a handwriting expert. We discern no prejudice arising from defense counsel's actions. We again note that Tidey, who had eighteen years experience working in the State Police "Questioned Document Unit," gave no testimony about signatures on insurance policy applications. Nor has any evidence been proffered by defendant to suggest that Tidey was not qualified to provide the expert testimony concerning other documents elicited from him by the Assistant Prosecutor.

██ Defendant alleges that counsel was ineffective in preparing to cross-examine Nikki Daly, defendant's former secretary, and in failing to elicit testimony from Daly concerning the reasons for defendant's departure from his office on the morning of September 6, 1984, and the circumstances concerning the mailing of a life insurance policy application to First Colony Insurance Company without defendant signing the premium check. Although we express no view about whether counsel's cross-examination of Daly could have been more comprehensive, we are convinced that defendant sustained no material prejudice. Daly specifically testified that defendant had left the office on the morning of September 6, 1984, shortly after receiving a telephone call around 10:00 a.m., and that he had left because Daly had reminded him that he had scheduled an insurance policy physical examination for ten o'clock that morning. Concerning the First Colony policy, defendant specifically testified that Daly had mistakenly mailed the First Colony applications with an unsigned check and that he had decided not to pursue the policy because Mrs. Marshall had resumed smoking cigarettes and the First Colony smokers' rates were too high. Additional cross-examination of Daly on those points would merely have been corroborative.

██ Defendant's remaining ineffectiveness-of-counsel claims in this claim category relate generally to counsel's failure to procure expert testimony to corroborate defendant's testimony about the reasonableness of the amount of insurance placed on the life of Mrs. Marshall. Other claims include counsel's failure to interview Edwin O'Malley, counsel's failure to object to so-called expert testimony elicited from Maria O'Phelan, an employee of Minnesota Mutual Life Insurance Co., and counsel's failure to request a mistrial or curative instruction when the prosecutor during cross-examination of John Zerrer stated that one does not make much money selling term insurance "unless you collect on a policy."

Although the credibility of defendant's testimony about the reasonableness of the amount of life insurance in force on Mrs. Marshall would obviously have been enhanced by corroborating testimony from an independent expert, we cannot conclude that there is any likelihood that the presentation of such expert testimony could have affected the jury's verdict. The uncontroverted evidence demonstrated that Mrs. Marshall's life was insured by more than one million dollars in life insurance and that most of the policies had been acquired in 1984, the year in which the homicide occurred. No matter what expert testimony was elicited, the jury could infer from the evidence of defendant's debt and his relationship with Sarann Kraushaar that the amount of insurance could have constituted a motive for the homicide. We are unpersuaded that defendant was materially prejudiced by any of the other omissions of counsel forming the basis for claims of ineffectiveness. We consider insignificant counsel's alleged failure to interview Edwin O'Malley, and in our view Maria O'Phelan did not provide expert testimony but merely testified about the practices of her employer. The prosecutor's remark about the unprofitability of selling term insurance was highly inappropriate and the trial court properly sustained counsel's objection, but we reject the contention that counsel was deficient in failing to request a mistrial or curative instruction.

## G. ALLEGED INFRINGEMENTS ON DEFENDANT'S RIGHT TO RETAIN COUNSEL

(B.29, B.39, B.99–100, B.170–72, B.214, B.222, E.1, E.8)

The claims in this category allege instances of prosecutorial misconduct and ineffective assistance of defense counsel stemming from State infringements on defendant's right to retain counsel. Most of the claims pertain to the manner in which defense counsel and the prosecutor during the trial addressed the fact that defendant had retained counsel early in the course of the State's investigation in this case. Two claims involve the State's alleged pretrial interference with defendant's right to retain counsel.

Adjudicating the claims on the merits, we conclude that they do not warrant an evidentiary hearing and are without merit.

In his opening statement at trial, defense counsel summarized the facts of the case and mentioned that defendant had retained counsel while the police were still investigating Maria Marshall's death. Defense counsel made that comment in the context of explaining that defendant had cooperated fully with the police investigation. Defendant now alleges that defense counsel's comment constituted ineffective assistance of counsel because it might have led jurors to infer that defendant's early retention of counsel indicated that he was guilty of Maria Marshall's murder. We disagree and find that the comment was entirely appropriate.

Sarann Kraushaar, Oakleigh DeCarlo, and one of defendant's sons each testified at trial about Investigator Mahoney's September 21, 1984, interview with defendant. At the interview, defendant answered one or two of Mahoney's questions and then terminated the interview, explaining that he had been advised by his attorney not to speak with representatives from the prosecutor's office.

At trial, the court ordered the State not to question witnesses about defendant's early retention of counsel. However, DeCarlo and defendant's son, both of whom were called as defense witnesses, mentioned in the course of their testimony that defendant had declined to answer questions in the September 21 interview on the advice of his attorney. Similarly, Kraushaar, called by the State, mentioned defendant's September 21 refusal to answer questions on the advice of counsel. In his PCR filings, defendant asserts that defense counsel should have informed DeCarlo and defendant's son about the court order, and that counsel should have told the prosecutor to tell Kraushaar of the court order. In our view, defendant's claims do not present a *prima facie* case of ineffective assistance of counsel. Defense counsel justifiably could have concluded that there was no need to tell the witnesses of the order. For example, defense counsel might have reasoned that he would simply refrain from question-

ing the witnesses about defendant's retention of counsel, and assumed that the prosecutor would similarly abide by the court's order. In view of the witnesses' volunteering of the information concerning the retention of counsel, hindsight suggests that it would have been prudent for defense counsel to ensure that all witnesses were informed of the court's order. However, counsel did not act unreasonably in electing not to do so. Moreover, any error on his part was harmless beyond a reasonable doubt. *See Marshall I, supra,* 123 *N.J.* at 125, 586 *A.*2d 85 (finding that prosecutor's suggestion, made while cross-examining witness, that defendant's early retention of counsel demonstrated his guilt was harmless error "because the jury knew from defendant's own testimony that he had retained counsel ... [and because] the evidence of defendant's guilt was so persuasive").

 Similarly, the prosecutor did not commit misconduct by not informing Kraushaar of the court's order. The record reveals that, during his questioning of the witness, the prosecutor attempted to steer Kraushaar away from the area of defendant's early retention of counsel, but Kraushaar nonetheless volunteered that information.

Defendant also alleges that Zeitz should have requested a mistrial or curative instruction after DeCarlo testified concerning defendant's early retention of counsel. However, because that testimony and the prosecutor's ensuing comments did not prejudice defendant to an appreciable extent, *see ibid.,* we conclude that that allegation is meritless.

 Defendant further asserts that defense counsel was ineffective in not attempting to alleviate the alleged detrimental effect of the witnesses' mentioning defendant's early retention of counsel. Specifically, defendant asserts that defense counsel could have improved the jury's perception of defendant by noting that Kraushaar also had retained counsel during the police investigation. Defendant also argues that defense counsel should have presented the testimony of attorney John Russo, who would have explained that defendant had consulted an attorney at such an

early stage of this case because of the police's September 8, 1984, search of defendant's office. In our view, defense counsel may reasonably have decided that he could best represent his client by concentrating on other areas of his case rather than reminding the jury of defendant's early contact with counsel. Moreover, the testimony of Russo would have been cumulative because Marshall himself testified that he had contacted a defense attorney after the search of his office.

Defendant also takes issue with Zeitz's inability to persuade the trial court not to admit into evidence the testimony of Investigator Mahoney. Mahoney testified that when, on September 21, 1984, he first had confronted defendant with the names of Billy Wayne McKinnon and Jimmy Davis, defendant appeared "visibly upset." Defendant alleges that defense counsel should have argued that Mahoney's sole purpose in confronting defendant on September 21 was "to provoke defendant into invoking his right to counsel, for the purpose of observing his physical reaction." Defendant argues, without offering legal support, that the trial court would have excluded Mahoney's testimony had defense counsel made such an argument. The record reveals that defense counsel effectively argued to limit Mahoney's testimony and succeeded in having certain significant aspects of that testimony excluded. Defendant's argument is without merit. Defendant also complains that Zeitz failed to interview witnesses concerning the incident at Marshall's household on September 21, 1984, leading counsel incorrectly to assume during cross-examination of Kraushaar that those present had not been drinking alcohol when Mahoney arrived. Our view of the trial transcript is that counsel's cross-examination of Kraushaar was effective and that no conceivable prejudice to defendant resulted from the question and response concerning the type of beverages being consumed.

Defendant's final argument in this category alleges that the State improperly interfered with defendant's right to counsel by asking insurance companies not to make disbursements on Maria Marshall's life insurance policies. The beneficiaries of the

policies in question were defendant's children. Defendant claims that had his children received the money from the insurance companies, defendant could have devoted more of his own money to his defense and less to providing for his children. We find this claim to be without merit. First, defendant has failed to demonstrate that the State's purpose in contacting the insurance companies was improper. Indeed, it appears that the State may have been acting to reduce the risk of flight, rather than attempting to interfere with defendant's right to counsel. Moreover, defendant has made no *prima facie* showing that any money was withheld as a result of the State's efforts. In fact, the record reveals that at least portions of the policies were paid by the insurance companies in a timely manner. There is no evidence that defendant's ability to retain effective counsel was affected by the State's conduct.

## H. ALLEGED VIOLATIONS OF DEFENDANT'S *MIRANDA* RIGHTS

### (B.20, B.22, F.1–2, H.1)

The claims in this category allege that certain pretrial statements made by defendant were introduced into evidence in violation of his *Miranda* rights, and that defense counsel was constitutionally deficient in attempting to persuade the trial court to rule that those statements were inadmissible. Adjudicating the claims on the merits, we conclude that they do not warrant an evidentiary hearing and are without merit.

The police questioned defendant three times on the day of Maria Marshall's death, September 7, 1984. They asked defendant a few preliminary questions at the crime scene and continued their inquiries a few hours later at defendant's house. Defendant then voluntarily accompanied the officers to the local police barracks to give a formal statement.

The trial court found that the police had not been required to inform defendant of his *Miranda* rights before the three interrogation sessions because defendant had not been in custody at those times. We agree. The police questioned defendant at the

crime scene and at his home as they would question any victim of or witness to a crime. Neither the crime scene nor defendant's home could reasonably be considered a custodial setting. Similarly, when defendant accompanied the officers to the police barracks, he did so voluntarily to support his claim that he himself had been a victim. The police explained to defendant that he was not in custody and that he was free to leave at any time. In short, defendant has not demonstrated that the September 7 questioning constituted custodial interrogation implicating defendant's *Miranda* rights. Thus, defendant's statements were properly admitted into evidence.

Defendant also argues that his counsel was ineffective in not using certain notes and a police report compiled by the investigating officers in his attempt to convince the trial court that defendant had been in custody at the time of the September 7 questioning. However, defendant is unable to point to anything in the notes or police report that conceivably could have had any impact on the *Miranda* determination. Defendant's claims are thus without merit.

Lastly, defendant asserts that at the *Miranda* hearing the prosecutor deceived the trial court by claiming that the statements made by defendant at the police barracks would not be offered against defendant at trial. We have reviewed the record of the *Miranda* hearing and find defendant's assertion to be without factual support. The fact that the trial court held a hearing to determine whether the statements made by defendant at the barracks were admissible belies the claim that that court was unaware that the State sought to admit those statements into evidence at trial.

## I. CLAIMS RELATING TO THE INTEGRITY OF THE IMPANELED JURY

(B.19, B.36, B.231, C.1–74, F.3, H.3–9)

The claims in this category allege that defendant was denied his right to a fair and impartial jury as a result of

ineffective assistance of counsel and erroneous decisions made by the trial court during *voir dire*. Four of the claims were adjudicated on defendant's direct appeal: that transfer of venue to Atlantic County was improper because of pretrial publicity in that county, *see Marshall I, supra*, 123 *N.J.* at 76–79, 586 *A*.2d 85; that jurors Wilkins, Smith, and Bader should have been excluded for cause because of their inability to be impartial, *see id.* at 80–87, 586 *A*.2d 85; that juror Marzano should have been excluded for cause because he was incapable of fairly evaluating the testimony of law-enforcement officers, *see id.* at 87–89, 586 *A*.2d 85; and that potential jurors Corrigan, Hart, and Scanny should not have been excluded for cause, *see id.* at 94–98, 586 *A*.2d 85. Defendant has not presented new legal or factual arguments in support of those claims and we therefore find the claims to be procedurally barred by *Rule* 3:22–5. Adjudicating the remaining claims on the merits, we conclude that they do not warrant an evidentiary hearing and should be dismissed.

■ Fifteen claims allege, in varying forms, that defense counsel's representation of defendant was ineffective because counsel did not adequately "death qualify" the jury during the *voir dire* in this case. In *Marshall I, supra*, we explained that in death-qualifying a jury, the court "ask[s] of each potential juror thorough and probing questions about that juror's attitude concerning the death penalty," to ensure that each potential juror can fairly apply our state's death-penalty law. 123 *N.J.* at 90–93, 586 *A*.2d 85. We viewed counsel's request to the trial court to limit death qualification of the jury as a debatable yet reasonable gambit designed to avoid a "conviction-prone jury," and "a well-considered strategic attempt to limit juror exposure to questions concerning capital punishment." *Ibid.* Defendant has presented nothing on PCR review that leads us to alter that conclusion. Thus, defendant's death-qualification claims do not present a *prima facie* case of ineffective assistance of counsel.

■■ Defendant further asserts that even if counsel's decision to limit pretrial death qualification were reasonable, there

is no justification for counsel's failure to request death qualification of the jurors after the guilt phase had concluded and defendant had been convicted. We need not reach the question whether the absence of a post-conviction death-qualification request was the product of a reasonable, strategic decision made by defense counsel. Instead, we address the prejudice component of the *Strickland/Fritz* test, and conclude that defendant was not prejudiced by the absence of a post-conviction death-qualification request because, even if that request had been made, it would have been denied. Post-conviction death qualification would necessitate the impanelling of separate juries for the guilt and penalty phases of a capital trial, a result that is plainly inconsistent with this Court's decisions holding that a defendant's desire not to death qualify a guilt-phase jury is insufficient justification for impanelling two separate juries in a capital case. *See State v. Bey,* 112 *N.J.* 123, 150, 548 *A.*2d 887 (1988) (*Bey II* ); *State v. Ramseur,* 106 *N.J.* 123, 251–54, 524 *A.*2d 188 (1987); *cf. State v. Erazo,* 126 *N.J.* 112, 133, 594 *A.*2d 232 (1991) (noting that separate penalty-phase jury may be necessary when "guilt-phase evidence is so prejudicial that the same jury could not fairly sit on both phases of the trial"); *State v. Biegenwald,* 126 *N.J.* 1, 44, 594 *A.*2d 172 (1991) (noting that two separate juries may be required in capital case in which State presents defendant's prior murder conviction as aggravating factor). Thus, defendant's claim concerning post-conviction death qualification does not set forth a *prima facie* case of ineffective assistance of counsel.

In addition to the suggested death-qualification questions, defendant points to sixteen other questions that trial counsel should have requested the court to ask each of the jurors during *voir dire.* The questions include inquiries concerning the jurors' attitudes toward guns, insurance policies, and the movie *Jagged Edge.* We have reviewed those claims thoroughly and conclude that none of them present questions that defense counsel was constitutionally required to request.

Forty of defendant's claims present questions that defense counsel should have requested the court to ask individual jurors in order to follow up on the responses that those jurors gave to earlier *voir dire* questions. For example, defendant asserts that defense counsel should have probed further concerning the drug problem of juror Axelrod's daughter, the prior case in which juror Hill had served as a juror, and the marital status of juror Litwinczuk's parents. We find that all of those claims are entirely without merit. Many of the questions that defendant claims should have been asked actually *were* asked. The remaining questions now suggested by defendant would have been irrelevant to the issue of juror bias or simply unnecessary.

 Defendant also raises two claims alleging that the cumulative effect of counsel's failure to request more detailed questions on *voir dire* denied defendant the right to be tried by a fair and impartial jury. In our view, because defendant's individual claims are almost entirely without merit, even viewed cumulatively those claims do not erode this Court's confidence in the fairness of the jury selection. See *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. We find that, on the whole, counsel's performance during *voir dire* was thorough and competent.

 Two of defendant's claims pertain to the trial court's decision not to excuse juror Stephen Calabro for cause. During the trial, Calabro informed the court that he was acquainted with one of the State's witnesses and that he was familiar with casino credit records, the subject about which the witness had testified. Calabro also noted that he had had a mid-trial conversation with another juror about the substance of the witness's testimony. The court questioned Calabro *in camera* outside the presence of the attorneys. After extensive questioning and numerous assurances from Calabro that he could remain impartial, the court elected not to excuse Calabro. We are satisfied with the trial court's questioning of Calabro and find no reason to disturb the court's discretionary ruling that Calabro was fit to serve as a juror in this case.

Defendant claims that defense counsel was ineffective in failing to request that he be present during the court's discussion with Calabro. However, the record reveals that counsel, after conferring with defendant, asked the court to question Calabro outside the presence of the attorneys so that the juror would not "feel ... intimidated or picked on or singled out." Counsel's request does not reflect ineffective assistance of counsel.

One of defendant's claims pertains to the trial court's decision to qualify Neil Marzano as a juror. In *Marshall I, supra,* we noted that the record indicates that Marzano responded "no" to a question on *voir dire* concerning whether he could fairly evaluate the credibility of law-enforcement officials testifying at trial. 123 *N.J.* at 88, 586 *A.*2d 85. We noted that after asking that question, the trial court suddenly moved on to another area of inquiry, and defense counsel never referred to Marzano's negative response. *Ibid.* We concluded:

> [Marzano's] isolated negative answer, especially in the context of both the trial court's and counsel's total lack of response, is inexplicable. Even assuming that the transcript accurately reflects Marzano's answer, however, that isolated response, when considered in the context of the entire *voir dire,* does not demonstrate that the juror was unfit to serve.
>
> [*Id.* at 88–89, 586 *A.*2d 85.]

On PCR review, defendant criticizes trial counsel's failure to move to exclude Marzano for cause or to request follow-up questions concerning Marzano's negative answer. However, in view of the fact that Marzano was fit to serve as a juror, *see id.* at 89, 586 *A.*2d 85, even if the transcription of Marzano's answer is accurate, counsel's failure to take remedial action did not prejudice defendant. Accordingly, defendant has not set forth a *prima facie* case in support of his *Strickland/Fritz* argument.

Defendant also sets forth general claims concerning the manner in which *voir dire* was conducted in this case. First, he contends that Zeitz was ineffective in failing to ask the trial court to allow attorney-conducted *voir dire* instead of the traditional court-conducted questioning. However, defendant fails to explain

how he was prejudiced by the use of court-conducted *voir dire* in this case. As we noted in *Marshall I, supra:*

> With but few exceptions, the trial court consistently and repeatedly acquiesced in defense counsel's requests to reinterrogate prospective jurors about specific subjects. The trial court's conduct of the *voir dire* was thorough and meticulous, and was painstakingly responsive to counsel's concerns that the scope of inquiry about specific subjects required amplification.
>
> [123 *N.J.* at 94, 586 *A.*2d 85.]

This claim is without merit.

Defendant also asserts that Zeitz was ineffective in failing to request additional peremptory challenges to offset the adverse impact of pretrial publicity in Atlantic County, the site of defendant's trial. However, we previously have concluded that there is "no indication that any juror was so tainted by pretrial publicity as to affect the deliberative process * * * * We are convinced that there was no 'realistic likelihood of prejudice from pretrial publicity.'" *Id.* at 78–79, 586 *A.*2d 85 (citation omitted). Thus, defendant was not prejudiced by Zeitz's failure to request additional peremptory challenges.

Defendant also alleges that the trial court improperly focused the jurors' attention on the notoriety of this case by referring to the presence of television cameras in the courtroom. In respect of the television coverage, the trial court explained to the jurors:

> A trial ... is a public matter. The public is entitled to attend. Obviously, persons may wish to attend this trial in such numbers that they cannot physically come into the courtroom. The news media may think it appropriate to cover the trial, and the Supreme Court of this state has decided that cameras can be in the courtroom under certain controlled guidelines ... and that is how these persons come to be present in the courtroom. They are limited in number. They are not, as you know, permitted to televise or photograph the jurors. So, if you can, just ignore them.

We find the trial court's comments on this subject to be entirely appropriate.

Lastly, defendant claims that trial counsel did not provide effective representation of defendant in the course of asking the trial court to close the courtroom to the media during two

pretrial hearings. Counsel had argued to the trial court that defendant's right to an impartial jury could be compromised if the media attended the hearings because news coverage of the hearings could infect the pool of potential jurors. The trial court denied the motion to close the courtroom, citing, among other reasons, defense counsel's failure to give notice of his motion to the media, as required by our decision in *State v. Williams*, 93 *N.J.* 39, 72, 459 *A.*2d 641 (1983). On that basis, defendant now argues that he did not receive effective assistance of counsel during the two pretrial hearings. However, defendant was not prejudiced by counsel's failure to give the requisite notice to the press. First, as the trial court noted, there were additional requirements of the *Williams* test for court closure that defendant could not satisfy, including demonstrating that an open court would result in a "realistic likelihood of prejudice to a fair trial," *id.* at 63, 459 *A.*2d 641, and that there were no reasonable alternatives to court closure. Moreover, there is "no indication that any juror [at defendant's trial] was so tainted by pretrial publicity as to affect the deliberative process." *Marshall I, supra,* 123 *N.J.* at 78, 586 *A.*2d 85. We thus conclude that defendant's claim is without merit.

## J. MISCELLANEOUS CLAIMS OF PROSECUTORIAL MIS-CONDUCT

**(E.3–7, E.21, H.15)**

 The claims in this category pertain to various instances of prosecutorial misconduct that allegedly occurred at defendant's trial. For example, defendant asserts that the following portion of the prosecutor's opening statement improperly referred to the fact that defendant had hired a lawyer: ·

> An indictment is a tool that we use in our judicial system which brings a case to a particular posture. . . . This indictment has served its purpose in that it has brought us all together, the Court, myself, two of the defendants, named Mr. Marshall and Mr. Thompson, *the lawyers hired by them*, and, most importantly, you, ladies and gentlemen, who will ultimately be called upon to decide the facts of this case.

Defendant also argues that the prosecutor committed misconduct in introducing "victim-impact evidence" by stating, during his opening remarks: "This is a murder case—not just a murder case—but a case of murder for hire. The execution of a forty-two-year-old Toms River housewife and mother; a killing solicited and paid for by her husband, defendant Robert Marshall." Most of the remaining claims in this category similarly criticize brief comments made by the prosecutor during the course of the trial. We have reviewed all of the claims thoroughly and conclude that they are entirely without merit and do not warrant extended discussion. Indeed, many of defendant's claims are mere restatements of claims rejected by this Court on defendant's direct appeal. See *Marshall I, supra,* 123 *N.J.* at 152–64, 586 *A.2d* 85. In respect of most of the claims in this category, defendant has failed to demonstrate that the prosecutorial conduct in question was improper. In the remaining instances, defendant has not established that the State's misconduct was "so egregious that it deprived defendant of a fair trial." *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.2d* 188. Thus, we find that the PCR court properly dismissed the claims in this category without granting an evidentiary hearing.

## K. TRIAL COUNSEL'S ALLEGED FAILURE TO INTRODUCE EVIDENCE CORROBORATING DEFENDANT'S TESTIMONY

(B.33–35, B.40, B.60, B.101–02, B.144–45, B.178, B.186–89, B.204–05, B.224, B.227–29)

The claims in this category allege that defendant's trial counsel was ineffective in failing to present evidence that would have corroborated various assertions made by defendant during his trial testimony. Among the assertions that counsel allegedly failed to corroborate are: defendant's insistence that at the time he made the "suicide tape" he truly planned to kill himself; defendant's claim that his love for his late wife was genuine; and defendant's statement that he hired an investigator not to murder his wife, but rather to investigate her financial activities. Adjudi-

cating the claims in this category on the merits, we conclude that they should be dismissed without an evidentiary hearing.

The first set of claims in this category pertains to defendant's testimony that he checked into the Best Western Motel in Lakewood on September 27, 1984, with the intention of taking his own life. At trial, the State questioned that testimony, suggesting that defendant had staged his purported suicide attempt. On PCR review, defendant asserts that trial counsel inadequately investigated defendant's suicide claim and, as a result, was unprepared to argue to the jury that defendant's suicide plans were sincere. Specifically, defendant argues that counsel was ineffective in failing to obtain various medical records concerning defendant's admission into a psychiatric hospital following his purported suicide attempt.

However, defendant presents to this Court only one document that arguably could have aided his attempt to convince the jury that his suicide plans were sincere. That document is the discharge summary from the Institute of Pennsylvania Hospital, where, as defendant testified, he stayed for twelve days following his purported suicide attempt. Our review of the discharge summary persuades us that there is not a reasonable probability that the result of defendant's trial would have been different had that document been introduced into evidence. See *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. Although the discharge summary indeed mentions defendant's suicidal state at the time of his admission into the hospital, it also notes that he was "rational," "coherent," "alert," "goal oriented," and that his "affect was appropriate." Moreover, even if defendant could have used the discharge summary to lead jurors to conclude that the suicide attempt was genuine, we fail to discern how such a conclusion could have materially affected the jury's verdict. The question whether defendant planned to kill himself on September 27, 1984, is largely irrelevant to the determination of whether defendant arranged the September 7, 1984, murder of his wife. The jury could have concluded that defendant planned

to take his life on September 27 because of his awareness of his guilt and his fear of being tried and convicted for a murder he knew that he had committed.

Defendant also alleges that trial counsel was ineffective in not corroborating defendant's testimony concerning his love for his late wife. While cross-examining defendant, the State had suggested that defendant's expressions of love for Maria were scripted rather than sincere. Referring to the fact that defendant was wearing his wedding ring at trial, the prosecutor asked defendant whether defense counsel or Investigator Kolins had advised defendant to wear the ring. Counsel objected, and the trial court sustained the objection. Defendant then explained that the ring was a reflection of his love for his late wife and that he was not permitted to wear the ring in prison so he was eager to do so at trial. On PCR review, defendant claims that counsel should have corroborated that testimony by calling a second witness to testify about the Ocean County Jail's rule against wearing jewelry. In view of the sustained objection to the State's question and defendant's thorough and informative response to the question, we conclude that counsel was not ineffective in concluding that he could better represent his client by pursuing other areas of inquiry.

After asking defendant about his decision to wear his wedding ring at trial, the prosecutor questioned defendant about the fact that Maria Marshall's ashes remained in a "brown cardboard box at the funeral home" over a year after her death. Defendant explained that the family had planned to bury the ashes in Florida, as Maria had requested, but that defendant's arrest had forced the family to postpone its Florida burial plans. Defendant now asserts that counsel was ineffective in failing to present testimony from defendant's sister and defendant's travel agent confirming the family's postponed Florida travel plans. Defendant also presents an affidavit from the Quinn–Hopping Funeral Home explaining that Maria Marshall's ashes were being kept in a "storage room" in the funeral home. Defendant claims that a

representative from the funeral home should have been called to testify that families often leave a deceased's ashes at the funeral home for a period of time before taking possession of the remains.

We conclude that the decision not to elicit the testimony in question from defendant's sister, defendant's travel agent, or the funeral-home representative does not reflect ineffective assistance of counsel. Instead of presenting that testimony, counsel called to the witness stand one of defendant's sons who fully corroborated defendant's explanation of the family's Florida burial plans. In our view, further testimony on that peripheral topic would not have materially aided defendant's chances of being acquitted of the charged offenses.

Defendant also alleges that trial counsel inadequately dealt with defendant's pretrial statement to police officers that he was not having an extramarital affair during the weeks preceding his wife's death. At trial, defendant testified that while being questioned at the Bass River State Police Barracks he had denied that he had been having an affair, and he admitted at trial that that denial had been a lie. Detective Petracca, testifying for the State, substantially corroborated defendant's account of the police questioning concerning defendant's extramarital affair, but testified that the questioning had occurred at defendant's house, not at the police barracks. On PCR review, defendant claims that trial counsel should have impeached Petracca's testimony with Investigator Murphy's police report, which stated that defendant's denial of the affair had been made at the police barracks. We find defendant's claim to be entirely without merit. The significance of defendant's denial of his relationship with Kraushaar was that the denial was a lie. The location at which defendant uttered the lie was irrelevant to defendant's case, and thus counsel was not ineffective in not attempting to corroborate defendant's testimony on that point.

Defendant presents three claims pertaining to defendant's relationship with Robert Cumber, the person who led defendant to Billy Wayne McKinnon. During his trial testimony, defendant

attempted to explain his reasons for becoming involved with Cumber. He explained that he had met Cumber at a party hosted by a neighbor and that he and Cumber had been drinking at the time. Defendant testified that he had told Cumber that some of his recent earnings could not be accounted for, and that he suspected that Maria had the missing money. Defendant testified that he had told Cumber that he wanted to hire an investigator to locate those missing funds.

On PCR review, defendant claims that trial counsel was ineffective in failing to elicit the fact that defendant's accusations concerning his wife were preceded by comments made by Cumber about problems that he was having in his own marriage. Defendant also claims that counsel should have presented testimony concerning the fact that defendant attempted to solicit business from Cumber in connection with defendant's work as an insurance agent and financial consultant. However, defendant has not explained how eliciting that information would have materially aided his case. We therefore find these claims to be without merit.

Defendant also alleges generally that trial counsel did not develop "a consistent strategy" with respect to defendant's decision to hire an investigator. However, defendant fails to explain what "consistent strategy" counsel could have adopted that could have affected the outcome of defendant's trial. We find this claim to be without merit.

Two of defendant's claims pertain to the State's effort to demonstrate the existence of a relationship between defendant and Billy Wayne McKinnon, who, at trial, admitted that he had participated in the murder of Maria Marshall. The State, attempting to prove that defendant and McKinnon were in contact in the days preceding Maria Marshall's death, used defendant's phone records to show that he had called Harrah's Marina Casino in Atlantic City at the same time that McKinnon had been staying at Harrah's. Defendant now asserts that trial counsel should have used those phone records to demonstrate that defendant had

called Harrah's on a regular basis and that the fact that defendant had called there while McKinnon was there did not indicate that defendant had made the calls in an attempt to reach McKinnon.

Defendant also argues that trial counsel should have presented witnesses who could have demonstrated that although McKinnon and defendant had a meeting in Atlantic City on September 6, 1984, defendant did not make the trip to Atlantic City solely to meet with McKinnon. Specifically, defendant claims that counsel should have presented the testimony of a representative from the Meadows Restaurant, which is located in Harrah's, to testify that defendant had made dinner reservations at that location before the date on which defendant had learned that McKinnon was in Atlantic City. That testimony, defendant argues, would have corroborated defendant's own testimony concerning his motives for going to Atlantic City on September 6.

In our view, these two claims concerning the relationship between defendant and McKinnon are without merit. In his testimony, defendant admitted that there had been ongoing communications between him and McKinnon. The issue that defendant and the State disputed at trial was whether those communications had included a plot to murder Maria Marshall. The testimony concerning the restaurant reservation and the frequency of defendant's calls to Harrah's would have been irrelevant to that critical issue and thus counsel was not ineffective in electing not to pursue those areas of inquiry.

One of defendant's claims pertains to defendant's testimony that he used self-parking instead of valet-parking at Harrah's on the night of his wife's death because self-parking on that night rendered the car owner eligible for a raffle prize. The defense theory was that because defendant had self-parked his car that night, passers-by had access to the car and could have inflicted the damage to defendant's tire that later caused defendant to pull off of the road and into the Oyster Creek Picnic Area. On PCR review, defendant claims that trial counsel was ineffective in not corroborating defendant's testimony by offering the raffle

ticket from that night into evidence. However, the raffle ticket itself would not have materially aided the jury's evaluation of the one significant issue relating to this area of defendant's testimony: whether someone had tampered with defendant's tire at Harrah's. Because the raffle ticket itself is almost entirely irrelevant to the question whether defendant is guilty of his wife's murder, counsel was not ineffective in not offering the ticket into evidence.

Lastly, defendant presents two claims that trial counsel was ineffective in handling the testimony of defendant's son, John, who testified about defendant's demeanor on the night he made the "suicide tape." Defendant claims that counsel should have also questioned John about defendant's demeanor on the night of Maria Marshall's death, and that counsel failed to ascertain whether there was any other information that John knew that could have been helpful to the defense. However, defendant is unable to explain what information John possessed that could have aided defendant's case or affected the result of defendant's trial. Accordingly, those claims were properly dismissed by the PCR court.

## L. ALLEGED ERRORS INVOLVING THE USE OF SEARCH WARRANTS

### (B.26, B.90, B.213, B.226, E.2)

Defendant raises several claims of ineffective assistance of counsel and one of prosecutorial misconduct in connection with references to search warrants in the course of the trial. Defendant claims that trial counsel should have moved *in limine* to preclude references to the search warrants in the presence of the jury. Defendant also claims that trial counsel should have objected to police testimony that the search of James Davis's home was executed pursuant to a search warrant. Finally, defendant claims that the prosecutor's reference to the issuance of a search warrant for defendant's telephone records constituted an impermissible reference to a judicial finding of probable cause that defendant was involved with the murder of Maria Marshall.

We find those claims to be without merit. They have in common the proposition that the jury should be shielded from knowledge that search warrants have been issued in a criminal matter because the prior judicial determination of probable cause may influence the jury to assume guilt. We are aware of no authority in support of such a rule. We are satisfied that a properly instructed jury will not presume guilt based on the issuance of a search warrant. We note, moreover, that the fact that a warrant was issued might necessarily be put before a jury in order to establish that the police acted properly.

Defendant's reliance on *State v. Milton,* 255 *N.J.Super.* 514, 605 *A.*2d 757 (App.Div.1992), is misplaced. That case dealt with a prosecutor's reference to a search warrant that had the capacity to mislead the jury. Defendant does not claim that any reference to search warrants in these proceedings was misleading, and we are satisfied from our own review of the record that the references of which defendant complains were accurate.

The balance of the claims in this category allege errors or omissions of trial strategy in connection with the search warrants, and assert that the errors deprived defendant of the effective assistance of counsel. Defendant claims that trial counsel erred in calling Investigator Mahoney as a defense witness to establish police procedure for obtaining a search warrant, because that testimony necessarily disclosed to the jury the probable-cause determination. Defendant also claims that trial counsel erred in not objecting to evidence seized in the search of Davis's house because the affidavit in support of the warrant application contained false testimony.

With regard to calling Investigator Mahoney, we find that counsel was not ineffective. Counsel called Mahoney to establish that the contents of a sealed envelope seized from defendant were omitted from an inventory made by the investigators. That omission is the basis for several other claims defendant has raised on PCR review. Trial counsel cannot be faulted for attempting to lay the foundation for claims on which defendant

now relies. We find that counsel's examination of Mahoney was a legitimate strategic choice. Furthermore, neither Mahoney nor counsel directly mentioned the probable-cause determination in the course of the examination. In view of our holding that the jury's awareness of a search warrant did not cause an impermissible inference of guilt, Mahoney's testimony concerning the search warrant was harmless.

We also find no merit to the claim that trial counsel should have challenged the Davis search warrant. Despite defendant's general allegations that the affidavit on which the warrant was based contained false testimony, defendant has not specified which of the averments in the challenged affidavit were false. Nor has it been demonstrated that probable cause would have been lacking had the alleged false swearing been stricken. Defendant's claim that the affidavit relied on information that could only have been within the knowledge of a dead person appears to have no basis in the record.

## M. ALLEGED ERRORS IN THE JURY CHARGE

### (F.7–8, H.11, H.16)

Defendant raises three claims relating to the trial court's charge to the jury. The PCR court dismissed these claims under *Rule* 3:22–4. We reach the substance of the claims and find that, to the extent that the arguments presented have not been addressed previously by this Court, each is without merit.

Defendant claims that the trial court erred in charging the jury that "in many cases, circumstantial evidence can be more certain, satisfying, and persuasive than direct evidence." Defendant claims that the trial court inadvertently implied that it had presided over trials in which circumstantial evidence was more persuasive than direct evidence, and that, because the State's case relied primarily on circumstantial evidence, the court also revealed a bias in favor of the prosecution. We perceive nothing in the quoted language that could have deprived defendant of a fair trial.

We note, moreover, that the same language appears in the Model Jury Charge on Circumstantial Evidence. We reject defendant's claim that the charge revealed a bias in favor of the prosecution or diluted its burden of persuasion, and note that both the State and defendant relied on circumstantial evidence at trial.

Defendant objects to the trial court's charge to the jury that the use of a .45 caliber pistol "in and of itself" permits the jury to draw the inference that the person using it had the purpose to take life. Defendant claims that the court should have instructed the jury that it was free to reject that inference. We approved a similar instruction in *State v. Martini,* 131 *N.J.* 176, 272, 619 *A.*2d 1208 (1993) (*Martini I*), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995). The charge clearly does not mandate the inference of an intent to kill. In any event, the intent of the shooter was never at issue in the case; the question for the jury was whether defendant had procured the death of his wife through the payment of money.

Defendant claims that the trial court erred in charging the jury that its function was to determine the truth, thus diluting the State's burden of proof beyond a reasonable doubt. Defendant also claims that the jury should have been charged that it could reject the death penalty based on any mitigating evidence, notwithstanding the outcome of the weighing process. We rejected both of those claims in *Marshall I, supra,* 123 *N.J.* at 134–36, 150–51, 586 *A.*2d 85. Defendant asserts that he was precluded from fully presenting these arguments by the two hundred page limit this Court imposed on briefs in the direct appeal. However, this Court has reviewed the original direct appeal briefs, submitted before the two hundred page limit was imposed, and we have found nothing that would change our original disposition of the issues raised. On this appeal, defendant has not revealed what substantive arguments he was unable to make due to the page limit, contenting himself with objecting to the PCR court's application of the procedural bar.

We are satisfied that defendant was not unfairly prejudiced by the two-hundred page limit on direct appeal briefs. Both of the claims are relatively simple. The trial court's reference to finding "truth" did not dilute the prosecution's burden when read in context with the jury charge as a whole. There is no legal foundation for defendant's claim that he was entitled to a charge that the jury could disregard the statutorily mandated balancing process and reject the death penalty on the basis of any mitigating evidence. We are satisfied that our original disposition of the issues was correct, and that defendant was not precluded from raising any dispositive argument. Therefore, we find those claims to be without merit.

## N. CLAIMS INVOLVING THE RELIABILITY OF THE PENALTY–PHASE PROCEEDING

### (B.231–66, E.16–18, F.9–14, F.17–21, G.6, H.12–14, H.16)

In general, the claims asserted in this subsection primarily relate to the adequacy of the representation afforded defendant in the penalty phase of his capital-murder trial. We addressed aspects of this issue on direct appeal—specifically, counsel's failure to present additional mitigating evidence during the penalty phase and counsel's alleged abdication of the role of advocate in his penalty-phase summation—concluding on both those issues that counsel's performance was not demonstrably deficient and that if counsel's summation argument was deficient it did not materially affect the sentence imposed. *Marshall I, supra,* 123 *N.J.* at 165–70, 586 *A.*2d 85.

Based on our disposition of those questions on direct appeal, the PCR court dismissed all but three of the claims of counsel's ineffectiveness relating to the penalty phase as procedurally barred. The PCR court held an extensive evidentiary hearing regarding the following two claims concerning counsel's alleged ineffectiveness: (1) failure to make reasonable inquiries of treating medical personnel regarding defendant's fitness to proceed with the penalty phase after fainting following the guilt-phase verdict;

and (2) failure to inform the trial court that defendant was incapable of proceeding in the penalty phase. The PCR court dismissed those claims on the merits, concluding that the evidence adduced at the hearing had demonstrated that defendant had recovered from his fainting spell and was fully competent to proceed with the penalty phase. We agree with that disposition.

The PCR evidentiary hearing revealed that defendant apparently fainted while being escorted after the guilty verdict from the courtroom to a holding cell. Sheriff's officers summoned the local Rescue Squad and squad members transported defendant by ambulance to a nearby hospital. The examining physician concluded that defendant's fainting spell was a reaction to the guilty verdict and that defendant was fully recovered and manifested no symptoms that warranted further observation. Defendant was then transported back to the Atlantic County courthouse.

In the interim, the prosecutors and defendant's trial counsel had reached tentative agreement on the procedure to be followed in the penalty phase. The agreement contemplated that neither side would produce additional witnesses to support the aggravating or mitigating factors. The State agreed to withdraw aggravating factors c(4)(c) (murder involved aggravated assault of victim) and c(4)(d) (murder committed in expectation of pecuniary gain), and to rely only on aggravating factor c(4)(e) (commission of homicide procured by payment or promised payment of money). Defense counsel agreed to rely solely on the guilt-phase evidence to support two mitigating factors: c(5)(f) (no significant history of prior criminal activity), to which the State stipulated; and c(5)(h) (any other relevant material). Both sides agreed that they would each briefly address the jury, first defense counsel and then the prosecutor, to present argument in opposition to and in support of the death penalty.

Defendant's trial counsel and defendant testified at the PCR evidentiary hearing and confirmed that the proposed penalty-phase procedure had been discussed with and approved by defendant. Defendant testified that he had told trial counsel that he

had fainted, that counsel had inquired of defendant whether he wished to go ahead with the penalty phase, and that defendant had replied, "[L]ets get it over with." Defendant testified that he and counsel had not previously discussed strategy concerning the conduct of a penalty-phase hearing.

Trial counsel testified that he had discussed penalty-phase strategy with defendant on prior occasions, but acknowledged that the written notes he had maintained as a memorialization of his numerous conversations with defendant did not reflect their penalty-phase discussions. Counsel recalled specifically that he and defendant previously had discussed whether Marshall's sons would be called to testify in the penalty phase, and that Marshall had been opposed to their testifying. Counsel testified that he again had raised with Marshall the issue of his sons' testifying during their conversation between the guilt phase and the penalty phase, and stated that Marshall had reiterated his opposition, indicating that he wished to avoid the emotional ordeal to which such testimony could expose his sons.

Relying on both testimony and affidavits contained in the PCR record, defendant asserts a multitude of both specific and generalized complaints of ineffectiveness of trial counsel concerning the preparation and conduct of the penalty-phase proceedings. The general complaints, broader in scope than those advanced on the direct appeal, allege that trial counsel did not adequately prepare for the penalty-phase hearing and that trial counsel had not developed any strategy in anticipation of the possible need for a penalty-phase hearing. The clear implication of the general complaints of ineffectiveness in the penalty phase is that trial counsel's decision to present no penalty-phase witnesses and to advance no forceful argument in summation against the death penalty was not the product of a strategic decision by trial counsel, but simply reflected counsel's utter lack of preparation for a penalty-phase proceeding.

The primary record support for the general claims of ineffectiveness in the penalty phase consists of a certification from Joan

O. Van Pelt, a Deputy Public Defender assigned to represent defendant on post-conviction relief, and an affidavit of Richard D. Ruffin, Jr., a psychologist who maintains a private practice as a mitigation specialist in capital cases. The Van Pelt certification states that she reviewed or supervised the review of the trial file and correspondence file maintained by trial counsel, including notes of interviews, and the file of counsel's investigator, Russ Kolins. She certified that the files include no materials concerning the penalty phase of the case, no legal research concerning aggravating and mitigating factors or requests to charge in the penalty phase of capital cases, no reports of investigations in preparation for a case in mitigation, no reports of consultations with experts in the presentation of mitigating evidence, and no notes of interviews with friends or family members in preparation for the presentation of mitigating evidence.

The affidavit of Richard D. Ruffin, Jr. sets forth his experience as a "mitigation specialist" who assists counsel in preparing and presenting mitigating evidence in capital cases. Ruffin asserts that he reviewed the penalty-phase transcript and portions of the trial transcript, and that he also reviewed defendant's educational records from grade school through college, as well as various medical records, military records, and other investigative reports concerning defendant. His affidavit alleges that a proper mitigation investigation in a capital case should include extensive interviews with the client, family members, friends, teachers, employers, and physicians; examination of all school, medical, and employment records; and preparation of a comprehensive social history containing all of the information compiled that could be useful to trial counsel in presenting mitigating evidence. Ruffin's affidavit states that his review of trial counsel's file demonstrated that trial counsel failed to retain a mitigation specialist and failed to conduct a penalty-phase investigation that met the accepted standards of counsel experienced in the conduct of death-penalty trials. Ruffin's affidavit concludes with this statement: "It is my opinion that information concerning Robert O. Marshall exists which could have served as a basis for a productive mitigation.

However, defense counsel's failure to investigate properly resulted in this information being unavailable to the sentencing jury." Significantly, Ruffin's affidavit does not disclose the nature or content of the information about defendant that he concludes "could have served as a basis for a productive mitigation."

We address and resolve on the merits defendant's claims relating to the penalty phase of the trial. Although some claims are similar to contentions we addressed on direct appeal, we are persuaded that the claims in the PCR petition have a different context and broader scope than those we reviewed on direct appeal and that application of the *Rule* 3:22–4 and –5 procedural bars would be improper. *See supra* at 148–54, 690 *A*.2d at 29–33. We have previously noted, *supra* at 158, 690 *A*.2d at 35, that PCR courts "ordinarily should grant evidentiary hearings ... if a defendant has presented a *prima facie* claim in support of post-conviction relief," which requires demonstration of a reasonable likelihood that the claim ultimately will succeed on the merits. *Preciose, supra,* 129 *N.J.* at 462–63, 609 *A*.2d 1280. We also noted, *supra* at 156–57, 690 *A*.2d at 34–35, that ineffective assistance of counsel claims are governed by the two-prong standard of *Strickland, supra,* requiring proof that "counsel's representation fell below an objective standard of reasonableness," 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

We have previously rejected the contention that we should "alter the *Strickland/Fritz* standard [for resolving ineffective assistance of counsel claims] for capital cases," and concluded that that standard "will adequately fulfill the constitutional guarantee." *State v. Davis,* 116 *N.J.* 341, 356–57, 561 *A*.2d 1082 (1989). Except for a brief reference in *State v. Savage,* 120 *N.J.* 594, 626, 577 *A*.2d 455 (1990), this is the first case in which we have occasion comprehensively to discuss and apply the *Strickland/Fritz* standard to the penalty phase of a capital case. Accordingly, we deem it appropriate to elaborate on our understanding of the manner in

which the prejudice prong of *Strickland/Fritz* should be adapted to the unique circumstances of a capital case penalty-phase proceeding. We recall that the *Strickland* court rejected as too severe a standard for prejudice a requirement that "counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland, supra,* 466 *U.S.* at 693, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 697–98. The Court instead adopted what it described as a "somewhat lower" standard, requiring a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and observing that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. The Court emphasized, however, that the standards it had adopted "do not establish mechanical rules." *Id.* at 696, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699. The Court stated:

> Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.
>
> [*Ibid.*]

Commentators have noted that strict application of *Strickland*'s prejudice prong poses a high obstacle to the successful assertion of ineffective assistance of counsel claims concerning the penalty phase in capital cases.

> Because the decision to impose death or to grant mercy is inherently subjective, to prove a "reasonable probability" that "the result of the proceeding would have been different" is daunting indeed. Faced with a horrific crime and overwhelming evidence of guilt, reviewing courts are often unable to imagine that a jury would have imposed any sentence but death.
>
> [Note, *The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials,* 107 *Harv. L.Rev.* 1923, 1931 (1994) (footnotes omitted).]

Moreover, a literal application of *Strickland*'s prejudice prong mandates that appellate courts attempt to step into the shoes of death-penalty jurors, assessing the likelihood that if counsel had provided adequate representation the result of the penalty-phase

proceeding would have been different. The difficulty inherent in that assessment derives from the unique function and responsibility of a capital jury:

> There are no standards to guide a capital jury in deciding whether to be merciful in sentencing. A capital case jury may have death-scrupled jurors, may constitutionally exercise mercy for any reason, and may consider any and all mitigating evidence, weighing and valuing it as it pleases. Consequently, short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision. A court which takes it upon itself to consider and weigh mitigating facts which were not presented to the sentencer at trial and to decide whether their presentation might have made a difference invades the province of the trier of fact and denies the capital defendant the right to a determination of sentence based on all relevant factors.
>
> [Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 *N.Y.U. L.Rev.* 299, 354 (1983) (footnote omitted).]

In *Caldwell v. Mississippi,* the United States Supreme Court concluded that a prosecutor's argument to a death-penalty jury that the responsibility for determining the appropriateness of the defendant's death rested ultimately with the reviewing appellate court violated the Eighth Amendment to the United States Constitution. 472 *U.S.* 320, 328–29, 105 *S.Ct.* 2633, 2639–40, 86 *L.Ed.*2d 231, 239 (1985). The Court's opinion focused specifically on the substantial difference between the role of a penalty-phase jury and the reviewing function of an appellate court:

> In the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court.
>
> Bias against the defendant clearly stems from the institutional limits on what an appellate court can do—limits that jurors often might not understand. The "delegation" of sentencing responsibility that the prosecutor here encouraged would thus not simply postpone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson* [*v. North Carolina,* 428 *U.S.* 280], 304 [96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976) ]. When we held that a defendant

has a constitutional right to the consideration of such factors, *Eddings* [*v. Oklahoma*, 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1 (1982) ]; *Lockett* [*v. Ohio*, 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978) (plurality opinion) ], we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses.

[*Id.* at 330–31, 105 *S.Ct.* at 2640, 86 *L.Ed.*2d at 240.]

Our recognition of the profound distinction between our circumscribed appellate-review function and the capital jury's significantly less-restricted role in deciding between life and death informs our application of the prejudice prong of *Strickland/Fritz* to penalty-phase proceedings. That distinction demonstrates that a reviewing court strays from its traditional function if it attempts to predict the probability that a penalty-phase jury would have changed its verdict if counsel had not been deficient. In our view, an adaptation of the *Strickland/Fritz* prejudice test to capital-case penalty-phase proceedings that more faithfully reflects our appellate function would require courts to determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially. That standard is, in our view, more consistent with the *Strickland* Court's admonition that a "reasonable probability that the result of the proceeding would have been different" is "a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. The reasonable probability that ineffective assistance of counsel in the penalty phase of a capital case substantially affected the jury's penalty-phase deliberation equates with "a probability sufficient to undermine confidence in the outcome."

We regard our understanding of the *Strickland/Fritz* prejudice prong for reviewing claims of ineffective assistance of counsel in penalty-phase proceedings to be a necessary adaptation of the literal *Strickland* standard to the realistic limitations on appellate review of jury penalty-phase deliberations. Although an appellate court cannot predict the outcome of a penalty-phase jury's deliberations, it is entirely capable of assessing whether the production of additional mitigating evidence would have been likely to have a

substantial effect on the jury's deliberations. We are satisfied that our adaptation of the *Strickland* prejudice prong to penalty-phase proceedings is faithful to the core meaning of the standard announced by the *Strickland* court.

Concerning defendant's generalized claims of counsel's ineffectiveness in the penalty phase, we are convinced that defendant has failed to demonstrate a reasonable likelihood that those claims ultimately will succeed on the merits. Defendant has offered documentation to support the allegation that trial counsel's preparation and performance in the penalty phase may not have been consistent with prevailing standards. The allegation that trial counsel's files reflect no investigation, research, or other preparation for the penalty phase is disturbing. Although Zeitz testified that he had conferred with defendant about the penalty phase on prior occasions, he acknowledged that his interview notes did not reflect those discussions. Similarly, the allegations in the Ruffin affidavit describing the scope of investigation in which mitigation specialists ordinarily engage suggests that trial counsel's penalty-phase preparation was less than that normally undertaken by experienced counsel, although we note that Ruffin is a mitigation specialist, not a lawyer experienced in capital cases.

However, no documentation in the PCR record discloses information that an adequate investigation would have revealed and that would have been reasonably likely to affect substantially the jury's deliberations in the penalty phase. Ruffin's unsubstantiated allegation that such information "exists" is plainly inadequate. Even with the benefit of hindsight, PCR counsel does not allege the existence of facts, information, or specific evidence possessing a reasonable possibility of having had a substantial effect on the jury's deliberation in the penalty phase.

The nature of the crime of which defendant was convicted diminishes the likelihood that the types of mitigation evidence commonly used in capital cases would have had a positive impact on the jury. For example, among the specific instances of ineffectiveness relied on by defendant are trial counsel's failure to adduce

testimony of defendant's sister and son that his family loved him, and that his execution would harm the family. Notwithstanding trial counsel's testimony that defendant refused to have his sons testify in the penalty phase, the obvious risk of relying on harm to defendant's family as a mitigating factor is that the jury would have been offended by that contention because of its guilt-phase determination that defendant had already inflicted grievous harm on the family by hiring McKinnon to murder his wife and the mother of his three sons. Other specific claims of ineffectiveness, which we are about to address, either suffer from similar flaws or simply were unlikely to have affected substantially the jury's deliberations.

The claims of ineffective assistance of counsel in the penalty phase can fairly be assessed only in the context of the entire trial record and of the grave offense of which defendant was convicted. We already have noted trial counsel's request to the trial court, concurred in by counsel for co-defendant Thompson, to limit death-qualification of the jury as a strategy designed to avoid a "conviction-prone" jury. *See supra* at 227, 690 A.2d 70. That strategy apparently assumed that a death-prone jury was preferable to a conviction-prone jury, an implied acknowledgement that the likelihood of acquittal was higher than the likelihood of avoiding the death sentence after conviction. Because trial counsel was privately retained and well-compensated, the inference is compelling that that strategic decision was not made without consultation with defendant. After the jury returned a guilty verdict, the conclusion is inescapable that the task of mounting an effective mitigation strategy was formidable indeed. That conclusion is buttressed by the inability of PCR counsel to identify specific facts or information concerning defendant that, if offered as mitigating evidence, were likely to have affected substantially the jury's penalty-phase deliberations.

In our direct appeal opinion we addressed specifically the contention that trial counsel's failure to produce additional mitigat-

ing evidence constituted ineffective assistance of counsel. We observed:

> It is self-evident that in view of the crime of which defendant was convicted, the selection of mitigating evidence on which to rely was a matter of some delicacy, requiring counsel to consider carefully the prospect of rebuttal evidence and rebuttal arguments, as well as the jury's anticipated reaction to any mitigation evidence that was offered. We are unwilling to second-guess counsel's strategic decision on this issue, particularly in view of the jury's determination that both mitigating factors offered had been established.
>
> [*Marshall I, supra*, 123 *N.J.* at 166, 586 *A.2d* 85.]

We also commented on the contention that counsel's closing argument in the penalty phase demonstrated ineffectiveness:

> We also infer from counsel's closing argument a strategic decision to avoid any emotional appeal to the jury, in favor of a low-key statement that emphasized that the life or death decision was the responsibility of each individual juror. In the context of this record and the grave offense of which defendant was convicted, a closing argument that focused each juror's attention on his or her moral responsibility for defendant's life or death cannot easily be discredited.
>
> [*Id.* at 167, 586 *A.2d* 85.]

We entertain no doubt that even the most experienced capital counsel would have encountered considerable difficulty in preparing an effective case in mitigation for the penalty-phase of defendant's trial. Acknowledging that difficulty, we cannot ascertain on the record before us whether or not an evidentiary hearing might establish that trial counsel's preparation for the penalty phase was deficient. Nevertheless, following the admonition in *Strickland, supra,* 466 *U.S.* at 697, 104 *S.Ct.* at 2069, 80 *L.Ed.2d* at 699, that disposition of the prejudice prong of an ineffectiveness claim may obviate resolution of whether counsel's performance was deficient, we hold that defendant has failed to demonstrate any likelihood that an evidentiary hearing would produce proof that would show that there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially. In reaching that conclusion, we reiterate our observation on direct appeal that "the jury found both mitigating factors relied on by defendant ... [and] that several defense witnesses at trial testified to defendant's good reputation in the community, and defendant testified extensively

concerning his background, education, family life, and civic activities." *Marshall I, supra,* 123 *N.J.* at 165, 586 *A.2d* 85. In this case, the contention that proper investigation and preparation would have unearthed new mitigating evidence that probably would have affected substantially the penalty-phase deliberations is simply too speculative to warrant an evidentiary hearing. Accordingly, we reject on the merits defendant's generalized claims of ineffectiveness of counsel in the penalty phase.

We now address defendant's specific claims of ineffectiveness in the penalty phase as well as defendant's other claims related to the penalty phase. We dismiss as meritless the contention that trial counsel was ineffective in failing to move to empanel a new penalty-phase jury or to conduct additional death-qualification *voir dire* prior to the penalty phase. Such motions properly would have been denied by the trial court.

Defendant contends that counsel was ineffective in failing to request specific instructions by the trial court on the existence, meaning, purpose, and effect of mitigating factors, in failing to request that the court separately charge each "catch-all" mitigating factor and list them separately on the verdict sheet, and in failing to request a charge requiring that the jury again consider whether there was sufficient evidence to establish the existence of the aggravating factor for the purpose of the penalty phase. On direct appeal, we concluded that "this jury understood clearly that the penalty proceedings were separate from the guilt phase of the case, and required the jury's fresh determination on the existence of aggravating and mitigating factors." *Marshall I, supra,* 123 *N.J.* at 139, 586 *A.2d* 85. Thus, any ineffectiveness of counsel in failing to request an instruction concerning the need to deliberate anew on the aggravating factor was harmless. Similarly, we comprehensively addressed on direct appeal the issue of the adequacy of the court's instructions on mitigating factors, *id.* at 141–48, 586 *A.2d* 85, and concluded that "the jury [understood] its function and the function and meaning of the mitigating circumstances," *id.* at 148, 586 *A.2d* 85. Thus, any ineffectiveness arising

from counsel's failure to request specific instructions concerning the mitigating factors or his failure to request that "catch-all" factors be listed separately on the verdict sheet did not possess any likelihood of affecting substantially the penalty-phase deliberations.

Defendant alleges that counsel was ineffective in failing to present specific types of mitigating evidence, including testimony from defendant's sister, Oakleigh DeCarlo, about their relationship and childhood and the impact of defendant's execution on her and defendant's children; testimony of an unspecified nature from a psychologist or other mental health professional; testimony from a qualified social scientist about defendant's likelihood of recidivism; testimony from a qualified mental health professional regarding defendant's lack of future dangerousness; testimony from Dr. Atkins concerning defendant's depressive state and suicidal tendencies on the occasion of defendant's alleged suicide attempt at the Best Western Motel; evidence consisting of family photographs provided to trial counsel by defendant's sister; testimony from Henry Tamburin concerning defendant's philosophy of gambling; evidence consisting of a letter written in July 1985 by the victim's father in support of a motion for bail reduction; testimony from defendant's son, John, concerning defendant's mental state when he spoke to John from the Best Western Motel and concerning John's relationship with defendant and the likely impact of defendant's execution on their family; testimony from defendant's religious counsellors about the appropriateness of sentencing defendant to death; and testimony establishing as a specific mitigating factor that defendant's execution would cause hardship and emotional distress on defendant's family. Aside from the claims that are obviously frivolous, such as the claim relating to the gambling expert and that relating to trial counsel's failure to offer evidence consisting of family photographs, the allegations of trial counsel's ineffectiveness all involve clearly debatable issues of strategy. We are unpersuaded that trial counsel's failure to offer evidence of the type described in defen-

dant's specific claims constitutes ineffectiveness of counsel, or that defendant has made the requisite showing suggesting that an evidentiary hearing would demonstrate a probability that the production of the omitted evidence would have affected substantially the jury's penalty-phase deliberations. Each of the specific allegations of ineffectiveness involves evidence that, although possibly beneficial to defendant, posed the clear risk of an adverse jury reaction. In reviewing claims of ineffective assistance of counsel, we reiterate that a defendant must show that "counsel's representation fell below an objective standard of reasonableness," and that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland, supra,* 466 *U.S.* at 688–89, 104 *S.Ct.* at 2064–65, 80 *L.Ed.*2d at 693–94. None of defendant's claims of ineffectiveness based on the failure to offer specific mitigating evidence in the penalty phase satisfy the *Strickland* standards..

Defendant also asserts claims of ineffectiveness based on counsel's failure to submit as mitigating factors the leniency of McKinnon's plea agreement, the disproportionality of a death sentence for defendant in comparison to McKinnon's sentence, and the disproportionality of sentencing defendant to death notwithstanding that the perpetrator of the murder had not yet been convicted. We specifically have held that accomplice sentencing is not to be considered as a mitigating factor in a penalty-phase proceeding. *State v. Brown,* 138 *N.J.* 481, 554–57, 651 *A.*2d 19 (1994); *State v. DiFrisco,* 137 *N.J.* 434, 502–05, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *State v. Gerald,* 113 *N.J.* 40, 101–05, 549 *A.*2d 792 (1988). Accordingly, no claim of ineffectiveness can be predicated on counsel's failure to offer such mitigating evidence, nor is there any demonstration of a probability that such evidence, if offered, would have affected substantially the penalty-phase deliberations.

Defendant also claims ineffectiveness based on counsel's failure to produce testimony concerning the nature of death by lethal

injection. In *State v. Rose*, 120 *N.J.* 61, 65, 576 *A.*2d 235 (1990), we specifically held that such testimony is inadmissible in the penalty phase. Accordingly, defendant's claim of ineffectiveness is without merit.

Defendant also asserts generalized claims of penalty-phase error and ineffectiveness that he argues were inadequately presented on direct appeal. We reject those claims on the same basis that we reject defendant's other generalized claims of penalty-phase ineffectiveness.

Defendant also asserts miscellaneous claims alleging that several of the trial court's penalty-phase jury instructions deprived defendant of constitutional rights. We reject those claims on the merits on the same basis that we reject the claims of penalty-phase ineffectiveness relating to trial counsel's failure to request specific instructions in the penalty phase. *Supra* at 254–55, 690 *A.*2d at 83–84.

Defendant also claims prosecutorial misconduct in the penalty phase, contending that the prosecutor improperly advanced his personal opinion in arguing that there was nothing more heinous than killing a family member such as one's wife, and in requesting the jury to consider as nonstatutory aggravating factors the heinousness of the killing and the fact that defendant's victim was his wife. Although related issues were raised on direct appeal, we address and dismiss those claims on their merits. In our view, the prosecutor's remarks were directly related to the aggravating factor alleged and found by the jury and did not constitute reliance on personal views or on nonstatutory aggravating factors.

Finally, defendant alleges that the cumulative effect of all of the claims of ineffectiveness of counsel in the penalty phase combined to deprive defendant of his constitutional rights. We reject those claims on the merits. The assertion of a large number of related claims of ineffectiveness of counsel does not necessarily enhance their significance or capacity to affect substantially the penalty-phase deliberations. We reject the cumulative claims on the grounds that we rejected the individual claims.

We are unpersuaded that the cumulative force of all the penalty-phase claims is measurably greater than that of the individual claims.

## O. ALLEGED MISCELLANEOUS DISCOVERY VIOLATIONS

(A.11, A.15, A.60–65, A.79, A.84–86, A.91–97; add-on claim "i")

Included in this category are a number of unrelated allegations of discovery violations. Defendant asserts that those violations materially prejudiced his defense. We address all claims on their merits and conclude that dismissal without an evidentiary hearing was appropriate.

Defendant first asserts prejudice because of the State's failure to provide copies of all pleadings and supporting documents filed with the State of Louisiana in support of the State's applications to extradite Robert Cumber, Billy Wayne McKinnon, James Davis, and Larry Thompson, but fails to explain the materiality of those documents or to specify the nature of the prejudice suffered. Our examination of the documents persuades us that they contain no significant information not otherwise available to defense counsel and that no prejudice resulted from their nonproduction.

Defendant next claims prejudice because of the State's failure to produce in discovery defendant's letter dated October 10, 1985, to Captain Hedin of the Ocean County Jail requesting a "contact visit" with a woman named Karin O'Dell. Defendant also asserts prejudice because of the nondisclosure of an unidentified memorandum concerning defendant's relationships with other women to which Assistant Prosecutor Kelly referred, as well as the nondisclosure of the source of the State's information about a conversation between defendant and his sons concerning Karin O'Dell. In the same context, defendant claims prejudice because of the nondisclosure of any memoranda reflecting the State's investigation concerning the status of Maria Marshall's ashes and its investigation of defendant's other post-homicide conduct, for use in defendant's cross-examination.

On defendant's direct appeal we addressed his challenges to the trial court's evidentiary rulings permitting cross-examination of defendant concerning the disposal of his wife's ashes and his relationships with other women after his wife's death, *Marshall I, supra,* 123 *N.J.* at 126–29, 586 *A.*2d 85, concluding that the trial court's discretionary rulings should be sustained:

> Although we find that defendant's affection for his wife was a proper subject of cross-examination, it is a matter of speculation whether defendant's failure to arrange for burial of his wife's ashes was particularly probative on that issue. We also find the potential for prejudice from the admission of that testimony to be significant. We cannot conclude, however, that the State's cross-examination did not adduce evidence that a jury could have found to be material to defendant's stated affection for his deceased wife. We also note that defendant had an opportunity to explain his conduct with respect to the wedding ring, his wife's ashes, and his relationships with two other women. On this record, it is debatable whether the potential for undue prejudice from this evidence "substantially out-weigh[ed] the probative value," *State v. Carter, supra,* 91 *N.J.* at 106, 449 A.2d 1280, and hence we are satisfied that the trial court's ruling on this issue was well within its broad ambit of discretion.
>
> [*Id.* at 128–29, 586 *A.*2d 85.]

Defendant's present challenge focuses on the State's alleged failure to produce in the course of discovery any memoranda or other documents reflecting the State's investigation that developed the factual information used by the prosecutor during defendant's cross-examination. The only specific document defendant identifies is his letter dated October 10, 1985, to Captain Hedin of the Ocean County Jail requesting a contact visit with a woman named Karin O'Dell, although defendant implies that the State must have possessed other documents or memoranda that were used during his cross-examination. The State's failure to produce the letter requesting the contact visit is unexplained, but the State asserts that its production could not conceivably have altered defendant's decision to testify. We are disturbed by the State's apparent inability to explain the nonproduction of the letter requesting a contact visit. Nevertheless, defendant falls far short of the burden of demonstrating a reasonable probability that the result of the trial would have been different if that letter, or any other documents used during defendant's cross-examination, had been

produced. *See Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.2d* at 494 (plurality opinion of Blackmun, J.).

We find meritless defendant's allegation of prejudice arising out of the State's nondisclosure of memoranda of interviews with Sarann Kraushaar in September 1984 that allegedly suggested a connection between the Marshall homicide and the murder of Vincent Craparotta. Defendant fails to explain the materiality of the alleged nondisclosure. We find similarly meritless defendant's claims of prejudice based on the nonproduction of various investigative notes made by Investigator Edward Murphy and by Lieutenant James Churchill. Neither our examination of those notes nor defendant's briefs reveal their materiality or the prejudice caused by their nonproduction. The lack of demonstrated prejudice or materiality also requires dismissal of defendant's claims relating to the State's failure to disclose information possessed by two individuals on the State's witness list who never testified at trial. Finally, defendant claims prejudice due to the State's failure to produce the mailing list prepared by LaSalle, Inc. from Harrah's raffle, which according to defendant would have established that he had used self-parking at Harrah's on the night of the homicide and therefore made his vehicle accessible and subject to tampering. We are satisfied that the tangential materiality of that document precludes its having resulted in prejudice to defendant.

## P. ALLEGED MISCELLANEOUS CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

**(B.2, B.7–9, B.11, B.23, B.27–28, B.30, B.65–67, B.69, B.79, B.91, B.109–10, B.138, B.146, B.151, B.157–59, B.163–69, B.182, B.184–85, B.192–94, B.196–203, B.211, B.215–17, B.220, B.230, B.267, E.14, F.5, add-on claims a-h)**

In this subcategory defendant asserts a veritable laundry list of assorted claims of ineffective assistance of counsel that encompass virtually every aspect of counsel's performance during the guilt phase of the trial. We address all claims on their merits and conclude that their dismissal without a hearing was warranted.

We previously have elaborated on the standard for evaluating defendant's claims of ineffective assistance of counsel, *supra* at 156–57, 690 *A.*2d at 34–35. Defendant first must show that counsel's performance was deficient, requiring a demonstration that "counsel's representation fell below an objective standard of reasonableness." *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. Second, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. Moreover, the Court in *Strickland* pragmatically observed that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699.

Both the large number of miscellaneous claims of counsel ineffectiveness and their widely diverging subject matter prompts us to focus on the prejudice prong of the *Strickland* standard. We note that some of the claims concern issues addressed by this Court on direct appeal. Thus our resolution of the Atlantic City venue issue, *Marshall I, supra,* 123 *N.J.* at 73–79, 586 *A.*2d 85, and of issues dealing with the testimony of Henry Tamburin and John Marshall, *id.* at 129–31, 586 *A.*2d 85, establish that the ineffectiveness claims dealing with those subjects properly should have been dismissed based on the lack of demonstrated prejudice. A substantial number of the ineffectiveness claims concern defense counsel's alleged failure to perform various tasks in preparation for trial and include assertions that counsel failed adequately to interview and prepare defense witnesses; to make various pretrial motions; to make motions *in limine* to preclude the State from eliciting prejudicial evidence; to turn over discovery, resulting in limitations on defense witness testimony; to prevent defendant

from being interviewed by Cumber's attorney; and to prevent defendant's investigator from holding a press conference and making prejudicial statements. Irrespective of whether those and analogous pretrial omissions by counsel constituted deviations that fell below an objective standard of reasonableness, we are convinced that defendant cannot demonstrate that counsel's alleged pretrial deficiencies either individually or collectively had the capacity to change the result of the proceeding. We uphold the dismissal of all such claims.

Several claims relate to counsel's alleged approval of defendant's grant of permission to co-defendant Thompson's wife to reside in defendant's home during the trial, to counsel's failure to prevent the State from offering evidence of this arrangement, and to counsel's failure to request a specific charge to the jury to avoid undue prejudice because of it. We note that counsel's strenuous objection to evidence of Mrs. Thompson's living arrangements was overruled by the trial court. Whatever counsel's role may have been, defendant's decision to permit Thompson's wife to reside in his home and, on occasion, to watch over defendant's youngest son must be regarded as aberrational. But the jury's decision to acquit Thompson of all charges suggests that any prejudice to defendant because of counsel's alleged involvement or omissions concerning Mrs. Thompson's residing during trial at the Marshall home did not have the capacity to affect the verdict.

Several ineffectiveness claims relate to trial counsel's failure to recuse or disqualify himself from representing defendant in order that he could provide testimony that defendant's present counsel contends could have been helpful to defendant. We noted earlier that in assessing ineffectiveness claims, a court "must avoid second guessing defense counsel's tactical decisions and viewing those decisions under the 'distorting effects of hindsight.'" *Supra* at 157, 690 *A*.2d at 35 (quoting *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694). Whether counsel's continuing representation of defendant at trial would better serve defendant's interests than counsel's recusal in order to testify is precisely the kind of tactical decision that should not be disturbed by a

reviewing court. In any event, defendant has failed to demonstrate any prejudice resulting from counsel's decision not to recuse himself.

 The remaining ineffectiveness claims relate to a variety of alleged omissions by counsel during trial and include various contentions concerning counsel's failure to raise objections to the interrogation of certain witnesses; failure to move for a mistrial on several occasions; failure to object to a portion of the assistant prosecutor's opening statement; failure to anticipate legal argument concerning admission of a letter from Maria Marshall to her attorney; failure to recall a State witness to testify for defendant; agreement with the assistant prosecutor that their respective summations would not be interrupted; and failure to present a coherent theory in closing. Without attempting to assess whether any of those allegations involve constitutionally deficient representation, we are fully satisfied that defendant has not established and could not establish that but for those alleged deficiencies, individually and cumulatively, there is a reasonable probability that the result of the trial would have been different.

This subcategory also includes one claim of prosecutorial misconduct and one alleged discovery violation, both of which we dismiss as meritless. In addition, defendant asserts various add-on claims that relate to a spectator's outburst during defendant's cross-examination concerning the disposal of his wife's ashes. We are satisfied that none of the add-on ineffectiveness claims had the capacity to affect the trial result.

## Q. CLAIMS ALLEGING THAT THE DEATH–PENALTY STATUTE IS UNCONSTITUTIONAL AND THAT THE APPELLATE DEATH–PENALTY PROCEEDINGS IN THIS CAPITAL CASE HAVE BEEN INADEQUATE AND UNRELIABLE

(G.1–9, I.1–19)

 Five of the claims asserted in this subcategory allege a number of violations of defendant's constitutional right to counsel

and to reliable and effective appellate and post-conviction relief review of his conviction and death sentence. All such claims are based on trial counsel's failure to prevent significant legal matters and issues from being resolved off the record at trial. During the PCR proceedings, PCR counsel moved to compel both prosecution and defense trial counsel to review their trial notes and attempt to collaborate in reconstructing a record concerning certain subjects allegedly omitted from the trial record. In support of the motion, PCR counsel referred specifically to the omission from the trial transcript of any reference to the race of the members of the jury panel, to defendant's fainting spell between the return of the guilt-phase verdict and the commencement of the penalty phase, and to the State's decision at the commencement of the penalty phase to dismiss two of the alleged aggravating factors. The PCR court denied the motion, noting that seven years had elapsed since the trial, but permitted PCR counsel to conduct an independent inquiry with leave to renew the application to supplement the record based on a specific assertion about the manner in which the supplementation should occur. Because we are unable to discern that defendant has sustained any prejudice from the alleged omissions in the record either during appellate, proportionality, or PCR review, we conclude that those claims should be dismissed on their merits without a hearing.

Concerning the specific contentions that the record's omission of any reference to defendant's fainting spell after the guilty verdict deprived defendant of a reliable penalty trial and precluded effective appellate review thereof, we already have determined that the fainting spell did not affect the fairness and reliability of defendant's penalty trial, *supra* at 244, 690 *A.*2d at 78, and our review of that issue in this opinion is substantially equivalent to the review defendant might have sought on direct appeal. With respect to the record's omission of any reference to the race of the members of the jury panel, we rejected on the direct appeal the contention that the Atlantic County procedures for selecting the petit jury pool deprived defendant of the representative jury pool to which he was constitutionally entitled. *Marshall I, supra,* 123 *N.J.* at

98, 586 *A*.2d 85. Defendant fails to allege or demonstrate any other prejudice resulting from that omission from the record.

Defendant also contends that page restrictions imposed by this Court on his direct appeal brief deprived him of effective assistance of counsel and adequate appellate review. In addition, defendant alleges that this Court's use of a less stringent standard of review in capital cases as compared with non-capital cases deprived him of due process and effective appellate review. We consider both contentions to be frivolous and dismiss them on their merits. Notwithstanding any page restrictions imposed on briefs as part of the process of managing capital case appeals, defendant has been and continues to be afforded careful and comprehensive appellate review by this Court. Concerning our standard for review of capital cases, we consistently have recognized our obligation to subject capital case records to heightened scrutiny and to exercise independent review of trial court rulings and determinations, a meticulous and searching standard that we have applied to all capital cases. *See Bey I, supra,* 112 *N.J.* at 92–93, 548 *A*.2d 846.

Defendant also asserts claims challenging the fairness and adequacy of his proportionality review, and claims challenging his proportionality review on the basis of evidence acquired after its conclusion. In addition, defendant asserts a number of claims that collectively allege that continuing evidence of race discrimination in the administration of the death penalty renders the death-penalty statute and defendant's death sentence constitutionally invalid.

We reject all those claims on their merits without an evidentiary hearing. Defendant was accorded searching and comprehensive proportionality review of his death sentence, conducted on the basis of all information and data then available. *See Marshall II, supra.* We have no reservations about the fairness and adequacy of that review. Concerning defendant's assertions that evidence acquired subsequent to his proportionality review challenges the conclusion that defendant's death sentence was not

disproportionate, we acknowledged in *Marshall II, supra,* that proportionality review was a finite process:

> And, finally, we cannot await a more certain state of proof before we render judgment. We must confront in this case the problem of the small sample of comparison cases. We do not know what will happen in the next ten similar cases, but we must nevertheless make our judgment now. . . .
>
> Proportionality review recognizes in that sense that society's standards may change and that which is proportionate in one era may be disproportionate in another. There are no absolutes. Ours is a finite role defined by our obligation to see that justice is done at a given time.

> [130 *N.J.* at 219, 613 *A.*2d 1059.]

Defendant also asserts that continuing evidence of race discrimination in the administration of the death penalty requires that this sentence be invalidated. We first addressed that issue in *Marshall II, supra,* and concluded that "we do not yet confront a record in which 'the statistical evidence . . . relentlessly documents the risk that [Marshall's] sentence was influenced by racial considerations.'" *Id.* at 213, 613 *A.*2d 1059 (quoting *McCleskey v. Kemp,* 481 *U.S.* 279, 328, 107 *S.Ct.* 1756, 1786, 95 *L.Ed.*2d 262, 301 (1987) (Brennan, J., dissenting)). We reached the same conclusion in *State v. Bey,* 137 *N.J.* 334, 396, 645 *A.*2d 685 (1994) (*Bey IV* ), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995), although reaffirming our commitment to "continue to monitor any correlation between race and the imposition of the death penalty." *Id.* at 389, 645 *A.*2d 685. We rejected similar claims of race discrimination in *State v. DiFrisco,* 142 *N.J.* 148, 210, 662 *A.*2d 442 (1995) (*DiFrisco III* ) and *State v. Martini,* 139 *N.J.* 3, 80, 651 *A.*2d 949 (1994) (*Martini II* ). We shall continue to request and receive additional data and to entertain argument concerning enhanced evidence of race discrimination in the administration of our capital-punishment statute.

## R. CUMULATIVE ANALYSIS OF CLAIMS

### (A.1, A.102, B.1, E.25, F.25)

Defendant asserts that the cumulative effect of the State's discovery violations, the cumulative effect of trial counsel's ineffec-

tiveness, the cumulative effect of the various instances of prosecutorial misconduct, and the cumulative effect of the so-called miscellaneous claims require the grant of defendant's PCR petition and the reversal of his conviction and death sentence. We reject the claims on their merits and without an evidentiary hearing.

The task of assessing the cumulative effect of numerous, assorted claims of error, related only loosely by their categorization as "discovery violations" or "ineffectiveness of counsel claims," is daunting. No formula adequately can inform the required exercise of judgment. The best objective test derives from an assessment of the merits of the individual claims, combined with a part-subjective, part-objective effort to extrapolate those individualized assessments into an aggregate one.

Our exhaustive review of this record and defendant's claims has demonstrated that the overwhelming majority of the discovery, ineffectiveness, prosecutorial misconduct, and other claims are meritless. Few of the documents allegedly withheld in discovery were both discoverable and significant, and the production of those that were discoverable and significant would not have materially affected the result of trial. Similarly, few of the allegations of ineffective assistance at trial involved significant deficiencies in the quality of counsel's representation, and those that did were not material to the trial result. We reached a similar conclusion about the allegations of prosecutorial misconduct, and about defendant's miscellaneous claims for relief. We conclude that the cumulative effect of defendant's claims is not appreciably more significant than their individual effects. Accordingly, we reject defendant's contention that the cumulative effect of his PCR claims mandates relief.

## V

## CLAIMS INVOLVING THE FAIRNESS OF THE POST–CONVICTION RELIEF PROCEEDINGS

In Section IV, we discussed the arguments raised in defendant's PCR petition concerning whether a reversal of his convictions and

sentence is warranted. In this Section, we address defendant's claims concerning the fairness of his PCR proceedings.

## A. DENIAL OF ACCESS TO THE STATE'S FILES

At the commencement of the PCR proceedings, defendant moved to inspect the State's entire file, arguing that he was entitled to such broad discovery because "the Defendant has demonstrated that the State did not comply with its obligation to provide [pretrial] discovery" and because "a post conviction proceeding in a capital sentenced case is a special situation which requires the broadest of all discovery." As noted, *see supra* at 139, 690 *A*.2d at 25, the PCR court denied that motion, ruling that such a broad discovery right is contemplated by neither the discovery provisions in our Court Rules, *see R.* 3:13–2 to –4, nor by our decisional law. The PCR court ruled, however, that defendant was entitled to make an application to inspect specific documents that he believed to be in the State's possession. Following that procedure, defendant requested and received from the State approximately one hundred documents. Defendant now contends that the PCR court's decision not to order the State to allow him to inspect the State's entire file denied him his right to a full and fair PCR hearing.

As defendant concedes, our Court Rules concerning petitions for PCR, *see R.* 3:22–1 to –12, do not contain any provision authorizing discovery in PCR proceedings. Moreover, the general discovery obligations contained in the *Rules Governing Criminal Practice, see R.* 3:13–2 to –4, do not extend to post-conviction proceedings. Defendant relies on *Rule* 3:13–3(g), which refers to parties' "[c]ontinuing [d]uty to [d]isclose" discoverable materials. However, that obligation continues only "during trial." Thus, our Court Rules do not explicitly authorize the discovery requested by defendant in this case.

Similarly, defendant cannot demonstrate a constitutional basis for his asserted right to inspect the State's file. Although the Due Process Clause requires that the State provide criminal

defendants with any exculpatory, material evidence in the State's possession, *see Brady, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196–97, 10 *L.Ed.*2d at 218, that Clause does not require the prosecutor "to deliver his entire file to defense counsel," *Bagley, supra,* 473 *U.S.* at 675, 105 *S.Ct.* at 3380, 87 *L.Ed.*2d at 489; *see also Weatherford v. Bursey,* 429 *U.S.* 545, 559, 97 *S.Ct.* 837, 845–46, 51 *L.Ed.*2d 30, 42 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one. . . ."); *Wardius v. Oregon,* 412 *U.S.* 470, 474, 93 *S.Ct.* 2208, 2212, 37 *L.Ed.*2d 82, 87 (1973) ("[T]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . .").

Nonetheless, our cases have recognized that, even in the absence of authorization in the form of a Court Rule or constitutional mandate, New Jersey courts have "the inherent power to order discovery when justice so requires." *State ex rel. W.C.,* 85 *N.J.* 218, 221, 426 *A.*2d 50 (1981); *see, e.g., State v. Cook,* 43 *N.J.* 560, 569, 206 *A.*2d 359 (1965) (permitting defendant to view State's psychiatric reports on defendant); *State v. Moffa,* 36 *N.J.* 219, 222, 176 *A.*2d 1 (1961) (permitting defendant to inspect witness's grand jury testimony); *State v. Butler,* 27 *N.J.* 560, 605, 143 *A.*2d 530 (1958) (compelling witness to submit to psychiatric examination by defendant's expert). Courts in other jurisdictions have concluded that a court's inherent discovery power applies in post-conviction proceedings, and we agree fully with that determination. *See, e.g., Harris v. Nelson,* 394 *U.S.* 286, 89 *S.Ct.* 1082, 22 *L.Ed.*2d 281 (1969) (holding that federal court may authorize taking of interrogatories in support of habeas corpus petition); *Gibson v. United States,* 566 *A.*2d 473, 478 (D.C.1989) ("[C]ourts . . . may fashion post-conviction discovery procedures as may be required to give meaning and substance to the objectives of the law."); *State v. Lewis,* 656 *So.*2d 1248, 1249 (Fla.1994) ("[I]t is within the trial judge's inherent authority, rather than any express authority found in the Rules of Criminal Procedure, to allow limited discovery [when a party is pursuing a post-conviction claim]."); *People ex rel. Daley v. Fitzgerald,* 123 *Ill.*2d 175, 121 *Ill.Dec.* 937, 941, 526

*N.E.*2d 131, 135 (1988) (holding that courts have inherent authority to authorize taking of depositions in post-conviction proceedings).

We anticipate that only in the unusual case will a PCR court invoke its inherent right to compel discovery. In most cases, a post-conviction petitioner will be fully informed of the documentary source of the errors that he brings to the PCR court's attention. Moreover, we note that PCR "is not a device for investigating possible claims, but a means for vindicating actual claims." *People v. Gonzalez,* 51 *Cal.*3d 1179, 275 *Cal.Rptr.* 729, 776, 800 *P.*2d 1159, 1206 (1990), *cert. denied,* 502 *U.S.* 835, 112 *S.Ct.* 117, 116 *L.Ed.*2d 85 (1991). The filing of a petition for PCR is not a license to obtain unlimited information from the State, but a means through which a defendant may demonstrate to a reviewing court that he was convicted or sentenced in violation of his rights. *See R.* 3:22–2.

Moreover, consistent with our prior discovery jurisprudence, any PCR discovery order should be appropriately narrow and limited. *See, e.g., State v. D.R.H.,* 127 *N.J.* 249, 256, 604 *A.*2d 89 (1992); *State v. R.W.,* 104 *N.J.* 14, 28, 514 *A.*2d 1287 (1986). "[T]here is no postconviction right to 'fish' through official files for belated grounds of attack on the judgment, or to confirm mere speculation or hope that a basis for collateral relief may exist." *Gonzalez, supra,* 275 *Cal.Rptr.* at 775, 800 *P.*2d at 1205; *see Deputy v. Taylor,* 19 *F.*3d 1485, 1493 (3d Cir.), *cert. denied,* 512 *U.S.* 1230, 114 *S.Ct.* 2730, 129 *L.Ed.*2d 853 (1994); *State v. Thomas,* 236 *Neb.* 553, 462 *N.W.*2d 862, 867–68 (1990). However, where a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged, the court has the discretionary authority to grant relief. *See Rules Governing Section 2254 Cases in the United States District Courts,* 28 *U.S.C.A.* § 2254 *Rule* 6(a); *Lewis, supra,* 656 *So.*2d at 1250; *Fitzgerald, supra,* 121 *Ill.Dec.* at 941, 526 *N.E.*2d at 135 (noting

that "good cause" standard guards against potential abuse of PCR discovery process).

Courts may reason by analogy to existing discovery rules, *see R.* 3:13–2 to –4, in designing an appropriate PCR discovery order. In the document-production context, barring exceptional circumstances, a defendant seeking to inspect State files should identify the specific documents sought for production. The PCR court may choose to view the documents *in camera* before determining whether to issue the requested discovery order.

We have thoroughly reviewed the PCR record and exhibits in this case and conclude that the PCR court did not abuse its discretion in ruling on defendant's discovery motions. While finding that defendant was not entitled to inspect the State's entire file, the PCR court permitted him to make requests for specific items and ordered the State to turn over those items that were relevant and not work product. We endorse the use of that procedure.

We are not unmindful of the State's failure to comply fully with its pretrial discovery obligations in this case. Our review of the record and defendant's PCR claims leads us to conclude that there were indeed some discoverable documents that the State did not provide to defendant before or during defendant's trial. If the PCR court had concluded that the State's nondisclosures had been willful, it would have been within that court's authority to grant defendant's motion to inspect the entirety of the State's file. Under appropriate circumstances, a PCR court may properly conclude that review of the State's file by either the defendant or the court itself is the only means to guarantee that the defendant has received all the discovery materials to which he is entitled.

In this case, however, defendant has not demonstrated that those circumstances exist. The overwhelming majority of defendant's PCR discovery claims refer to documents that were either

protected by the work-product privilege, largely irrelevant to the issue of defendant's guilt or innocence, or simply nonexistent. Although it appears that the State was not as meticulous as it should have been in abiding by our court rules governing discovery, there has been no showing that the State acted willfully, with malice, or with the intent to conceal discoverable evidence from defense counsel.

The PCR court reached a similar conclusion. Finding defendant's motion to inspect the State's file to be "overly broad," the court explained: "There's no showing of any reasonable likelihood of discoverable material in the motion as constituted, and therefore, I will deny the motion without prejudice to the right of the Defendant to pursue any application for specific items." Based on the PCR court's familiarity with the practices and conduct of the parties, that court's informed sense of whether any discoverable documents remain unseen by defendant, and our own independent review of the record, we decline to disturb the PCR court's determination of the type and amount of discovery "justice ... requires" in this case. *W.C., supra,* 85 *N.J.* at 221, 426 *A.*2d 50; *cf. State v. Johnson,* 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964) (discussing trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy"). We hold that the trial court did not abuse its discretion in concluding that this is not one of the rare cases in which a blanket inspection of the State's file is appropriate.

Defendant also argues that the Right-to-Know Law, *N.J.S.A.* 47:1A-1 to -4, and the common-law right to inspect public documents entitle him to the discovery requested in this case. We find those arguments to be without merit. "Under the Right-to-Know Law, New Jersey citizens have an absolute right to inspect, copy, or purchase records *'required by law to be made, maintained or kept on file' by public officials." Home News v. State, Department of Health,* 144 *N.J.* 446, 453, 677 *A.*2d 195 (1996) (quoting *N.J.S.A.* 47:1A-2) (emphasis added). The Right-to-Know Law does not provide defendant with the right to inspect

the law-enforcement files sought in this case because no law or regulation requires that such files "be made, maintained or kept." *N.J.S.A.* 47:1A–2; *see River Edge Sav. & Loan Ass'n v. Hyland,* 165 *N.J.Super.* 540, 545, 398 *A.*2d 912 (App.Div.) (holding that no law required that results of law-enforcement official's investigation into alleged criminal offense be maintained or kept, and thus such results were not subject to Right–to–Know Law), *certif. denied,* 81 *N.J.* 58, 404 *A.*2d 1157 (1979); *Asbury Park Press, Inc. v. Borough of Seaside Heights,* 246 *N.J.Super.* 62, 67, 586 *A.*2d 870 (Law Div.1990) (holding that no law required that police reports be maintained or kept and thus reports were not subject to Right–to–Know Law).

 "The common-law right to inspect extends to any document 'made by public officers in the exercise of public functions' and thus encompasses a far broader range of documents than the Right–to–Know Law." *Board of Educ. v. Department of the Treasury,* 145 *N.J.* 269, 279, 678 *A.*2d 660 (1996) (quoting *Nero v. Hyland,* 76 *N.J.* 213, 222, 386 *A.*2d 846 (1978)). However, although the "common-law right to inspect documents extends to a wider pool of public records than does the Right–to–Know Law, ... the right itself is a qualified one." *Home News, supra,* 144 *N.J.* at 453, 677 *A.*2d 195. Specifically, before a claimant is granted access to the document in question, the claimant's "common-law right of access must be balanced against the State's interest in preventing disclosure." *Higg–A–Rella, Inc. v. County of Essex,* 141 *N.J.* 35, 46, 660 *A.*2d 1163 (1995). That interest in nondisclosure consists primarily of "the need to maintain the confidentiality of the information sought," *id.* at 48, 660 *A.*2d 1163, a concern that is especially important in the context of a pending criminal proceeding. As the Appellate Division has explained:

> The receipt by appropriate law enforcement officials of information concerning the existence or occurrence of criminal activities is critical to the uncovering and the prosecution of criminal offenses, and is thus crucial to effective law enforcement. In order that the flow of such information be not impeded or cut off, the law has long treated the information as confidential and privileged against disclosure, thereby protecting witness security, the State's relationship with its informants and witnesses, and other confidential relationships, among other things.
>
> [*River Edge Sav. & Loan Ass'n, supra,* 165 *N.J.Super.* at 543–44, 398 *A.*2d 912.]

*See also Loigman v. Kimmelman,* 102 *N.J.* 98, 107, 505 *A.*2d 958 (1986) (discussing "government's need to conduct [investigative] affairs with skill, with sensitivity to the privacy interests involved, and in an atmosphere of confidentiality that encourages the utmost candor"); *Nero, supra,* 76 *N.J.* at 225, 386 *A.*2d 846 ("Confidentiality is vital not only because it serves to protect government sources of information, but also because it enhances the effectiveness of investigative techniques and procedures." (citations omitted)).

In our view, the policies that inspire the common-law right of inspection of public documents are different from the considerations that govern discovery in criminal proceedings. The interests at stake in criminal proceedings require a different analysis and a balancing of different interests. The appropriate analysis and balancing of interests is reflected in our criminal discovery rules. *See R.* 3:13–2 to –4. Moreover, we note that no court in this State has relied on the common-law right to inspect in granting a criminal defendant discovery beyond that authorized by the *Rules Governing Criminal Practice.* We endorse that result and hold that the common-law right to inspect public documents may not be invoked in a pending criminal case by a defendant seeking discovery rights beyond those granted by *Rule* 3:13–2 to –4. *See State ex rel. Steckman v. Jackson,* 70 *Ohio St.*3d 420, 639 *N.E.*2d 83, 89, 92 (1994) (reversing prior interpretation of state records law that allowed criminal defendants to use records law to obtain discovery in addition to that provided by criminal procedure rules, because prior practice brought about "interminable delay" and "chaos" in criminal trials and state's discovery rules had "virtually been rendered meaningless").

Defendant attempts to differentiate this case from "pending" criminal proceedings on the ground that, on this appeal, defendant is seeking collateral, post-conviction review. Defendant suggests that his case is "closed" because it is no longer at trial or on direct appeal, and that he is therefore entitled to invoke the common-law

right to inspect. However, the fact that defendant seeks a new trial on this appeal belies the claim that his case is in any sense "closed."

Moreover, the fact that there is no Court Rule explicitly governing post-conviction discovery does not render the common-law right to inspect an alternative basis for obtaining discovery materials in this pending PCR case. The proper approach is for courts to reason by analogy to existing discovery rules in fashioning appropriate discovery orders in PCR cases.

We thus conclude that the post-conviction nature of these proceedings does not entitle defendant to the discovery he seeks. Whether a criminal defendant's case is at trial, on direct appeal, or on PCR review does not alter the defendant's inability to invoke the common-law right to inspect in an effort to obtain additional discovery. *See also Nero, supra,* 76 *N.J.* at 225, 386 *A.*2d 846 (" '[E]ven inactive investigatory files may have to be kept confidential in order to convince citizens that they may safely confide in law enforcement officials.' " (quoting *Koch v. Department of Justice,* 376 *F.Supp.* 313, 315 (D.D.C.1974))).

## B. THE POST–CONVICTION RELIEF COURT'S DECISION NOT TO DISQUALIFY ITSELF

Following the usual practice in this state, the same judge that presided over defendant's trial also heard his PCR petition. During the PCR proceeding, defendant moved to disqualify the judge for bias. Defendant claimed that bias had been demonstrated by prior rulings adverse to the defense and by extra-judicial remarks made by the judge.

Under our rules, the judge of any court "shall be disqualified" if the judge has given an opinion on the matter before the court, *R.* 1:12–1(d), if the judge is interested in the outcome of the matter, *R.* 1:12–1(e), or if there is "any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." *R.* 1:12–1(f). The disqualification decision is

initially left to the discretion of the trial court. *Hundred East Credit Corp. v. Eric Schuster Corp.*, 212 *N.J.Super.* 350, 358, 515 *A.*2d 246 (App.Div.), *certif. denied,* 107 *N.J.* 60, 526 *A.*2d 146 (1986); *State v. Flowers,* 109 *N.J.Super.* 309, 311–12, 263 *A.*2d 167 (App.Div.1970). Moreover, judges are not free to err on the side of caution; it is improper for a court to recuse itself unless the factual bases for its disqualification are shown by the movant to be true or are already known by the court. *Hundred East Credit, supra,* 212 *N.J.Super.* at 358, 515 *A.*2d 246; *Clawans v. Schakat,* 49 *N.J.Super.* 415, 420–21, 140 *A.*2d 234 (App.Div.1958) (citing *State v. De Maio,* 70 *N.J.L.* 220, 222, 58 *A.* 173 (E. & A. 1904)).

"Fundamental to any consideration of possible judicial disqualification is a showing of prejudice or potential bias." *Flowers, supra,* 109 *N.J.Super.* at 312, 263 *A.*2d 167; *see also State v. Walker,* 33 *N.J.* 580, 592, 166 *A.*2d 567 (1960) (holding judicial disqualification inappropriate where "[t]here is no showing that the trial judge had any personal or private interest apart from the fulfillment of his judicial duties"), *cert. denied,* 371 *U.S.* 850, 83 *S.Ct.* 89, 9 *L.Ed.*2d 86 (1962). An adverse ruling in prior proceedings does not warrant disqualification. *See Walker, supra,* 33 *N.J.* at 591, 166 *A.*2d 567 ("Absent a showing of bias or prejudice, the participation of a judge in previous proceedings in the case before him is not a ground for disqualification.").

An error by the court in the previous proceeding does not necessarily justify an inference of bias and will not, by itself, furnish a ground for disqualification. *See ibid.* (holding that reversal of judgment in previous proceedings is insufficient ground for disqualification on remand); *Hundred East Credit, supra,* 212 *N.J.Super.* at 358, 515 *A.*2d 246 (upholding denial of disqualification motion on remand following reversal of trial court's earlier rulings). Of course, an error might be sufficiently blatant, and so lacking in an alternative, good faith explanation that the error would support a charge of bias. In the ordinary case, however, the fact that a court is overruled or overrules its own prior ruling

is entitled to no weight in deciding whether that court is biased against the party harmed by the error.

Defendant claims that evidence of bias exists in two erroneous discovery rulings by the trial court. The rulings concerned two documents, a memorandum by Investigator Edward Murphy to Assistant Prosecutor Kelly concerning an interview of witnesses and a memorandum by Lieutenant James Churchill concerning alibi witnesses for Thompson. The documents are also the subject of discovery claims discussed elsewhere in this opinion. The trial court reviewed those documents *in camera* and ruled that they were work product, withholding from defendant the entire Murphy memorandum and turning over only a redacted version of the Churchill memorandum. The trial court acknowledged its error in the PCR proceedings and the unedited documents were released.

Defendant claims that those rulings reveal the trial court's bias against him. Defendant emphasizes his assertion that the court's ruling on the Murphy memorandum prevented the discovery of evidence contrary to the court's factual basis for denying the suppression motion, and that those factual findings were made soon after the court's *in camera* review of the document. Redacting the Churchill memorandum, it is claimed, prevented defendant from interviewing key witnesses.

We are unpersuaded that those discovery rulings constitute evidence of bias. The trial court itself acknowledged that the documents were withheld in error. We note, however, that the documents are within the literal terms of the rule exempting from discovery "internal reports, memoranda or documents made by that party or the party's attorney or agents, in connection with the investigation, prosecution or defense of the matter." *R.* 3:13–3(e). Moreover, the information contained in the Murphy memorandum is not directly contrary to the trial court's findings at the suppression hearing, and we have sustained the PCR court's determination that releasing that document to the defense would not have had the capacity to change the outcome of the proceedings. Likewise, as we find elsewhere in this opinion, the Churchill memorandum contained no material information. Therefore, the

nature of those two documents will not serve to elevate the trial court's discovery rulings from mere error to something more sinister.

Defendant also alleges that several statements by the trial court warrant its disqualification. A court's prior statement of opinion concerning a matter before it may indicate that the court has prejudged the matter and must be disqualified under *Rule* 1:12–1(d). The *Rule* contains an important qualification, however. A judicial statement of opinion in the course of the proceedings in the case at bar, or in another case in which the same issue is presented, will not require disqualification. *R.* 1:12–1 ("[Paragraph (d) ] shall not prevent a judge from sitting because of having given an opinion in another action in which the same matter in controversy came in question or given an opinion on any question in controversy in the pending action in the course of previous proceedings therein. . . ."); *Hundred East Credit, supra,* 212 *N.J.Super.* at 358, 515 *A.*2d 246. A judge's statement of opinion in the course of proceedings might reveal such prejudice that disqualification is required under the *Rule* 's catch-all paragraph (f). However, the effect of paragraph (d) is directed primarily at statements made outside of the declarant's role as a judge.

Defendant raises the fact that the trial court presided over the trial in the unrelated case of *State v. Acceturo,* in which the issue of the Ocean County Prosecutor's compliance with its discovery obligations was in dispute. Defendant claims that a statement by the court in relation to that issue warrants disqualification. However, that is obviously a statement of opinion in another action expressly exempted from 1:12–1(d).

Defendant also claims that testimony by the trial judge in a civil matter in Louisiana titled *Thompson v. McKinnon* requires disqualification. Defendant contends that the testimony reveals that the judge prejudged whether the prosecution was conducted fairly and whether defense counsel had committed gross negligence. Concerning whether the prosecution was fair,

the judge testified that he "had no reason to believe otherwise." That statement does not support the inference that the judge had prejudged the fairness of the prosecution. With regard to negligence of defense counsel, the judge's Louisiana testimony merely recounted a statement the court had made in defendant's trial.

Defendant's remaining allegations concern a speech to a high school class about defendant's case and a fragment of a conversation in chambers that was caught on videotape. However, defendant does not claim to know the substance of the court's remarks to the high school class, and only a fragment of the conversation in chambers was recorded. Contrary to defendant's claim, the sentence attributed to the court does not necessarily reveal that it had prejudged defendant's credibility. The sentence appears out of context, and is subject to a variety of interpretations.

Thus, none of the supposed examples of bias or prejudice raised by defendant warranted disqualification of the PCR court. Nor do those examples taken together show the "pattern of bias" defendant alleges. We recognize that litigants are "fierce in their determination and view an adverse decision as prejudice of the judge." *Matthews v. Deane,* 196 *N.J.Super.* 441, 447, 483 *A.*2d 232 (Ch.Div.1984), *appeal dismissed,* 206 *N.J.Super.* 608, 503 *A.*2d 376 (App.Div.1986). We also acknowledge that it is not necessary to prove actual prejudice on the part of the court, and that the mere appearance of bias may require disqualification. *R.* 1:12–1(f). However, before the court may be disqualified on the ground of an appearance of bias, the belief that the proceedings were unfair must be objectively reasonable. *Ibid.* We do not believe that the court's conduct in this case approaches such a standard, and we thus affirm the denial of the disqualification motion.

## C. DENIAL OF DEFENDANT'S ATTEMPT TO INTERVIEW THE TRIAL JURORS

Defendant claims that the PCR court's denial of his request to interview the trial jurors was in error. Defendant further claims that our rule precluding post-trial contact with jurors without

leave of the court, *R.* 1:16–1, violates his constitutional rights under the First Amendment.

Defendant acknowledges the long-standing common-law rule against inquiring into jurors' motives to impeach their verdict. *See Tanner v. United States,* 483 *U.S.* 107, 117, 107 *S.Ct.* 2739, 2745, 97 *L.Ed.*2d 90, 104 (1987). For sound reasons of policy, including the prevention of juror harassment and the avoidance of chilling jury deliberations, courts typically require some showing of extraneous influence before permitting a party to interview jurors. *See, e.g., State v. LaFera,* 42 *N.J.* 97, 110, 199 *A.*2d 630 (1964); *see also United States v. Console,* 13 *F.*3d 641, 669 (3d Cir.1993), *cert. denied,* 511 *U.S.* 1076, 114 *S.Ct.* 1660, 128 *L.Ed.*2d 377, and *cert. denied,* 513 *U.S.* 812, 115 *S.Ct.* 64, 130 *L.Ed.*2d 21 (1994); *United States v. Sun Myung Moon,* 718 *F.*2d 1210, 1234 (2d Cir.1983), *cert. denied,* 466 *U.S.* 971, 104 *S.Ct.* 2344, 80 *L.Ed.*2d 818 (1984). That practice is particularly appropriate when the jury has already been discharged. *See Tanner, supra,* 483 *U.S.* at 120–21, 107 *S.Ct.* at 2747–48, 97 *L.Ed.*2d at 106.

Before the PCR court, defendant sought permission to contact jurors some seven years after their discharge, but he made no showing that would justify such an extraordinary measure. Defendant's allegations of extraneous influence lack any factual basis and rely on purest speculation. This Court has found that the trial court's conduct of the *voir dire* was without error. *Marshall I, supra,* 123 *N.J.* at 93–94, 586 *A.*2d 85. Therefore, we reject defendant's claim that the PCR proceeding was unfair because of the court's denial of his request to interview jurors. We also are unpersuaded by defendant's First Amendment challenge to *Rule* 1:16–1. The compelling public interest in protecting jurors and their deliberations amply justifies the restriction on contacting them without good cause.

## D. REFUSAL TO PERMIT RECONSTRUCTION AND SUPPLEMENTATION OF THE TRIAL RECORD

Before the PCR court, defendant moved to expand the record and to hold a hearing to reconstruct the record concerning evi-

dence of the service of the notice of aggravating factors on the defense, off-the-record discussions concerning jury selection, withdrawal of two of the three aggravating factors, and off-the-record discussions of penalty-phase procedures and jury selection. The PCR court denied this request, and defendant seeks to reverse that determination and to have the case remanded to complete the record. Defendant bases his claim on the proposition that due-process rights require that a record be made of the proceedings.

Obviously, however, there is no mandate to memorialize every inconsequential event in the course of a major trial. Defendant claims that the missing material would be "relevant to defendant's claims of ineffective assistance of trial counsel," with regard to a number of issues, but defendant does not state specifically what that relevance is or that the omitted material would affect the outcome of the PCR proceeding. Moreover, we find significant the fact that defendant failed to move to reconstruct the record before the PCR proceeding began, years after the conversations at issue took place. The fact that neither counsel who participated in the conversations, nor defendant's counsel on direct appeal, found it worthwhile earlier to attempt to reconstruct the record is strong evidence that the conversations were considered unimportant by those in the best position to know their substance.

In addition, we note that the information defendant seeks to reconstruct seems redundant. Defendant cannot reasonably argue that he lacked notice that the State would present aggravating factors. The fact that two of the aggravating factors were withdrawn is certainly of record. Moreover, it is not clear how off-the-record discussions concerning the withdrawn aggravating factors could establish an ineffectiveness claim. Likewise, unrecorded discussions concerning jury selection would appear to be of limited usefulness, in view of the fact that we have found that counsel's performance in the jury selection process was not deficient. We note that defendant's trial counsel testified at the PCR hearing concerning the circumstances of the State's withdrawal of the

aggravating factors and his discussions with his client concerning the penalty phase.

Finally, we concur with the PCR court's observation that PCR counsel remained free to interview trial counsel without judicial assistance and to present any evidence indicating that the missing portions of the record are indeed material. That defendant has made no such showing further supports the inference that the omissions are inconsequential. Accordingly, we reject defendant's claim that the PCR court interfered with his right to appeal, and we affirm the trial court's denial of the motion to reconstruct the record.

## E. REFUSAL OF LAW ENFORCEMENT PERSONNEL TO TALK TO THE DEFENSE

### (Claims include E.26–27)

Defendant claims that the refusal of law enforcement personnel to be interviewed by defense counsel seeking evidence to support defendant's PCR claims violated his rights to due process, confrontation of witnesses, and his right to a fair PCR hearing. According to defense investigator Robert Worthy, he was told by members of the Ocean County Prosecutor's office and the State Police to clear any interview requests with Investigator Dino Dettorre of the Attorney General's office. Dettorre testified at the PCR hearing that pursuant to the inquiry by Worthy he had informed law enforcement personnel that whether they spoke to the defense was up to them, that the Attorney General's office took no position on the matter, but that an attorney from the Attorney General's office would be present at an interview if the interviewee wished. Dettorre testified that he had relayed the message that law enforcement personnel had the same right as civilians to refuse to be interviewed. Worthy also stated that Dettorre had told him that any interviews would take place in the Attorney General's office. Lieutenant James McIntyre subsequently informed Worthy that state police officers had declined to be interviewed on the basis of the instructions from the Attorney

General's office. Captain Churchill of the Ocean County Prosecutor's office likewise informed Dettorre that none of the county investigative personnel would consent to interviews.

It is not disputed that a potential witness has the right to refuse to speak to a representative of a party in litigation. Defendant argues that by informing the law enforcement personnel that they had the right to refuse to be interviewed, Dettorre suggested that they exercise that right. He also claims that by offering the assistance of an attorney from the Attorney General's office, Dettorre, in effect, implied that an attorney must be present at an interview. Finally, defendant suggests that, as a matter of fundamental justice, law enforcement personnel should not be permitted to refuse to be interviewed in a criminal matter.

Defendant claims that he is entitled to a remand for a hearing on this issue on the ground that the testimony is conflicting. We find, however, that the material factual points are not disputed. The testimony of Dettorre and Worthy's affidavit demonstrate that the instructions Dettorre relayed to the law-enforcement personnel could not reasonably have been interpreted as instructing them not to talk to the defense. McIntyre's statement that the police officers refused to be interviewed in accordance with the instructions of the Attorney General's office does not mean that the officers were ordered not to cooperate. McIntyre's statement equally may be interpreted to refer to "instructions" that the officers had the right to refuse an interview, and that they were exercising that right.

The cases cited by defendant in which it was found that prosecutors had interfered with defendants' access to witnesses are distinguishable. *See Gregory v. United States,* 369 *F.*2d 185, 188 (D.C.Cir.1966) (holding that prosecutor's advice to witness not to speak to anyone unless prosecutor was present amounted to denial of access to witness); *United States v. Peter Kiewit Sons' Co.,* 655 *F.Supp.* 73, 78 (D.Colo.1986) (holding that prosecutors had interfered with defendant's access to witnesses by implicitly conveying wish that witnesses not speak to the defense when

witnesses were in danger of prosecution themselves). In this case, the prospective witnesses were not advised to have a representative of the prosecutor's office present, nor was that made a condition of defendant's access to them. As representatives of law enforcement, there was no motive or pressure brought to bear on them not to speak to defense counsel. More likely than not, their disinclination to be interviewed was an inevitable incident of their position as law enforcement officers and their loyalty to the prosecution's cause.

We also decline to impose a new duty on law enforcement officials to consent to being interviewed by the defense. We note that the State is already under an obligation to turn over material, exculpatory evidence to the defense. *Brady, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196–97, 10 *L.Ed.*2d at 218. Furthermore, we note that no duty analogous to the *Brady* obligation is imposed on nongovernmental litigants. Thus, defendant's assertion that law enforcement personnel's obligation to do justice should impose a higher duty of candor to the defense is addressed in part by the State's *Brady* obligation.

Of course, if the State were to interfere with a defendant's ability to answer criminal charges by using its influence to discourage witnesses from speaking to counsel or counsel's agents, a very different case would be presented. We are satisfied that the undisputed testimony will not support an inference that such influence was brought to bear. Defendant's claims under the *Brady* standard are dealt with at length elsewhere in this opinion. Accordingly, we reject defendant's claim that law enforcement personnel's refusal to be interviewed tainted the fairness of the PCR proceeding.

## F. MISCELLANEOUS CLAIMS THAT THE POST–CONVICTION RELIEF PROCEEDINGS WERE UNFAIR

Defendant claims that the Attorney General should have been disqualified from representing the State in the PCR hearing on the ground that the Director of the Division of Criminal Justice,

Terrence P. Farley, was the First Assistant Prosecutor of Ocean County at the time of the remand hearing following defendant's direct appeal. Defendant argues that, because he raises claims of prosecutorial misconduct by the Ocean County Prosecutor's Office in the petition, the former First Assistant Prosecutor's presence in the Attorney General's Office precluded fair adjudication of his PCR petition, and will preclude fair adjudication of federal habeas review.

Other than constitutional due process and fairness considerations, defendant does not cite any legal authority for the proposition that he may compel the disqualification of the State's counsel on PCR because the same counsel represented the State earlier in the proceedings. Defendant does not allege that Director Farley had any direct role in either the Ocean County trial or in the PCR proceeding. Nor is there an allegation of specific prejudice that resulted from the dual roles of Director Farley. The fact that defendant alleges misconduct in prior proceedings cannot entitle him to disqualify counsel for the State. Moreover, we note that the underlying allegations of prosecutorial misconduct have been found to be without merit. Accordingly, we find that the Attorney General's representation of the State on PCR did not taint the fairness of the proceeding.

Defendant also claims that the refusal of the PCR court to permit defendant to amend his petition rendered the proceeding unfair. Because we address in this opinion the merits of the claims defendant proposed to add in an amended petition, the claim based on the denial of permission to amend is moot.

Defendant claims that videotaping the PCR proceeding deprived him of the assistance of counsel and a full and fair hearing. He claims that his ability to confer confidentially with counsel during the proceedings was impaired by the microphone system used in the courtroom. The State responds that the fear that the microphones would not permit private conversations at the counsel table was due to a misunderstanding, and that a "kill" switch at the table permitted such conversations without interruption of the

proceedings. Defendant does not contradict those representa-
tions. The record shows that any misunderstanding was correct-
ed by the court. Therefore, defendant's claim is without merit.

## VI

## CONCLUSION

We affirm the denial of defendant's petition for post-conviction
relief.

O'HERN, J., concurring in part and dissenting in part.

With two exceptions, I agree with the comprehensive opinion
and judgment of the Court dismissing defendant's petition for
post-conviction relief (PCR). I dissent from the Court's denial of
a hearing to defendant on his claim of ineffective assistance of
counsel, and I dissent from its denial of access to the State's
investigative file. I join Justice Handler's dissenting opinion
insofar as he would reverse on the basis of these issues. I add
only the following observations.

## I

The principal thesis of the Court's disposition of defendant's
ineffective assistance of counsel claim at the penalty phase of his
death penalty trial is that counsel made a strategic decision not to
present a defense and that, moreover, any defense was not likely
to have affected substantially the jury's deliberations. The latter
premise is untenable.

> The quality of defense representation is likely to matter in the sentencing stage of
> the vast majority of capital cases. Because of the breadth of the jury's discretion
> and the subjectivity of its decision, the imposition of a death sentence will rarely, if
> ever, be a foregone conclusion. Moreover, the quality of defense representation
> plays a critical role because of the vast range of information relevant to the
> sentencing decision that the jury can learn only through defense counsel's efforts
> and because of the jury's susceptibility to persuasive argument. Thus, in capital
> cases, more than any other class of criminal cases, the quality of representation will
> make a difference—and the difference will be between life or death for the accused.

[Bruce A. Green, *Lethal Fiction: The Meaning of "Counsel" in the Sixth Amendment*, 78 *Iowa L.Rev.* 433, 499 (1993).]

In this case, defendant seeks a hearing to establish that he was sentenced to death without the constitutionally-required effective assistance of counsel. In order to establish his entitlement to a hearing, defendant's petition need only raise a prima facie right to relief. *State v. Preciose*, 129 *N.J.* 451, 462, 609 *A.*2d 1280 (1992). Defendant's petition raises an almost open and shut case of ineffective assistance of counsel. All that can possibly sustain the conviction is a hearing that might somehow lend credibility to counsel's choice to present no case at all. "[A] capital defense attorney's central mission is to present the defendant's 'case for life' through the introduction of mitigating evidence at the sentencing stage." Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 *U. Ill. L.Rev.* 323, 360–61 (1993). Marshall's attorney made no case for life.

In my dissenting opinion in *State v. Marshall (Marshall I )*, 123 *N.J.* 1, 586 *A.*2d 85 (1991), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993), I observed, as did Justice Handler, that the sentencing phase in Marshall's case had been telescoped into the guilt phase of the capital trial.

> Defense counsel relied solely on evidence presented in defense of the crime charged. There is no reason to suppose that the evidence offered by defendant at the guilt trial by way of a defense to the charges could be more than marginally helpful with respect to whether he deserved only life imprisonment.
>
> [*Id.* at 242, 586 *A.*2d 85 (Handler, J., dissenting).]

In essence, there was no sentencing trial.

> In practice, a defendant whose lawyer fails to present any mitigating evidence is little different from one who has had no legal representation at all at sentencing. The failure to present mitigating evidence is effectively equivalent to a lack of representation at sentencing because they both deny a defendant a fair penalty trial.
>
> [Ivan K. Fong, *Ineffective Assistance of Counsel at Capital Sentencing*, 39 *Stan. L.Rev.* 461, 494–95 (1987).]

In *State v. Dixon*, 125 *N.J.* 223, 260, 593 *A.*2d 266 (1991), we explained that an ineffective assistance of counsel claim in a capital case is not measured by whether the trial attorney is

capable of trying other types of criminal cases but, rather, whether the attorney is familiar with constitutional criminal procedure and the extraordinarily complex issues of capital cases. Reasonably competent capital counsel must be aware of the proper methods of trying capital cases.

> [T]he special procedures in capital cases impose unique responsibilities on defense lawyers which include conducting an investigation prior to trial to uncover information that may be presented in mitigation of the sentence, attempting to select jurors who are least likely to impose a death sentence, and conducting the defense during the guilt phase of the trial in light of its potential impact on the jury's sentencing decision.
>
> [*Green, supra,* 78 *Iowa L.Rev.* at 496–97 (citing Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 *N.Y.U. L.Rev.* 299 (1983)).]

Marshall's trial counsel did none of this. He did nothing to select jurors least likely to impose the death penalty, had no theory of defense consistent with a plea for life, and made no case for life. The ABA Standards for Criminal Justice ("The Defense Function") clearly state that " '[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to the facts relevant to the merits of the case *and the penalty in the event of conviction.*' " Fong, *supra,* 39 *Stan. L.Rev.* at 480–81 (quoting 1 *American Bar Assoc. Standards for Criminal Justice,* Standard 4–4.1, at 4–53 (2d ed.1980)) (emphasis added). Prevailing norms of practice expressly dictate the duty to investigate mitigating evidence. *Id.* at 480. Trial manuals for capital defense counsel employed by the Southern Poverty Law Center of California, Office of State Public Defender, describe in detail the effect and importance of investigating and presenting a case in mitigation. *Ibid. See, e.g., Thomas v. Kemp,* 796 *F.*2d 1322, 1324 (11th Cir.) (finding failure to seek mitigating evidence because defendant told counsel he did not "want anyone to cry for him" was unreasonable), *cert. denied,* 479 *U.S.* 996, 107 *S.Ct.* 602, 93 *L.Ed.*2d 601 (1986); *Thompson v. Wainwright,* 787 *F.*2d 1447, 1451–52 (11th Cir.1986) (finding failure to investigate defendant's background, allegedly out of deference to client's wishes, was unreasonable), *cert. denied,* 481 *U.S.* 1042, 107 *S.Ct.* 1986, 95 *L.Ed.*2d 825 (1987). Not even the

instructions of a defendant to ignore possible defenses can reasonably excuse counsel from the performance of that duty. *See Blanco v. Singletary,* 943 *F.*2d 1477 (11th Cir.1991), *cert. denied,* 504 *U.S.* 943, 112 *S.Ct.* 2282, 119 *L.Ed.*2d 207 (1992); *Martin v. Maggio,* 711 *F.*2d 1273 (5th Cir.1983), *cert. denied,* 469 *U.S.* 1028, 105 *S.Ct.* 447, 83 *L.Ed.*2d 373 (1984). The selection of defenses at the penalty phase must be based on investigation and evaluation, not on a mere reliance on a defendant's statements, *Blanco, supra,* 943 *F.*2d at 1503, or "jailhouse bravado." *Martin, supra,* 711 *F.*2d at 1280.

The Court accepts the decision by trial counsel to make no case for life as a strategic choice. But on this record there is absolutely nothing to indicate that Marshall's counsel was at all aware of the function of defense counsel in capital cases. Justice Handler's dissent thoroughly discusses the manner in which counsel mishandled the penalty phase. *Post* at 303–09, 690 *A.*2d at 108–11 (Handler, J., dissenting).

A tactical decision that is not based on a proper understanding of the law is not entitled to deference. "Representation at the sentencing hearing varies so greatly from the ordinary work of lawyers, including criminal defense lawyers, and draws on such a variety of skills and knowledge, that it would take incredible dumb luck for an ill-trained attorney to happen upon a competent approach." Green, *supra,* 78 *Iowa L.Rev.* at 497.

Yes, it would be difficult to defend one such as Marshall. To be defended effectively, such a case requires a coherent theory of defense.

Experienced capital counsel have observed that it "does not work" to put on a "he didn't do it" defense at the guilt stage and then a "he's sorry he did it" defense at the sentencing stage. White, *supra,* 1993 *U. Ill. L.Rev.* at 357. What is required is a consistent theory of defense. One consistent theory of defense that has been suggested is that this was a trumped-up case against defendant with favoritism shown to the rogue killer, McKinnon, who implicated Marshall, as well as favoritism to

Sarann Kraushaar, who was motivated by self-interest to lay the blame on Marshall.

Can one imagine that had competent capital counsel been assembled to represent Marshall at his capital sentencing, they would not have been prepared to present *any* case in mitigation of a possible death sentence?

In short, the petition discloses more than a prima facie case that defendant was denied the effective assistance of counsel. It is as though Marshall had no counsel in the penalty phase of the trial. The Court cannot, in reason, invoke the second prong of the *Strickland/Fritz* test.[1] Because of the complexity and individualization of capital sentencing, it is "at the sentencing stage, when the quality of lawyering does make a difference, [and] the difference is more than a matter of degree. It is a difference between a sentence of imprisonment and a sentence of death." Green, *supra,* 78 *Iowa L.Rev.* at 434–35.

Every member of the Supreme Court agrees that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. But, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. "Thus, an inadequate

---

[1] To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate the reasonable likelihood of succeeding under the standard set forth in *Strickland v. Washington* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), which we adopted in *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.2d* 336 (1987). Under the *Strickland/Fritz* standard, the first prong is whether counsel's performance was deficient. *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. The second prong of the *Strickland/Fritz* test is whether there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. In the case of capital sentencing, the Court interprets the inquiry to be whether the deficient performance of counsel would have substantially affected a jury's deliberation.

investigation of law or fact robs a strategic choice of any presumption of competence." *State v. Davis*, 116 *N.J.* 341, 357, 561 *A.*2d 1082 (1989).

Capital defendants are guaranteed competent capital counsel. *Id.* at 356, 561 *A.*2d 1082. Obviously, the measure of an advocate's competency depends on the task to be accomplished. "The best intentions and the most devoted of efforts do not necessarily equate with capital competence. We expect capital defense counsel to have an expertise regarding the special considerations present in capital cases." *Ibid.* The sentencing phase of a capital trial is the most crucial aspect of a capital case. In many capital trials, this "trial for life" is the "true focus of the trial." Note, *The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials*, 107 *Harv. L.Rev.* 1923, 1926 (1994). The record contains nothing to indicate that defense counsel had made any preparation for the penalty phase of this trial. That is a prima facie case of ineffective assistance of counsel. The hearings held by the PCR court on this issue embraced only the decision to go ahead with the penalty phase after Marshall had fainted and the decision not to call defendant's sons as witnesses in view of defendant's unwillingness to submit them to the ordeal of trial. In capital cases, we have held that the proper manner in which to determine a claim of ineffective assistance of counsel based on inadequate preparation for trial is to conduct a factual hearing. *State v. Savage*, 120 *N.J.* 594, 609, 577 *A.*2d 455 (1990); *Dixon, supra*, 125 *N.J.* at 262, 593 *A.*2d 266. The Court cannot escape that obligation in this case.

## II

The refusal of the prosecutor to disclose to court or counsel the contents of the State's file with respect to any exculpatory materials also requires further proceedings. I dissented in *Marshall I, supra*, 123 *N.J.* at 208, 586 *A.*2d 85, because I believed that nondisclosure of the promise of immunity to Sarann Kraushaar sufficiently undermined confidence in the penalty phase of that

trial to warrant reversal of the death sentence. The additional evidence of nondisclosure of items relevant to the defense *ante* at 180–183, 690 *A.*2d at 46–48, convinces me that in the circumstances of this case the Court should require disclosure of the State's investigative file to the trial court or to a court-appointed master to determine whether there are any relevant exculpatory materials in the file.

*Moore v. Illinois,* 408 *U.S.* 786, 92 *S.Ct.* 2562, 33 *L.Ed.*2d 706 (1972), establishes that the obligation to release exculpatory evidence under *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963), does not require the prosecution to deliver its entire file to the defense. However, when a trial is concluded and a pattern of prosecutorial misconduct has been shown, a court should exercise its discretion to require a supervised review of the State's investigative file. We noted a number of instances of such misconduct in our earlier decision in this case. *See Marshall I, supra,* 123 *N.J.* at 155, 161, 586 *A.*2d 85. The Court's response to defendant's request is that the State has agreed to furnish to defendant any documents he can identify as being in the State's possession. There is a Kafkaesque air of unreality to this analysis. *See* Franz Kafka, *The Trial* (1937). Like the accused in *The Trial,* who was forced to defend himself without being told the charges against him, Marshall is denied access to possibly exculpatory evidence unless he can first identify that evidence.

Federal district courts have the authority to authorize discovery in order to provide an adequate inquiry into habeas corpus claims.[2] In *Harris v. Nelson,* 394 *U.S.* 286, 89 *S.Ct.* 1082, 22 *L.Ed.*2d 281 (1969), the Supreme Court concluded that a district court may use "suitable discovery procedures" to elicit facts necessary to dispose of a habeas corpus claim. *Id.* at 290, 89 *S.Ct.* at 1086, 22 *L.Ed.*2d at 285. The Court ruled in *Harris* that, although the discovery provisions of the Federal Rules of Civil Procedure did not extend to habeas proceedings, a district court may fashion procedures

---

[2] Habeas corpus under 28 *U.S.C.* § 2254 is the federal analogue to post-conviction relief. *Preciose, supra,* 129 *N.J.* at 459, 609 *A.*2d 1280.

based on these rules in habeas corpus cases. *Id.* at 299, 89 *S.Ct.* at 1090, 22 *L.Ed.*2d at 291.

The rules governing federal habeas corpus now incorporate *Harris,* and entitle a defendant in post-conviction relief proceedings to discovery procedures available under the Federal Rules of Civil Procedure. These procedures include, at the discretion of the court, production of documents for inspection and other purposes. *See* 28 *U.S.C.* § 2254, Rule 6.

Some states, within their own habeas corpus framework, have given trial courts similar latitude. *See, e.g., State v. Harris,* 227 *Conn.* 751, 631 *A.*2d 309 (1993) (affirming trial court's independent obligation to examine file and release relevant evidence).

Procedures in other jurisdictions permit criminal defendants pursuing post-conviction relief access to the government's investigative files. *See, e.g., Fla. Stat.* § 119.07(k)(1) (1996) (exempting from disclosure only those records concerning imminent investigations or prosecutions); *Ga.Code Ann.* § 50–18–72(a)(4) (1996) (exempting from disclosure only those records concerning pending prosecutions and appeals). It is disturbing to think that New Jersey would do less than such jurisdictions when the matter involves life or death.

HANDLER, J., dissenting.

This is the first time that the Court has heard a capital case on post-conviction review since the reemergence of the death penalty in New Jersey. I have twice before expressed unanswered criticisms about this case. *State v. Marshall,* 123 *N.J.* 1, 214–67, 586 *A.*2d 85 (1991) (*Marshall I* ) (Handler, J., dissenting), *State v. Marshall,* 130 *N.J.* 109, 229–312, 613 *A.*2d 1059 (1992) (*Marshall II* ) (Handler, J., dissenting), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). Significant facts that militate materially in support of defendant's claims for post-conviction relief have been developed during these most recent proceedings. This Court's dismissive treatment and rejection of all of defendant's numerous claims strongly reinforce my belief that the death

penalty cannot be constitutionally applied in any circumstances and is egregiously defective in the circumstances of this case.

In this extended prosecution, time and the realistic limitations on decisional exposition effectively preclude an in-depth discussion of the hundreds of claims raised by defendant and dismissed with little analysis by the majority today. However, three sets of errors are so profound that I feel compelled to discuss them in detail. They differ only in degree of gravity from the many remaining claims that go undiscussed. First, the lack of a meaningful penalty phase coupled with defense counsel's virtual abrogation of his role as an advocate for defendant warrants a reversal of the death sentence or, at the very least, a remand to determine whether defense counsel had any plausible strategic basis for his decision not to fight vigorously for defendant's life. Second, the lack of a death-qualified jury at both the guilt and penalty phases accentuates the prejudicial impact of the ineffectiveness of defense counsel. A death sentence handed down by an uninformed and unchallenged jury is unprincipled and cannot be reconciled with even minimal constitutional standards, particularly in the context of a case in which defense counsel is grossly ineffective. Lastly, the multitude of discovery violations, several implicating directly the credibility of key witnesses, warrants close scrutiny of the prosecutor's role and mandates a remand to permit defendant the opportunity to establish a full factual basis for his *Brady*[1] and prosecutorial-misconduct claims.

In addition to the aforementioned specific categories of errors, I am also troubled by the Court's treatment of all of defendant's claims. While properly rejecting the trial court's blanket assertion of procedural bars, the Court's cursory and piecemeal analysis of the claims, though partially attributable to defendant's misguided fracturing of every plausible allegation of error, does a disservice. The trial court erred in not analyzing the merits and in not permitting the development of the claims. Then to relieve the

---

[1] *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963).

court of its obligations by undertaking independent fact-finding, without benefit of a hearing and constrained by this Court's heavy burden, is mistaken, seriously undermines the Court's proper role, and visits grave harm on defendant.

## I

The trial court erred in dismissing the vast majority of defendant's claims without holding a hearing or discussing the merits of the claims and based solely on the procedural bars of *Rule* 3:22-4 and *Rule* 3:22-5. I join in the majority's condemnation of that practice. *See ante* at 143-154, 690 *A.*2d at 27-33. Unlike the majority, however, I am convinced that the trial court's error warrants remand of the case for findings. Moreover, I believe that the trial court's severe abridgement of the hearings that were conducted regarding several of defendant's claims was unwarranted, ill-advised, and erroneous. Therefore, I would remand the case for both hearings and factual findings.

## A.

The trial court's disposition of defendant's petition for post-conviction relief ("PCR") did not conform to the rules governing PCR and this Court's holdings in *State v. Preciose,* 129 *N.J.* 451, 609 *A.*2d 1280 (1992), and *State v. Mitchell,* 126 *N.J.* 565, 601 *A.*2d 198 (1992).

Defendant raised 548 grounds that he alleged warranted reversal of his conviction and vacation of his death sentence. Relying on procedural bars, the State moved to dismiss. After a brief oral argument on the motion and a short recess, the trial court issued its ruling. The court dismissed 371 claims merely by citing to the procedural bars. For example, in dismissing the seventy-four claims related to jury selection, the court noted in one sentence that it was dismissing them because the claims either "were adjudicated or could have been raised in the appeal process." In a two-page letter, the trial court confirmed its dismissal of over two-thirds of the claims; again, the court provided no details or

analysis and simply listed the claims it was dismissing. The court did not even specify which procedural bar it was invoking to deny defendant his day in court.

In *State v. Preciose,* this Court warned lower courts not to restrict PCR unduly through the use of procedural hurdles:

> New Jersey's system of state post-conviction review apparently affords criminal defendants a broader opportunity to raise constitutional claims than does federal habeas review. It would be a bitter irony indeed if our courts, in an attempt to accommodate the Supreme Court's retrenchment of federal habeas review, were artificially to elevate procedural rulings over substantive adjudications in post-conviction review, at a time when the [United States Supreme] Court's curtailment of habeas review forces state prisoners to rely increasingly on state post-conviction proceedings as their last resort for vindicating their state and federal constitutional rights. When appropriate, the procedural bars imposed by [the rules governing post-conviction review] . . . may be asserted to preclude post-conviction relief, but their use should not be shaped or influenced in the slightest by the federal courts' restrictive standards for allowing or disallowing habeas review. In such instances, an abbreviated reference to underlying meritorious issues may be useful in demonstrating that reliance on the procedural bar has caused no injustice. However, when meritorious issues are raised that require analysis and explanation, our traditions of comprehensive justice will best be served by decisions that reflect thoughtful and thorough considerations and disposition of substantive contentions.
>
> [129 *N.J.* at 477–78, 609 *A.*2d 1280.]

We further warned that "[o]ur compelling judicial interest in sustaining only those convictions free from constitutional error is disserved by decisions of our courts or, for that matter, federal courts that limit the availability of . . . habeas review in cases in which such review may be warranted." *Id.* at 454, 609 *A.*2d 1280.

This Court has announced that because the issues potentially raised in a PCR petition are so varied and important, "[f]rom our state perspective, finality is [only] achieved when our courts grant or deny post-conviction relief." *Id.* at 475, 609 *A.*2d 1280. The Court has explained that this principle exists because "[w]here meritorious issues are presented, our interest in affording defendants access to both state post-conviction and federal habeas review outweighs our interest in finality. . . . Simply put, considerations of finality and procedural enforcement count for little when a defendant's life or liberty hangs in the balance." *Id.* at 475–76, 609 *A.*2d 1280. We thus recognized, in *Preciose,* that the

rules governing PCR are not to be read strictly to avoid substantive adjudications. *Id.* at 477–78, 609 *A.*2d 1280; *see also State v. Johns*, 111 *N.J.Super.* 574, 576, 270 *A.*2d 59 (App.Div.1970) ("[T]he constitutional problem presented is of sufficient import to call for relaxation of the rules [governing PCR] so that we may consider the question on its merits."), *certif. denied*, 60 *N.J.* 467, 291 *A.*2d 17, *cert. denied*, 409 *U.S.* 1026, 93 *S.Ct.* 473, 34 *L.Ed.*2d 319 (1972).

PCR's importance escalates in quantum measure in capital cases. Thus, even when procedural bars might properly preclude certain claims in noncapital cases, I believe that courts must address the merits of those claims in capital cases to ensure that a defendant will not be executed in violation of our Federal or State Constitution. That approach is implicit in the enhanced procedural and substantive protections that are essential to the constitutional effectuation of any capital-punishment regime. *State v. Ramseur*, 106 *N.J.* 123, 324, 524 *A.*2d 188 (1987); *State v. Williams*, 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983) (*Williams I* ). Thus, in *State v. Martini*, 144 *N.J.* 603, 677 *A.*2d 1106 (1996) (*Martini III* ), *cert. denied*, —— *U.S.* ——, 117 *S.Ct.* 699, 136 *L.Ed.*2d 621 (1997), we held that the public interest in the reliability and integrity of a decision to sentence a defendant to death transcends the normal procedures governing post-conviction review. Therefore, even when a capital defendant seeks to abandon his appeals and to speed the date of his execution, "[t]he Court must decide if issues that could not be raised on direct appeal make the prisoner's sentence of death unconstitutional or illegal." *Id.* at 614, 677 *A.*2d 1106; *see also State v. Hightower*, 120 *N.J.* 378, 577 *A.*2d 99 (1990) (*Hightower I* ) (citing with approval *State v. Hightower*, 214 *N.J.Super.* 43, 518 *A.*2d 482 (App.Div.1986), and its requirement that mitigating evidence be introduced even over a capital defendant's objections); *State v. Koedatich*, 98 *N.J.* 553, 489 *A.*2d 659 (1984) (Order), and 112 *N.J.* 225, 548 *A.*2d 939 (1988) (*Koedatich I* ) (requiring appellate review even over a capital defendant's objections), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989).

Where the enforcement of the bar would result in fundamental injustice or where the denial of relief would be repugnant to the United States Constitution or the New Jersey Constitution, the rules permit the claims to be heard. *R.* 3:22–4; *see also State v. Cerbo,* 78 *N.J.* 595, 605, 397 *A.*2d 671 (1979) ("In the absence of the timely raising of an issue available on direct appeal or a constitutional infringement, relief will be granted in such proceedings only in exceptional circumstances involving a showing of fundamental injustice."). I believe that a claim that the death penalty was unconstitutionally applied to a defendant would implicate the type of fundamental injustice contemplated by the rule.

I therefore join with the majority, *ante* at 153, 690 *A.*2d at 32, in "expressly overrul[ing]' the post-conviction relief court's reliance on the *Rule* 3:22–4 and –5 procedural bars to dismiss defendant's claims."

## B.

The majority correctly recognizes the deficiencies of the trial court's handling of this petition and therefore refuses to dismiss most of the claims raised by defendant on mere procedural technicalities. The Court seemingly spends much time and effort discussing each of defendant's claims and then rejecting them on the merits. As discussed below, I find the majority's dismissal on the merits of several of the claims to be erroneous. Worse, however, is the majority's decision to forge ahead with a discussion of the merits after concluding that the trial court's dismissal of the claims based on procedural bars was improper.

By refusing to remand the action for findings of fact and law, the Court has dramatically moved away from its function as a reviewing court. *See State v. Whitaker,* 79 *N.J.* 503, 515–16, 401 *A.*2d 509 (1979) ("The appellate tribunal 'should give deference to those findings of the trial judge which are substantially influenced' by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy,' since it depends rather upon the cold appellate record.") (quoting *State v. Johnson,* 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964)). The Court today

assumes a dual role of fact-finder and appellate court. I believe the Court is misguided in overreaching its traditional function of determining whether the trial court committed error in ruling on a defendant's claims.

By not remanding the action for factual findings, the Court puts itself in the contradictory position of crediting the fact-finding that was done on some claims while attributing no weight to the absence of fact-finding on other claims. Thus, the majority sways back and forth in its opinion as to the importance of the trial court's findings. At several points, the majority recognizes the importance of a trial court's review of the evidence. *E.g., ante* at 186, 690 *A.*2d at 49 (citing trial court's finding as an important aspect of its ruling that the alleged error was not material). At other times, the Court has no trepidation in plunging ahead without benefit of the trial court's findings. *E.g., ante* at 193, 690 *A.*2d at 53 (assuming trial court's role in determining whether under the totality of the circumstances a search warrant would have been issued); *ante* at 208, 241, 690 *A.*2d at 60, 76 (finding strategic reasons for trial counsel's behavior despite absence of record). The majority's oscillation bespeaks its recurrent ambivalence. Its decision moves us far from our ruling in *Preciose* where we noted that "we cannot address the merits of defendant's claim without ascertaining the sufficiency of the factual record before us." 129 *N.J.* at 462, 609 *A.*2d 1280. There, like here, the fact-finding was deficient and the defendant's allegations grave; in that case, however, we ordered a "remand to the trial court for an evidentiary hearing and a determination of the merits of defendant's claim." *Id.* at 464, 609 *A.*2d 1280.

Remarkably, the claims in *Preciose* are not only identical to some of the claims raised below, but the factual support for the claims there was not nearly as strong as the support evident here. The strongest evidence of ineffectiveness of counsel put forth by the defense in *Preciose* was an affidavit by the defendant setting forth his specific allegations of error. *Id.* at 456, 609 *A.*2d 1280. That affidavit was not submitted until the appeal of his denial of PCR. *Ibid.* Yet in *Preciose,* the Court found that those allegations

required a factual hearing. Here, the Court does its own fact-finding, which, not surprisingly, is cursory and superficial. That the Court would beggar the need for trial-level fact-finding in a PCR proceeding seeking to redress error in a capital prosecution that has led to a death sentence is an alarming anomaly. *See Marshall I, supra,* 123 *N.J.* at 215–16, 265–66, 586 *A.*2d 85 (Handler, J., dissenting) (pointing out that capital jurisprudence subtly may be distorting traditional criminal law).

Real fact-finding is necessary here, and such a process can occur only in a trial court. As the Appellate Division recently noted, "[d]efendant's claim of ineffective assistance of counsel based on these grounds cannot be resolved on the basis of this record. The appropriate forum for resolving such claims is in the trial court...." *State v. Lane,* 279 *N.J.Super.* 209, 224, 652 *A.*2d 724 (App.Div.), *certif. denied,* 141 *N.J.* 94, 660 *A.*2d 1193 (1995); *see also State v. Florez,* 134 *N.J.* 570, 584–91, 636 *A.*2d 1040 (1994) (finding factual record insufficient and remanding case to trial court for development of record); *State v. Shabazz,* 263 *N.J.Super.* 246, 256, 622 *A.*2d 914 (App.Div.) ("Because this issue is cognizable on a petition for post-conviction relief, we hold that the Law Division judge erred by refusing to consider the question. The issue should be further developed and resolved *by the Law Division.*") (emphasis added), *certif. denied,* 133 *N.J.* 444, 627 *A.*2d 1149 (1993). *See generally State v. Kremens,* 52 *N.J.* 303, 245 *A.*2d 313 (1968) (remanding case for purpose of taking testimony and developing factual record on which to evaluate defendant's claims).

If the Court insists on making factual findings on the basis of the record, it is obligated to accept those facts urged by defendant. *Preciose, supra,* 129 *N.J.* at 462, 609 *A.*2d 1280. The Court does not do that here. Instead, flouting our precedent and practice, the Court undertakes independent fact-finding for no apparent purpose other than to rationalize its dismissal of defendant's claims.

## C.

Compounding the failure to remand the case for factual findings is the deficiency in the evidence regarding several of defendant's claims. Despite the inadequacy of the record, the Court clears its own fact-finding path. Indeed, in many instances, the majority recognizes how incomplete the record is, but nevertheless charges that deficiency to defendant. *See, e.g., ante* at 195, 690 *A.*2d at 54 ("The State denies that such a report exists, and defendant has made no showing to contradict that representation."); *ante* at 200, 690 *A.*2d 56 ("However, there has been no showing that such a report ever existed or that any chemical analysis was ever prepared."); *ante* at 206, 690 *A.*2d at 59 ("In our view, the allegation is insufficiently substantiated...."). I believe that the deficiencies in the record can much more readily be traced to the trial court's refusal to permit hearings. In such instances, the appropriate remedy is to remand the case. *See State v. Purnell,* 126 *N.J.* 518, 537, 601 *A.*2d 175 (1992) (remanding case because "[t]he record is insufficient to determine whether any prejudice ensued from the foregoing circumstance [alleged by defendant as a basis for his ineffective-assistance claim]"); *State v. Dixon,* 125 *N.J.* 223, 593 *A.*2d 266 (1991) (finding record of appeal to be inadequate to evaluate allegations of ineffective assistance of counsel and ruling that post-conviction-relief proceeding would have to address issue of whether counsel's conduct was the product of a strategic decision).

Several of defendant's claims require factual hearings because defendant has made out a *prima facie* case. *Preciose, supra,* 129 *N.J.* at 462, 609 *A.*2d 1280. Courts must "view the facts in the light most favorable to a defendant to determine whether a defendant has established a *prima facie* claim." *Id.* at 462–63, 609 *A.*2d 1280. Certainly, defendant's allegations, if accepted as true, would require the Court to grant relief.

The Court, however, does not accept defendant's allegations. For example, the majority fills in the inadequate factual record regarding trial counsel's motivations despite the fact that defendant was not permitted to question counsel on most of those issues

at a hearing, and despite the fact that trial counsel refused even to speak with defendant. Notwithstanding the absence of evidence, the Court imputes strategic reasons for counsel's actions, whether or not those were counsel's reasons, and then draws the foregone conclusion that the claims are without merit. *E.g., ante* at 197, 690 *A.*2d at 55 ("[D]eciding not to call her would be a reasonable tactical choice."); *ante* at 212, 690 *A.*2d at 62 ("[C]ounsel's decision not to offer direct evidence ... may have reflected counsel's prudent recognition that such evidence would have been unpersuasive...."); *ante* at 222, 690 *A.*2d 67 ("[C]ounsel justifiably could have concluded that there was no need to tell the witnesses...."); *ante* at 224, 690 *A.*2d at 68 ("In our view, defense counsel may reasonably have decided that he could best represent his client by concentrating on other areas of his case...."); *ante* at 241, 690 *A.*2d at 76 ("We find that counsel's examination ... was a legitimate strategic choice."). With no hearing and no factual findings below, blindly attributing motivations to defendant's counsel is insupportable.

Another set of claims dismissed with nary an inquiry into their evidentiary support were defendant's *Brady* claims. For example, after establishing nearly one-hundred instances of discovery violations and obtaining hundreds of pages of documents wrongfully withheld, defendant alleged that numerous documents and information still had not been turned over. In one specific claim, defendant asserted that the State had failed to advise him before or during trial that a key witness, McKinnon, had been investigated by federal authorities for criminal acts unrelated to this case. Supporting such a claim was an affidavit by a law enforcement agent, Churchill, that McKinnon had provided information to the F.B.I. regarding bank robberies in which codefendant Thompson may have been involved. Unable to obtain McKinnon's consent and unable to interview government agents and witnesses, defendant asked the court to conduct a hearing to determine what information related to McKinnon's criminal acts had been known by the government and not disclosed to the defense. The trial court denied the request explaining that any hearing on the issue "would be to venture into a legal morass essentially in the nature

of a discovery proceeding with no ascertainable parameters and limits." Thus, for essentially convenience sake, the trial court denied defendant the ability to defend his serious allegations. The majority now adds insult to injury by finding that defendant is at fault for failing to establish his claims.

### D.

In sum, the majority correctly ascertains error in the trial court's blanket dismissal of most of defendant's claims. The majority, however, errs in not concluding its inquiry at that point and remanding the action for the trial court to undertake the necessary hearings and to make the requisite findings. Although the Court is correct to reverse the trial court's decision applying procedural bars to the vast majority of defendant's claims, defendant's victory is pyrrhic. The Court fails adequately to address this class of errors when it opts not to remand the case, but instead attempts to make important factual findings itself. Further, not in the slightest deterred from usurping the trial court's fact-finding responsibilities, the majority compounds its error by engaging in independent fact-finding based on an impoverished record and by utterly failing to recognize the need for additional hearings.

### II

Although the failings of the penalty phase were explored on direct appeal based on the available record, the PCR hearings revealed numerous new facts all of which serve to highlight just how deficient the penalty phase truly was. The majority's description of what occurred, *ante* at 243–258, 690 *A.*2d at 77–85, is incomplete and inadequate.

### A.

At approximately 11:30 a.m. on March 5, 1986, the jury returned a verdict of guilt for procuring the murder of Mrs. Mar-

shall. Immediately after the jury announced that defendant was guilty of capital murder, he was escorted out of the courtroom by Sheriff's officers. As he exited the courtroom, he felt "lightheaded," he tried to sit down, his eyes rolled back, and he collapsed. Sheriff's officers caught him before he hit the floor. The next thing defendant remembered was having smelling salts in his face. He was escorted downstairs to the holding area and placed on a couch where the officers attempted to administer oxygen. Emergency Medical Technicians ("EMTs") soon arrived and checked defendant's vital signs. He was clammy to the touch—diaphoretic—but otherwise appeared all right. The EMTs placed defendant in a stretcher and brought him by ambulance to a hospital. He was first examined at the hospital at 12:25 p.m. He was diagnosed as having had "syncope," which is a fainting spell related to an emotional situation. After determining that defendant was alert and well, the treating physician discharged him from the hospital at 1:15 p.m.

Meanwhile, defense counsel, although informed of the fact that defendant had been hospitalized, proceeded to meet with the prosecutor and the trial judge to discuss "how we were going to proceed in the penalty phase of the case." He told the trial court only that "some type of medical situation" had occurred, but he neither informed the court that defendant had been taken to the hospital nor did he express any desire to delay the start of the penalty phase.

Without having conferred with defendant—indeed, while defendant was being examined at the hospital—defense counsel agreed to certain "ground rules" with the prosecutor. They agreed that the State would proceed on only one of the three aggravating factors of which it had filed notice, while defense counsel would rely on only the two mitigating factors of which he prematurely had filed notice. Counsel also "agreed that the lawyers would waive their opening speeches; [and] that neither side would call any witnesses in the penalty phase." In fact, defense counsel obtained from the prosecutor a commitment that the State would

not "strenuously" seek the death penalty (although counsel later acknowledged that any advocacy in favor of the death penalty could be said to be strenuous advocacy). In return, defense counsel agreed that during the penalty phase, he would "make a very limited closing argument." His argument would be followed by the prosecutor's closing statement. The prosecutor agreed that his argument would "be very, very limited" if defense counsel "honored [the] commitment" to have a "closing ... of a limited nature." None of the discussions of these agreements were made on the record or with defendant's participation, consultation, or input.

Only after defense counsel had made his pact with the prosecutor did he meet with defendant. In fact, counsel met with defendant only once between the guilt phase and penalty phase and this was a very brief meeting held sometime after defendant had returned from the hospital. Defendant, who was not discharged from the hospital until 1:15 p.m., then had to be transported back to the courthouse, which according to the Sheriff's officers took between fifteen and twenty-five minutes.[2] The penalty phase commenced at 1:45 p.m. During the five to fifteen minutes that defendant was in the courthouse prior to the start of the penalty phase, he had to be moved from one holding cell to another and then escorted into the courtroom. In some of the brief remaining moments, defendant and defense counsel met. A Sheriff's officer testified that the discussion between counsel and defendant "wasn't long" and lasted only "several minutes."[3]

Defense counsel's only recollection of the meeting was that he may have asked defendant how he felt and that he advised

---

[2] One officer testified that the trip took between fifteen and twenty minutes. The other officer testified it took twenty-five minutes. An EMT stated it normally took between twenty and twenty-five minutes.

[3] Another officer testified that it had lasted "less than ten minutes." Defense counsel asserted that it must have lasted more than ten minutes, although he could not recall clearly.

defendant of the terms of the agreement with the prosecutor. Specifically, counsel informed defendant that the State was proceeding on only one aggravating factor and that neither the State nor he would introduce any new evidence at the penalty phase. Defendant seemingly acquiesced in the decision not to call any witnesses, but his discussion with counsel was obviously not in-depth—or from defendant's perspective especially informed. Even defense counsel admitted as much: "We basically were discussing whether or not, now knowing that [the prosecutors] were dropping these other two [aggravating] factors, and now knowing that we could proceed in this fashion, whether we wanted to go in this route." One Sheriff's officer who observed the conversation testified that although there was some back and forth between defendant and counsel, defendant was basically "just listening to whatever the lawyer was telling him and basically nodding, you know, his head."

Defendant asserts that his conversation with counsel prior to the penalty phase was very brief. There was no extended discussion of legal strategy or full consideration of the options for handling the penalty-phase presentation. According to defendant, counsel merely asked him what had happened, to which defendant responded that he had fainted. Counsel did not suggest that there be any delay. Rather, he asked whether defendant wanted to go ahead, to which defendant responded, "[l]et's get it over with." Counsel then informed defendant that the attorneys had come to an agreement regarding the penalty phase. Counsel described the "agreement" simply as a decision that no witnesses would be called and that counsel would simply sum up: "That would be it," defendant recalls counsel saying. Defendant received no advice from counsel. He claims that counsel "didn't ask me anything. He didn't ask for my feelings or contributions in the matter. He gave me no options." [4]

---

[4] Defendant asserts that he was feeling "numb" during this conversation and "weak" in court, although he is unable to ascertain whether that was the result of the trial or of his having fainted. PCR counsel notes that some evidence

Defense counsel asserted that prior to March 5, 1986, he had discussed with defendant the procedures he wanted to follow in the event of a penalty trial. Counsel recalled only one conversation in which he and defendant had discussed whether to call defendant's sons as witnesses. Defendant did not want to put his sons through the ordeal, although defense counsel advocated that they be witnesses. Other than that, counsel admitted that "it was not a situation where we spent hours, you know, on end mulling over each and every issue."

Although defense counsel alleged that prior to March 5, 1986, he had discussed the penalty phase with defendant, none of his detailed notes reflect that. Moreover, defendant denied that any such conversation had occurred. In fact, counsel did not even maintain that he had explained to defendant the nature and purpose of the penalty phase and what types of evidence they could submit. Nor did counsel explain the importance of having defendant's sons testify and what the effect of that testimony likely would be, although counsel admitted that they "would have been very compelling witnesses at the penalty phase." Importantly, even though defense counsel knew defendant was reluctant to have his sons testify on his behalf in the penalty phase, nowhere does it appear that counsel thought to have a mitigation specialist or other family member testify in lieu of the sons.

At the end of the brief meeting between defense counsel and defendant, counsel informed the court that he was ready to proceed and announced that "I've explained to my client, in

indicates that defendant was not fully competent at the time. Defendant told the medical personnel that he had never before had any medical problems, yet during the hearing, defendant recounted a fainting episode shortly before trial. Moreover, defendant misinformed the doctor by telling him he was taking no medication; his prison records show that he was on Fulvicin (an antifungal medication for athlete's foot). In addition, defendant told the doctor he did not have any allergies, but other medical records show defendant is allergic to lactose. Defendant, however, conceded that he understood what counsel was saying to him, and the Sheriff's officers testified that defendant appeared alert and normal.

essence, that this is a procedure that I would like to adopt and follow at this stage. And it's my understanding that he is in agreement with this procedure." The court was not aware that defendant had returned from the hospital only a few minutes earlier. The court did not explore whether defendant understood the rights he was waiving by this stipulated penalty phase.

The proceeding itself was incredibly short. The entire penalty phase, including the trial court's opening remarks and closing instructions, lasted only twenty minutes and fills only seventeen transcript pages. Most striking, are the four pages of arguments advanced by defense counsel. In the three sentences devoted to the no-significant-criminal-history mitigating factor, he made only one argument, that defendant should have a "credit" for having lived a law-abiding life up until the point that he had murdered his wife:

> The reason why I believe, when you look to the legislative history of the death penalty when it came into New Jersey that that clearly is a mitigating factor, is because, if you will, people feel, and I think quite rightly, that if you live a law-abiding life, that at some point in time you may be in a position where you may have to ask people to allow you to draw, if you will, maybe a credit because of the fact that you've led such a life. There are people obviously who have not led law-abiding lives and have been in situations where they've been in front of a jury and the jury has convicted them of a capital offense, and the jury will hear that this person has led a life, not law-abiding, but, in fact, has had a juvenile record, has had a record of other offenses and, for the most part, has lived a life that in all ways, shapes, and forms never conformed to what our society at least requires.
>
> In this particular case it's been agreed that Rob Marshall has led a law-abiding life, and that you must consider that as a mitigating factor.

The only other mitigating factor advocated by defense counsel was the catch-all mitigating factor. Counsel mentioned briefly, almost off-handedly and without detail or emphasis, a few of defendant's charitable and community activities:

> The other mitigating factor that Judge Greenberg referred to deals with other circumstances and factors which a jury may consider in mitigating with regard to the death penalty. In this particular case, in addition to the fact that Rob Marshall has no prior criminal record, there's certain things, at least with regard to his life, that he has done, which he is entitled for you to consider.
>
> He was involved in, among other things, with the Ocean County Businessmen's Association. You've heard that. He was campaign chairman for the United Way, and for a number of years worked with them in community affairs, raising money

for United Way. In addition to that, he served with his family on various social activities, involving the swim leagues and certain other things of a community nature.

I don't want to stand here and go through the whole litany of things that he's done in forty-six years that—either for other people or for his family or of a civic nature. Suffice it to say, the record is substantial in that area, and you have an absolute right to consider that as a mitigating factor.

While merely asking the jurors to consider defendant's community activities, counsel conceded the existence of the sole *aggravating* factor and did not suggest that its weight should be counterbalanced by the mitigating factors:

The State has one aggravating factor which they are going to ask you to consider, and that is the fact that, under the statute, this offense as you have found—and at this point, as a lawyer, I have to accept that you have found that— was procured by the payment or the thought of payment for some pecuniary gain.

In concluding, defense counsel urged the jurors to make an individualized decision and to "reach whatever opinion you find in your own heart." Counsel did not ask the jurors not to impose the death penalty, and, in fact, he invited a death verdict: "whatever you feel is the just thing to do, *we can live with it.*"

Defense counsel never discussed defendant's family and defendant's support for his sons. He never discussed defendant's background and life. He never gave the jury any reason to view defendant as a person. He never even asked the jury to spare defendant's life. Ninety minutes after the jury began its deliberations, it returned a sentence of death.

### B.

The majority analyzes all of defendant's ineffective-assistance claims under the standards set out in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and adopted by this Court in *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987). *Ante* at 156–158, 690 *A.*2d at 34–35. For the first time though, the majority recognizes that the special considerations present in capital cases demand a more stringent evaluation of those standards. *Ante* at 244–251, 690 *A.*2d at 78–82. Thus, the Court seemingly has responded to the repeated criticisms that the

*Strickland* standard is not sufficiently protective in capital proceedings. *See State v. DiFrisco*, 137 *N.J.* 434, 530, 645 *A.*2d 734 (1994) (*DiFrisco II* ) (Handler, J., dissenting), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *State v. Davis,* 116 *N.J.* 341, 400–13, 561 *A.*2d 1082 (1989) (Handler, J., dissenting). *See generally,* Note, *The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials,* 107 *Harv. L.Rev.* 1923 (1994) (arguing that the Eighth Amendment requires higher standard of effectiveness in death-penalty cases). As I noted in *DiFrisco II,*

> I remain convinced of the wisdom of Justice Marshall, who dissenting in *Strickland* stated:
>
> > The importance of the process of counsel's efforts, combined with the severity and irrevocability of the sanction at stake, require that the standards for determining what constitutes "effective assistance" be applied especially stringently in capital proceedings.
>
> [137 *N.J.* at 530, 645 *A.*2d 734 (Handler, J., dissenting) (quoting *Strickland, supra,* 466 *U.S.* at 715–16, 104 *S.Ct.* at 2079, 80 *L.Ed.*2d at 711–12 (Marshall, J., dissenting)).]

Unfortunately, the Court's new pronouncement neither alters the standard by which to measure the performance of capital counsel nor defines sufficiently the meaning of prejudice in the capital context. The Court's new test for determining prejudice— "whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially," *ante* at 250, 690 *A.*2d at 81—is far too amorphous a test to be applied with any degree of consistency. In fact, its application to this very case demonstrates the inherent unworkability of the test as well as its indeterminateness.

The majority declines to discuss what meaning it attaches to its "affected substantially" interpretation of *Strickland* 's prejudice prong. As with the old standards, "[t]hese definitions carry no intrinsic meaning or objective guidance." *Davis, supra,* 116 *N.J.* at 402, 561 *A.*2d 1082 (Handler, J., concurring in part and dissenting in part). Certainly, noncumulative, material mitigating evidence generates the real possibility that it would "affect substantially" "penalty-phase deliberations." I would suggest that if a reasonable juror would have considered the material in his or her

deliberative process, then vacation of the death sentence is required. Only under this standard can the Court avoid usurping the penalty jury's role in determining the existence and then balancing the mitigating and aggravating factors.

The Court then succumbs to contradiction. After appearing to accept the proposition that the likely influence on a single juror's deliberative process will demonstrate prejudice, the Court indicates that the only substantial effect on deliberations that would cause the Court to find counsel's performance to be prejudicially ineffective is where the ultimate *result* of the deliberations would have been different. The Court is back where it began. In its own words, such an evaluation would require "a reviewing court [to] stray[ ] from its traditional function [because it would have] to predict the probability that a penalty-phase jury would have changed its verdict if counsel had not been deficient." *Ante* at 250, 690 *A.*2d at 81. Thus, the Court's application of its own "new" standard violates the very purpose the Court ascribes for having a new standard in capital cases in the first place.

Further, the Court even now refuses to recognize the deficiencies in the deficient-performance prong of *Strickland.* As I have noted previously, "we must recognize that counsel representing a defendant in a capital-murder prosecution must demonstrate the competence of a specialist and expert, not simply the skills of an average practitioner." *Davis, supra,* 116 *N.J.* at 405, 561 *A.*2d 1082 (Handler, J., concurring in part and dissenting in part).

In any event, to establish a federal constitutional claim of ineffectiveness of counsel, a defendant must establish that "counsel's performance was deficient" and that "the deficient performance prejudiced defendant." *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693; *see Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336. Counsel's performance is deficient when "counsel's representation [falls] below an objective standard of reasonableness," *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693, and is not within the "wide range of professionally

competent assistance." *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695.

In certain circumstances, the prejudice prong of the *Strickland* test is presumed to have been met. Where there are "egregious shortcomings in the professional performance of counsel" a presumption of prejudice arises without inquiry into the actual conduct of the trial. *Fritz, supra,* 105 *N.J.* at 61, 519 *A.*2d 336 (citing *United States v. Cronic,* 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984), a companion case to *Strickland* ). That aspect of the *Strickland/Fritz* standard presumably still applies even, and, indeed, especially, in the context of a capital prosecution and, most particularly, in the penalty phase of such a prosecution.

On the other hand, "[m]atters of strategy or trial tactics are almost always unassailable when they are based on a proper understanding of the law and evaluation of all the facts in a case." *Purnell, supra,* 126 *N.J.* at 536, 601 *A.*2d 175 (citing *Marshall I, supra,* 123 *N.J.* at 165, 586 *A.*2d 85). Nevertheless, a failure to investigate, " 'so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *State v. Savage,* 120 *N.J.* 594, 624, 577 *A.*2d 455 (1990) (quoting *Strickland, supra,* 466 *U.S.* at 686, 104 *S.Ct.* at 2063, 80 *L.Ed.*2d at 692–93).

Against this background counsel was utterly ineffective, under any standard, during the penalty phase. "Capital defendants are guaranteed competent capital counsel," *Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082, but here, defense counsel totally abandoned his role as an advocate for life, and thus cannot be considered to have provided competent legal advocacy.

## C.

The record conclusively establishes that absolutely no preparation went into the penalty phase. Defense counsel called no witnesses, he entered no exhibits, and he advanced only the most cursory and superficial arguments. He did not prepare any requests to charge and did not raise even one objection to the trial

court's instructions or the prosecutor's arguments, despite the presence of serious errors in both. Moreover, counsel did not provide reasons as to why the jury should find the catch-all mitigating factor. Even if believed, defense counsel's brief conversations with defendant about the penalty phase were hardly a sufficient basis on which defendant could have made a voluntary and knowing waiver of his rights. Certainly, counsel's failure to provide meaningful advice, to investigate the most basic aspects of the penalty phase, and to present a case must be considered ineffective.

The role of counsel at the penalty phase of a capital trial is far different from the traditional role of defense counsel because it requires counsel to construct a sympathetic picture of a defendant's character:

> American lawyers—even the best—operate in an adversary system concerned primarily with describing past events, not with portraying people. Adversary presentation ordinarily resolves questions of historical fact—What happened? Who did it? In what state of mind?—that only incidentally require inquiry into character. When a defendant's character is proved, it is usually because his character provides circumstantial evidence of his deeds, not for its intrinsic interest. The traditional issue is "Did he do the crime?" not "Is he otherwise worthy of life?"
>
> [James Doyle, *The Lawyers' Art: "Representation" in Capital Cases*, 8 Yale J.L. & Human. 417, 420 (1996).]

Defense counsel must present a psychohistory of the defendant to humanize him before the penalty jury. *See* Vivian Berger, *The Chiropractor as Brain Surgeon: Defense Lawyering in Capital Cases*, 18 *N.Y.U. Rev. L. & Soc. Change* 245, 250 (1990–1991) ("[C]apital defense involves what some attorneys view as an alien unlawyerly task. Constructing . . . a 'dramatic psychohistory' of the client and presenting it at the penalty phase smacks more of social work than of law."); Welch White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 *U. Ill. L.Rev.* 323, 361 ("In every case, the capital defendant's attorney should seek to 'humanize' the defendant.").

The crafting of a personal history for each capital defendant is not just what commentators view as appropriate advocacy, but is

specifically required by the Federal and State Constitutions. Individualized consideration is the cornerstone of a constitutional death-penalty scheme. *Gregg v. Georgia*, 428 *U.S.* 153, 189, 197–98, 96 *S.Ct.* 2909, 2932–33, 2936–37, 49 *L.Ed.*2d 859, 883, 888 (1976); *Ramseur, supra*, 106 *N.J.* at 182–97, 524 *A.*2d 188; *see also Spaziano v. Florida*, 468 *U.S.* 447, 460, 104 *S.Ct.* 3154, 3162, 82 *L.Ed.*2d 340, 352 (1984) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."); *Lockett v. Ohio*, 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978) (plurality opinion) (noting that a death sentence is "so profoundly different from all other penalties ... that an individualized decision is essential in capital cases"). Because of this requirement, the United States Supreme Court has repeatedly struck down limitations on what mitigating evidence a capital defendant can introduce. *Parker v. Dugger*, 498 *U.S.* 308, 315, 111 *S.Ct.* 731, 736, 112 *L.Ed.*2d 812, 822 (1991) (ruling that a codefendant's life sentence is a nonstatutory mitigating factor that must be weighed in balancing aggravating and mitigating factors); *Hitchcock v. Dugger*, 481 *U.S.* 393, 398–99, 107 *S.Ct.* 1821, 1824, 95 *L.Ed.*2d 347, 352–53 (1987) (holding that jurors had to be permitted to consider even nonstatutory mitigating evidence); *Skipper v. South Carolina*, 476 *U.S.* 1, 106 *S.Ct.* 1669, 90 *L.Ed.*2d 1 (1986) (finding reversible error in exclusion of mitigating evidence related to defendant's good behavior in prison); *Eddings v. Oklahoma*, 455 *U.S.* 104, 114, 102 *S.Ct.* 869, 876–77, 71 *L.Ed.*2d 1, 10 (1982) (finding reversible error in trial court's refusal to consider defendant's family history as a mitigating factor: A "sentencer [may not] refuse to consider, *as a matter of law*, any relevant mitigating evidence.") (emphasis in original); *Green v. Georgia*, 442 *U.S.* 95, 99 *S.Ct.* 2150, 60 *L.Ed.*2d 738 (1979) (holding that defendant must be permitted to introduce hearsay evidence at penalty phase); *Lockett, supra*, 438 *U.S.* at 604, 98 *S.Ct.* at 2964–65, 57 *L.Ed.*2d at 990 (plurality opinion) ("[T]he Eighth and Fourteenth Amendments require that the

sentencer ... not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original); *Jurek v. Texas*, 428 *U.S.* 262, 271, 276, 96 *S.Ct.* 2950, 2956, 2958, 49 *L.Ed.2d* 929, 938, 941 (1976) (plurality opinion) ("A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.... What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."); *cf. Riggins v. Nevada*, 504 *U.S.* 127, 133, 112 *S.Ct.* 1810, 1814, 118 *L.Ed.2d* 479, 488 (1992) (not reaching question of whether forced administration of drugs to a capital defendant during penalty phase denied the defendant the opportunity to show jurors his true mental condition).

The clear and unequivocal import of this sea of cases is that the penalty-phase jury must have the information necessary to make an individualized sentencing determination; otherwise, the death sentence is unconstitutional. Counsel here did nothing to enable the jury to make that individualized determination.

It is almost insulting for the majority to suggest that because defense counsel was retained privately and was well-paid, he was effective. *Ante* at 252, 690 *A.2d* at 82. The inference that in this case well-paid, but inexperienced, private counsel was effective is not only *not* "inescapable," *ibid.*, it is ludicrous and totally belied by the record; indeed, the opposite inference is inescapable.

Defense counsel gambled, with defendant's life, that if he presented little or no evidence and if the State reciprocated by not "strenuously" arguing for the death penalty, the jury would understand that this case was not an appropriate one in which to impose the ultimate punishment. Capital punishment cannot be premised on a gamble. *Cf. DiFrisco II, supra*, 137 *N.J.* at 527, 645 *A.2d* 734 (Handler, J., dissenting) (arguing for the rejection of guilty pleas in capital cases when such pleas are based on the gamble that the death penalty will not be imposed if the defendant pleads guilty).

Certainly, a death sentence that is derived from purposefully withheld, pertinent information cannot be sustained.

In *Koedatich I*, we found "persuasive policy reasons ... for not allowing a defendant in a capital case to execute even a knowing and voluntary waiver of his right to present mitigating evidence during the penalty phase." 112 *N.J.* at 329–30, 548 *A.2d* 939. Justice O'Hern aptly reminded us that

> [w]hat is required at the capital sentencing stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.... The record before us does not disclose how or whether the jury was informed of the essential information concerning the character of the defendant that should precede the jury's judgment.
>
> [*Koedatich, supra,* 98 *N.J.* at 554, 489 *A.2d* 659 (Order) (O'Hern, J., concurring in part and dissenting in part).]

Thus, the Court concluded that "[i]t is self-evident that the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty.... Hence, [without the presentation of mitigating evidence] we would be unable to discharge our constitutional and statutory requirement to review a judgment, and, therefore, we would fail to safeguard the state's interest in insuring the reliability of death-penalty decisions." *Koedatich I, supra,* 112 *N.J.* at 332, 548 *A.2d* 939; *see also Hightower I, supra,* 120 *N.J.* at 415, 577 *A.2d* 99 ("[C]ounsel must provide evidence of mitigating circumstances even over the defendant's objection.").

*Koedatich* and *Hightower* stand for the proposition that only a fully informed jury can fulfill its important function at the penalty phase. The effect of the majority's conclusion is to create an exception to that rule for defendants whose counsel wrongly believe that there is sound strategic reason to entrust the defendant's fate to an uninformed jury by forgoing a full penalty phase. I do not understand how the majority can interpose a different rule for a defendant who, when misadvised by his counsel, opts not to contest the penalty phase, from a defendant who purposefully embraces a death sentence by not actively contesting the penalty phase. The bases of the *Hightower* and *Koedatich* decisions are clear: a fully informed penalty phase is essential. Nothing less is

required by United States Supreme Court precedent. *See supra* at 154–155, 690 *A.*2d at 32–33. Defense counsel denied the penalty-phase jury an opportunity to carry out its responsibility to make an individualized decision about whether defendant deserved to die, and for that reason alone defendant's death sentence must be vacated.

Worse though, defense counsel explicitly invited a death sentence even though defendant actively sought to contest it. Counsel inexplicably told the jurors that, "whatever you do, we can live with it." An attorney represents the client to the jury. Thus, any juror who listened to defense counsel's statement readily could have assumed that defendant himself believed that reasonable people could conclude that he deserved to die and that he simply did not care. Obviously, if jurors reached such a conclusion, they would find it much easier to vote for a death sentence. Precisely for this reason, experienced capital counsel as a general practice specifically ask jurors to spare the defendant's life. *See* Gary Goodpaster, *The Trial For Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 *N.Y.U. L.Rev.* 299, 335 (1983). Counsel's duty is to appeal to conscience, not to ease the exercise of conscience.

Moreover, defense counsel stipulated to the existence of the sole aggravating factor. We explicitly have refused to permit such stipulations when a defendant is seeking not to contest a death sentence. *See Koedatich I, supra,* 112 *N.J.* at 327–28, 548 *A.*2d 939 (noting favorably that trial court had refused to permit the defendant to stipulate to any aggravating factor aside from the existence of a prior-murder conviction). Again the majority, without discussion, draws an untenable distinction, based solely on counsel's supposed "strategic" choice.

Even if such a strategic choice is permissible, which I doubt, certainly such an option requires the informed consent of the capital defendant. Informed consent can only be found where the defendant has knowledge of the pertinent facts. *Cf. Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938) (holding that the validity of a waiver "depend[s], in each

case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused"). *But see Koedatich I, supra,* 112 *N.J.* at 330, 548 *A.*2d 939 ("[A] defendant in a capital case [is not permitted] to execute even a knowing and voluntary waiver of his right to present mitigating evidence during the penalty phase."). At most, counsel spoke with defendant for ten minutes about the far-reaching arrangement counsel had made with the prosecutor to forgo a full penalty phase. Ten minutes can never be long enough to discuss such weighty issues and was certainly insufficient here where defendant was recovering from an acute episode that had resulted in his hospitalization and where he could not have been fully focused and coherent. *See Savage, supra,* 120 *N.J.* at 620, 577 *A.*2d 455 ("In a capital trial, where strategy is crucial to the life-or-death determination, the need for adequate pretrial consultation becomes paramount.").

Further, counsel here did not actively seek out mitigating evidence, thus leaving the penalty-phase jury with something less than a complete picture of defendant. A mitigation specialist who reviewed the trial transcripts, defense counsel's files, and defense counsel's copious notes concluded that "the mitigation phase investigation in *State v. Marshall* did not meet the accepted practice standards for proper trial level mitigation investigation, and was deficient in many respects." Specifically, "the defense attorney failed to develop a comprehensive social history through interviews with the client, his family or significant others." Moreover, "the attorney failed to collect the necessary records of documentary evidence to support the social history and he failed to integrate background materials as presented through the records, interviews with the defendant or collateral interviews."

Counsel's lack of preparation was confirmed by PCR counsel. PCR counsel reviewed all of the contents of defense counsel's trial file and the materials in the hands of counsel's investigator. The files contained complete notes of interviews with defendant and all correspondence. PCR counsel's findings are astounding:

> There are no materials in [counsel's] file that reflect any legal research into any aspects of the death penalty. There is nothing relating to the nature and scope of aggravating or mitigating factors. There is nothing related to jury instructions governing capital cases. Nor is there anything to indicate that [counsel] researched, or discussed with anyone, any motions or requests to charge that might be filed with respect to the death penalty aspect of this case.
>
> ... [T]here were no records, reports or correspondence relating to any background investigation in preparation for a mitigation case. There is nothing to indicate that he consulted with or attempted to retain a social worker or investigator qualified to serve as a capital mitigation specialist. Nor are there any records from any of the schools Mr. Marshall attended, or any childhood medical records. In addition, there are no notes, statements, reports or other indication that [counsel] or [his investigator] spoke with any family members, teachers or longtime friends regarding the defendant's background.

Shockingly, defense counsel never even consulted with a psychiatrist or psychologist or had defendant examined by a mental-health professional despite the fact that the record contains ample indications that defendant suffered from mental problems. After all, we know that defendant attempted to commit suicide. *See ante* at 181–200, 690 *A.*2d at 47–56 (discussing defendant's "suicide tape"); *see also* PCR Counsel's affidavit ("Other than the report of Elliot Atkins, dated February 14, 1986, there are no reports from, correspondence with or notes indicating that [counsel] consulted any mental health professionals to evaluate the defendant. From the Atkins report, it is clear that his consultation was limited to an evaluation of the mental status of the defendant on the night he attempted suicide.").

Moreover, even without such evidence of mental imbalances, the failure to consult a mental-health expert was ineffective. The reason is simple—many capital defendants have issues relevant to mental condition, and the law explicitly permits those defendants to argue that evidence in mitigation. White, *supra*, 1993 *U. Ill. L.Rev.* at 339 ("[I]t's a rare case in which the capital defendant has no mental problems."). In fact, two out of the seven delineated mitigating factors concern a defendant's mental capacity. *N.J.S.A.* 2C:11–3c(5)(a) ("The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution."); *N.J.S.A.* 2C:11–3c(5)(d) ("The defendant's capacity to appreciate the wrongfulness of his conduct

or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution."). Further, evidence of psychiatric problems is frequently used by defendants in support of the catch-all mitigating factor, and explicitly has been permitted by this Court. *See State v. Martini*, 131 *N.J.* 176, 301–08, 619 *A.2d* 1208 (1993) (*Martini I* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995).

For counsel to be effective, this evidence must be investigated and presented. "In our view, counsel's decision to forgo a psychiatric examination when defendant had admittedly participated in such bizarre conduct, and possibly had a history of mental illness and drug abuse, is contrary to professional norms of competent assistance. 'The usefulness of a thorough evaluation in a case where the capital defendant has problems of this kind is obvious.' " *Savage, supra,* 120 *N.J.* at 619, 577 *A.2d* 455 (quoting *Burger v. Kemp,* 483 *U.S.* 776, 813, 107 *S.Ct.* 3114, 3135, 97 *L.Ed.*2d 638, 669 (1987) (Blackmun, J., concurring)); *see also Brewer v. Aiken,* 935 *F.*2d 850, 857 (7th Cir.1991) (finding that "defense counsel's failure to investigate the mental histories of a [capital] defendant with low intelligence" was ineffective); *Stephens v. Kemp,* 846 *F.*2d 642, 652 (11th Cir.) ("[T]rial counsel's failure to investigate, present and argue to the jury at sentencing any evidence of appellant's mental history and condition constituted error 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' ") (quoting *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693), *cert. denied,* 488 *U.S.* 872, 109 *S.Ct.* 189, 102 *L.Ed.*2d 158 (1988); *People v. Perez,* 148 *Ill.*2d 168, 170 *Ill.Dec.* 304, 592 *N.E.*2d 984 (finding counsel ineffective for failing to present evidence of a capital defendant's mental history), *cert. denied,* 506 *U.S.* 1002, 113 *S.Ct.* 608, 121 *L.Ed.*2d 543 (1992).

Not to pursue possible and plausible defenses is the mark of ineffectiveness. Counsel failed to develop not only psychiatric

mitigation evidence, but he even failed to develop the most common of all mitigation evidence—family circumstances. Robert Marshall's sister, Oakleigh De Carlo, who was very close to her brother, who moved into his house and cared for his family and personal affairs after his arrest, and who handed defense counsel his payments, was not even interviewed about defendant's childhood and life. In fact, in a sworn affidavit, Ms. De Carlo stated that defense counsel,

> never spoke with me, or to my knowledge, other family members, regarding the possibility of our testifying in the penalty trial. At one point I took it upon myself to give over 100 family photographs to [counsel] to use, in some manner, in my brother's defense. They were returned to me unused. I would have been prepared to testify about our family history, up-bringing, the relationship of my brother with our parents and other family members, the relationship of my brother with his sons and the effect my brother's incarceration was having on his sons, especially John, for whom I was caring.

Moreover, defendant's father, in a pretrial letter, highlighted the powerful role defendant had in the upbringing of his sons: "The boys desperately need [defendant's] guidance, understanding, moral support and most importantly paternal love." Even defense counsel understood the strength of this mitigating evidence and noted that defendant's children "would have been very compelling witnesses at the penalty phase." That evidence needed to be presented to the penalty-phase jury. *See Mak v. Blodgett,* 754 *F.Supp.* 1490 (W.D.Wash.1991) (finding counsel ineffective for failing to offer testimony of family members and others at penalty phase), *aff'd,* 970 *F.*2d 614 (9th Cir.1992), *cert. denied,* 507 *U.S.* 951, 113 *S.Ct.* 1363, 122 *L.Ed.*2d 742 (1993); *see also Middleton v. Dugger,* 849 *F.*2d 491 (11th Cir.1988) (finding that failure to conduct investigation into defendant's background to uncover mitigating evidence amounted to ineffective assistance of counsel); *Tyler v. Kemp,* 755 *F.*2d 741 (11th Cir.) (finding counsel ineffective for failing to present evidence of spousal abuse and defendant's care of his children), *cert. denied,* 474 *U.S.* 1026, 106 *S.Ct.* 582, 88 *L.Ed.*2d 564 (1985), *overruled on other grounds, Peek v. Kemp,* 784 *F.*2d 1479 (11th Cir.), *cert. denied,* 479 *U.S.* 939, 107 *S.Ct.* 421, 93 *L.Ed.*2d 371 (1986).

Even if we credit counsel's claims that defendant did not want his sons to testify for fear of how that experience might affect them, there was no reason not to call other family members to testify or to lay out the other options for defendant to decide how to proceed. "Counsel has the obligation, even after receiving such instructions, to 'evaluate potential avenues and advise the client of those offering potential merit.'" White, *supra*, 1993 *U. Ill. L.Rev.* at 349 (quoting *Blanco v. Singletary*, 943 *F.*2d 1477, 1502 (11th Cir.1991), *cert. denied*, 504 *U.S.* 943, 112 *S.Ct.* 2282, 119 *L.Ed.*2d 207 (1992)). One of those options was hiring a mitigation expert to review and to testify about defendant's care for his sons and his general family obligations. *Cf. Curry v. Zant*, 258 *Ga.* 527, 371 *S.E.*2d 647, 648 (1988) (finding counsel ineffective for failing to hire psychiatrist to testify in mitigation at penalty phase). I share the mitigation expert's opinion "that information concerning Robert O. Marshall exists which could have served as a basis for productive mitigation. However, defense counsel's failure to investigate properly resulted in this information being unavailable to the sentencing jury."

The failure to investigate, assemble, and present mitigating evidence is the most basic form of ineffectiveness of capital counsel. "By failing to inquire into the very facts that could support his case in mitigation, counsel's performance 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Savage, supra*, 120 *N.J.* at 624, 577 *A.*2d 455 (quoting *Strickland, supra*, 466 *U.S.* at 686, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 692–93). In fact, federal courts have not hesitated to invalidate death sentences for exactly the type of failings evident here. *See, e.g., Horton v. Zant*, 941 *F.*2d 1449, 1462 (11th Cir.1991) ("Mitigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty. To fail to do any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonable professional norms."), *cert. denied*, 503 *U.S.* 952, 112 *S.Ct.* 1516, 117 *L.Ed.*2d 652 (1992); *Jones v. Thigpen*, 788 *F.*2d 1101

(5th Cir.1986) (finding capital defense attorney ineffective for presenting no mitigating evidence), *cert. denied,* 479 *U.S.* 1087, 107 *S.Ct.* 1292, 94 *L.Ed.*2d 148 (1987); *Thomas v. Kemp,* 796 *F.*2d 1322 (11th Cir.) (finding capital attorney ineffective because he made no effort to investigate possible sources of mitigating evidence aside from interviewing defendant's mother), *cert. denied,* 479 *U.S.* 996, 107 *S.Ct.* 602, 93 *L.Ed.*2d 601 (1986); *King v. Strickland,* 748 *F.*2d 1462 (11th Cir.1984) (finding counsel, who had no capital experience, ineffective because he did not search for mitigating evidence, humanize defendant, or present available character witnesses), *cert. denied,* 471 *U.S.* 1016, 105 *S.Ct.* 2020, 85 *L.Ed.*2d 301 (1985); *Osborn v. Schillinger,* 639 *F.Supp.* 610 (D.Wyo.1986) (finding counsel ineffective because he was unprepared for the penalty phase, presented no mitigating evidence, and made a poor closing argument), *aff'd,* 861 *F.*2d 612 (10th Cir.1988); *see also State ex rel. Busby v. Butler,* 538 *So.*2d 164 (La.1988) (holding that counsel was ineffective when he failed to make opening statement, failed to challenge plaintiff's case, and failed to introduce any mitigating evidence).

Further, the American Bar Association guidelines for capital defense counsel specifically state that counsel "should conduct independent investigations relating to the guilt/innocence phase *and to the penalty phase* of a capital trial." *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,* Guideline 11.4.1(A) (1990) (emphasis added). Moreover, the guidelines provide that counsel should seek to "discover all reasonably available mitigating evidence." *Id.* at Guideline 11.4.1(C); *see also* Doyle, *supra,* 8 *Yale J.L. & Human.* at 426 ("Good capital lawyers collect all of the information—school records, medical history, family memories, the defendant's own accounts—that bear on the defendant's humanity."); Bruce A. Green, *Lethal Fiction: The Meaning of "Counsel" in the Sixth Amendment,* 78 *Iowa L.Rev.* 433, 502 (1993) ("[I]t is almost invariably a mistake to present no evidence at the sentencing proceeding."); Andrea Lyon, *Defending the Death Penalty Case: What Makes Death Different,* 42 *Mercer L.Rev.* 695, 705 (1991)

(explaining that effective capital lawyers "[g]et personal records and objects from the family such as photographs, report cards, favorite books, or even a baseball mitt"); White, *supra,* 1993 *U. Ill. L.Rev.* at 341 ("To find mitigating evidence, a capital defense attorney must construct the defendant's complete social history, exploring all of the significant relationships and events in the client's life. Experienced attorneys emphasize that the defendant's social history must be constructed 'from the ground up.' ").

The extent to which defense counsel ignored mitigation evidence is obvious from the record. He served premature notice of the mitigating factors on the State the very same day he filed his pretrial discovery request and only one week after receipt of the notice of death eligibility. Counsel could not plausibly have conducted adequate investigation into the mitigating factors within that one-week time period and prior to the receipt of the discovery materials. Counsel never amended or expanded the scope of mitigation from that originally served on the State, despite his opportunity to do so.

*Counsel's failure in respect of the penalty phase was not limited to his omissions.* His superficiality and lack of preparation are evident from his handling of the sole statutory mitigating factor. He thoughtlessly asked that the jurors not be told that the c(5)(f) mitigating factor applied to any defendant with "no *significant* history of prior criminal activity." (Emphasis added). Instead he asked that the jurors simply be told that it applied to defendants with no criminal history at all, and he asked that the jurors be told that they must find the factor. By doing this, counsel foreclosed a potentially telling argument—that the mitigating factor applied even to defendants with limited criminal histories and that the jurors should give even more weight to the circumstance that defendant had no criminal history at all. Moreover, by having the court tell the jurors that they must find this factor, defense counsel virtually ensured that the jurors would not discuss the factor. It is not simply *the finding of the factor that is important,* but also the process of weighing and evaluating the factor and

then balancing it against any aggravating factors. Competent counsel would have thought through these issues prior to the penalty phase and would have devised far stronger arguments than counsel here raised. This type of error comes from having an attorney unskilled in penalty-phase advocacy. His advocacy fell far below an objective standard of reasonableness. *See Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082 ("We expect capital defense counsel to have an expertise regarding the special considerations present in capital cases.").

Counsel's ineffectiveness was also evident in his handling of the difficult jury instructions. He suggested no charge, and he failed to suggest that any limitations be placed on the jury's use of the guilt-phase evidence. Guilt-phase evidence is rarely applicable in its entirety to penalty-phase issues. Thus, courts must endeavor to explain which evidence is material and relevant and which evidence should be disregarded. *State v. Erazo,* 126 *N.J.* 112, 131–33, 594 *A.*2d 232 (1991). Counsel failed to recognize or deal with this issue. Moreover, he did not explain or ask to have explained to the jurors that they could consider the guilt-phase defenses and evidence in mitigation even though they had rejected that evidence during the guilt phase. *Marshall I, supra,* 123 *N.J.* at 139, 586 *A.*2d 85.

In addition to failing to suggest jury charges, counsel did not object to the erroneous charges that were delivered. He did not object when the trial court failed to instruct the jury that it should disregard its guilt verdict and deliberate anew as to the existence of the murder-for-hire aggravating factor. *Marshall I, supra,* 123 *N.J.* at 138–40, 586 *A.*2d 85. In fact, as previously noted, diametrically contrary to the purposes of this charge, defense counsel conceded the existence of the aggravating factor. In addition, counsel suggested no charge and raised no objection when the trial court failed to explain or amplify the meaning and function of mitigating factors. *See id.* at 141–48, 586 *A.*2d 85; *id.* at 245–47, 586 *A.*2d 85 (Handler, J., dissenting). Moreover, he did not protest when the prosecutor blatantly and improperly argued

victim-impact evidence during the penalty phase. Not a word was heard from defense counsel when the prosecutor stated that "Maria Marshall had no prior criminal history. Maria Marshall was civic-minded, and this defendant did not give her the option of thirty years." That argument was "inappropriate." *Id.* at 163–64, 586 *A.*2d 85.

Despite the total absence of preparation for the penalty phase and the dramatic occurrences in the brief time between the penalty and guilt phases, counsel never even asked for a continuance. He attempts to exonerate himself by professing to have adopted defendant's suggestion to "get it over with." "Getting-it-over-with" is not an acceptable strategy. It is that attitude which makes it imperative that there be a continuance between the guilt and penalty phases.

> Most defense attorneys request continuances because they are emotionally and substantively unprepared to proceed with the penalty phase immediately following the guilt phase. The defendant, the jury, and the defense attorney need time to recover emotionally from the capital conviction and to focus on the issue of sentencing. On a substantive level, unless a court grants an attorney representing a capital defendant a continuance, the attorney essentially must prepare for two trials simultaneously. The complexity of the legal rules governing both the guilt/innocence and penalty phases of capital trials complicates this preparation and intensifies the need for time.
>
> [Robin E. Abrams, Note, *A Capital Defendant's Right to a Continuance Between the Two Phases of a Death Penalty Trial,* 64 *N.Y.U. L.Rev.* 579, 581–82 (1989).]

*See also* Berger, *supra,* 18 *N.Y.U. Rev. L. & Soc. Change,* at 250–51 (noting that defense attorneys " 'try to win … rather than prepare for losing it,' [and] are devastated when the client is convicted and afterward just throw in the towel. In one of my cases, the original lawyer, who had done an adequate job at the guilt trial, tried to convince the court to proceed to the penalty phase immediately after the verdict came in late at night—so that he could attend a football game the following day! Perhaps he was not so much callous toward the client as exhausted, depressed, and unattuned to the critical importance of the sentencing stage."). Counsel emphasized the get-it-over-with approach by agreeing with the prosecution not to bear down in his advocacy that defendant's life be spared and by not presenting any evidence and

hardly arguing in mitigation. His final suggestion to the jury to do "whatever you feel is the just thing" illustrated *his own* disengagement from the penalty jury. His comment that "we can live with" any decision the jury made, assuredly eased the jury's conscience and raised its comfort level in returning a death sentence; indeed, it was "a virtual invitation to impose the death penalty." White, *supra*, 1993 *U. Ill. L.Rev.* at 341.

In sum, we have here an attorney who was so ineffective at the penalty stage, that Judge Bazelon undoubtedly would label him "a walking violation of the Sixth Amendment." David L. Bazelon, *The Defective Assistance of Counsel*, 42 *U. Cin. L.Rev.* 1, 2 (1975).

### D.

The majority, by splintering counsel's interrelated failings into tiny peccadillos and then weighing those minutiae against the heavy standard used in evaluating claims of ineffectiveness of counsel, not surprisingly finds that no single slip standing alone was significant or consequential enough to establish prejudice. The majority's approach misses the forest: Defense counsel was grossly ineffective.

The majority characterizes defendant's contentions as "generalized claims of counsel's ineffectiveness in the penalty phase," and dismisses them without even the benefit of a hearing because it is "convinced that defendant has failed to demonstrate a reasonable likelihood that those claims ultimately will succeed on the merits." *Ante* at 251, 690 *A.*2d at 82. The Court does not come close to explaining or supporting the basis for its conviction. While noting that it is "disturb[ed]" about the allegation that defense counsel had *no discussions with defendant about the penalty phase, ante* at 251, 690 *A.*2d at 82, and while recognizing the evidence "that trial counsel's penalty-phase preparation was less than that normally undertaken by experienced counsel," *ante* at 251, 690 *A.*2d at 82, the Court nevertheless finds that defendant has failed to meet not only *Strickland*'s prejudice prong, but also the prejudice prong as the Court has redefined it. *Ante* at 251, 690 *A.*2d at 82.

The majority now concludes that "defendant has failed to demonstrate any likelihood that an evidentiary hearing would produce proof that would show that there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." *Ante* at 253, 690 *A*.2d at 83 (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698). The Court reaches this conclusion based on its finding that "the contention that proper investigation and preparation would have unearthed new mitigating evidence that probably would have affected substantially the penalty-phase deliberations is simply too speculative to warrant an evidentiary hearing." *Ante* at 253, 690 *A*.2d at 83.

The Court's conclusions are unacceptable. Even under its redefinition of the prejudice prong, I can find no case, and the majority cites not one, that stands for the proposition that a hearing can be denied even if a defendant establishes that his counsel fell far below an objective standard of reasonableness. Defendant had next to no opportunity to introduce evidence that counsel could or should have used in mitigation. Despite this, evidence does exist in the record now before the Court that flatly contradicts the majority's rash conclusion. There is substantial evidence that defendant was a good father to his sons and that his execution would have a detrimental impact on them. Moreover, the majority fills over a page of its opinion by simply listing the evidence that defendant contends constituted mitigating evidence that should have been investigated, presented, and argued during the penalty phase. *Ante* at 255–256, 690 *A*.2d at 84–85. Then to pretend that defendant does not claim that such evidence exists is disingenuous. I find it hard to imagine that the majority seriously believes that no aspect of defendant's life and character could have and should have been considered in mitigation of the punishment of death. Why is the Court afraid of giving defendant the opportunity to establish whether or not such mitigating evidence exists?

As for the little mitigating evidence upon which the majority stumbles, it actually concedes that such evidence could "possibly

[have been] beneficial to defendant." *Ante* at 256, 690 *A*.2d at 84. Yet, the Court, with no analysis, discussion, or factual basis, concludes that the evidence "posed the clear risk of an adverse jury reaction." *Ante* at 256, 690 *A*.2d at 84. Thus, despite concluding that the evidence could be helpful to the defense, the Court falls back on the proposition that defendant did not show that counsel's performance was unprofessional. *Ante* at 256–257, 690 *A*.2d at 84–85. Of course, the Court does not reconcile this holding with its earlier holding that counsel's failure to investigate mitigating evidence was unprofessional. Moreover, one cannot consider counsel's strategy reasonable, as the majority appears to do, because it was not "proceeded by a 'thorough investigation of law and facts' and a consideration of all 'plausible options.'" *Savage, supra,* 120 *N.J.* at 618, 577 *A*.2d 455 (quoting *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland, supra,* 466 *U.S.* at 690–91, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695; *see also Kenley v. Armontrout,* 937 *F*.2d 1298, 1304 (8th Cir.) ("[S]trategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel."), *cert. denied,* 502 *U.S.* 964, 112 *S.Ct.* 431, 116 *L.Ed.*2d 450 (1991).

In any event, I maintain that counsel's deficient performance had the clear capacity to affect both the deliberations and the ultimate imposition of the death sentence. What the Court appears to be saying is that given the heinous nature of this offense—a proposition that I fully recognize—no mitigating evidence could possibly have persuaded the jury to impose anything but the death penalty. *See ante* at 251, 690 *A*.2d at 82 ("The nature of the crime of which defendant was convicted diminishes the likelihood that the types of mitigation evidence commonly used in capital case would have had a positive impact on the jury."). The Court, in effect, itself evaluates and weighs the omitted mitigating evidence that is now belatedly proffered and determines that it comes to naught. It is an arrogant arrogation of the

jury's own nondelegable responsibility to determine whether a defendant deserves to die. In the guise of appellate review, the Court engages in the most wolfish fact-finding. In launching its argument that introducing mitigating evidence in this case would have been futile, the majority verges perilously close to a holding that the death penalty was mandatory in this circumstance. Such a proposition violates fundamental principles of death-penalty jurisprudence. *See Sumner v. Shuman*, 483 *U.S.* 66, 107 *S.Ct.* 2716, 97 *L.Ed.*2d 56 (1987); *Woodson v. North Carolina*, 428 *U.S.* 280, 96 *S.Ct.* 2978, 49 *L.Ed.*2d 944 (1976); *Roberts v. Louisiana*, 428 *U.S.* 325, 96 *S.Ct.* 3001, 49 *L.Ed.*2d 974 (1976).

Prejudice must be presumed when counsel's failings are as serious as these. "[W]hen the level of counsel's participation makes the idea of a fair trial a nullity prejudice need not be shown, it is presumed." *State v. Jack*, 144 *N.J.* 240, 249, 676 *A.*2d 545 (1996) (citing *Cronic, supra,* 466 *U.S.* at 659, 104 *S.Ct.* at 2047, 80 *L.Ed.*2d at 668); *see Fritz, supra,* 105 *N.J.* at 61, 519 *A.*2d 336. Counsel conducted no investigation, put on no evidence, made no legitimate arguments, and mounted no defense. When counsel fails to demonstrate minimal competence and when his decisions cannot be considered strategic because he failed to conduct any substantial investigation, prejudice is presumed. *Savage, supra,* 120 *N.J.* at 619, 577 *A.*2d 455. We have before us a case of counsel being so ineffective during the penalty phase that defendant might as well have had no counsel at all.

It no longer can be debated that capital trials call for professional experience and skill beyond that required of an attorney in the typical criminal case. It comes as little surprise to me that the first capital defendant facing execution in New Jersey since the resurrection of the death penalty was represented by an attorney untrained and inexperienced in capital cases. His handling of the case—particularly the penalty phrase—was grossly incompetent and unprofessional. The prejudice that flows from that massively ineffective representation—the irremovable prospect that defendant's life might have been spared—is patent.

## III

Defendant was found guilty of capital murder and sentenced to death by a jury not qualified to render either decision. This ineluctable defect in the prosecution reverberated through every critical aspect of the trial of this case. Its significance on post-conviction review is that it exacerbated the prejudice that flowed from defense counsel's gross incompetence and ineffectiveness.

During *voir dire*, defense counsel requested that the trial court qualify, for purposes of the guilt phase, prospective jurors who otherwise would be excludable because of their views on the death penalty; such jurors would be replaced by death-qualified jurors in the event of a penalty phase. He argued that this distinction between the guilt and penalty phases was the only way that defendant could receive a fair trial since a death-qualified guilt-phase jury would be conviction-prone. The court rejected the request. Counsel then requested that the court not engage in any death qualification of prospective jurors beyond their superficial *voir dire* questionnaire responses. Both the State and the court agreed to this second request.

Because of defense counsel's "strategic decision" not to death-qualify the jury before the guilt phase, the jury was unaware of the full "legal effect" of its decisions. *See State v. Mejia*, 141 *N.J.* 475, 485, 662 *A.*2d 308 (1995). Even more disturbing, counsel's decision to forgo death qualification at the outset of the trial resulted in a penalty-phase jury that was far from fully informed about the awesome task with which it was confronted. Furthermore, the jury may have included one or more death-prone jurors who were predisposed to sentence defendant to death. Additionally, because the jury may not have fully understood the differences between the guilt and penalty phases, it could have been, consciously or subconsciously, unduly influenced and induced by its recent guilt determination to impose the death sentence. Counsel's ineffectiveness in this regard requires vacation of defendant's death sentence.

## A.

I begin with an obvious proposition, namely, that in any criminal prosecution, jurors must be fair and impartial. *Williams I, supra,* 93 *N.J.* at 60–62, 459 *A.*2d 641. *Voir dire* serves the essential function of culling potentially biased jurors from the jury venire. *Id.* at 69, 459 *A.*2d 641. During *voir dire,* either the court or the parties inquire into potential jurors' views about a variety of subjects relevant to their ability to be impartial. For example, jurors are often asked about their attitude toward law enforcement, their comprehension of the presumption of innocence, and their ability to view graphic photos dispassionately. Indeed, a defendant may be constitutionally entitled to inquire during *voir dire* into a subject that is highly relevant to ensuring that he receive a fair trial. *See, e.g., Turner v. Murray,* 476 *U.S.* 28, 106 *S.Ct.* 1683, 90 *L.Ed.*2d 27 (1986) (holding that, because of interracial nature of case, defendant was entitled to inquire about prospective jurors' racial attitudes).

Although jurors in all criminal cases must be able to follow the law regarding a variety of subjects, the requirement is enhanced when a defendant's life is at stake. *Williams I, supra,* 93 *N.J.* at 61, 459 *A.*2d 641. Capital jurors must understand with unmistakable clarity the importance during a capital trial of adhering to their oath to consider the evidence fairly and impartially. Consequently, a capital jury, perhaps more than other juries, must be aware of the absolute impermissibility of racial bias, the improper use of photos, and the improper consideration of evidence admitted for a limited purpose. *See id.* at 68–69, 459 *A.*2d 641 (stating that trial courts must take extra care in capital cases to counteract juror exposure to pretrial publicity); *see also Ramseur, supra,* 106 *N.J.* at 427, 524 *A.*2d 188 (Handler, J., dissenting) ("A searching *voir dire* is especially critical in cases where the defendant is exposed to the death penalty."). A trial court must ensure that jurors seated for a capital case, at either stage, are truly able to put aside their biases and to evaluate the evidence as instructed. Jurors must comprehend the formidable task facing them and the

life-or-death consequences that their evaluation of the evidence will entail.

Jurors' views about the death penalty are particularly relevant during *voir dire* in a capital case because a capital jury must be composed of jurors who are able and willing to impose a sentence as required by law and who are neither staunch opponents nor staunch proponents of the death penalty. Consequently, although jurors expressing qualms about capital punishment may not be excused simply for harboring such qualms, they must be removed if their reservations will "substantially impair" their ability to follow the law. *Adams v. Texas*, 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980). Moreover, jurors biased in favor of the death penalty must be removed for cause at a defendant's request. *Morgan v. Illinois*, 504 *U.S.* 719, 112 *S.Ct.* 2222, 119 *L.Ed.*2d 492 (1992). In general, capital jurors must be able to follow the law regarding capital punishment, including both the determination of death eligibility as well as the actual imposition of the death penalty.

Adequate *voir dire* during capital cases thus serves the indispensable function of ensuring that the jury is neither predisposed regarding the death penalty generally (either pro or con) nor biased regarding more specific trial issues that may arise in any criminal case but that take on greater importance during a capital trial (e.g., the type of offense involved, the status of the victim, graphic photos, and racial issues). Such "death qualification" is essential to a fair trial.

### B.

One component of the necessity that capital juries be as unbiased as possible is the requirement that juries understand the legal effect of their decisions. *Mejia, supra,* 141 *N.J.* at 485, 662 *A.*2d 308; *Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188. Consistent with this principle, we have not hesitated to require trial courts to provide both guilt- and penalty-phase juries with information critical to full knowledge of the impact of their various

decisions. *State v. Loftin*, 146 *N.J.* 295, 370–72, 680 *A.2d* 677 (1996) (*Loftin I* ) (requiring trial courts to inform juries of parole ineligibility in the event of a noncapital sentence); *Mejia, supra,* 141 *N.J.* at 485–87, 662 *A.2d* 308 (requiring that jury be informed of noncapital alternative sentences and be instructed that a non-unanimous verdict regarding theory of murder would result in noncapital sentence); *State v. Brown,* 138 *N.J.* 481, 511–14, 651 *A.2d* 19 (1994) (requiring that jury be informed of effect on death eligibility of nonunanimous decision about whether defendant was principal or accomplice); *State v. Bey,* 129 *N.J.* 557, 600–01, 610 *A.2d* 814 (1992) (*Bey III* ) (similar holding to *Loftin I* ), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1131, 130 *L.Ed.2d* 1093 (1995).

Our insistence that capital juries be informed during both phases about the true consequences of their decisions reflects their role as the "conscience of the community." *State v. Perry,* 124 *N.J.* 128, 166, 590 *A.2d* 624 (1991). It also reflects the reality that almost every decision that a capital jury makes at either phase has an impact on the ultimate determination of whether the defendant will live or die.

Death qualification is an indispensable condition and an essential element of ensuring that capital juries are willing and able to appreciate the legal effect of their decision. At the penalty phase, a defendant is entitled to a jury that is not predisposed to impose death and that fully understands the awesome task with which it is entrusted. At the guilt phase, a defendant is entitled to a jury that understands how its guilt-phase decisions will impact on the ultimate death determination and that will make its guilt decisions with such life-or-death ramifications in mind. *Loftin I, supra,* 146 *N.J.* at 409, 680 *A.2d* 677 (Handler, J., dissenting).

I continue to adhere to the view that capital defendants are constitutionally entitled to distinct guilt-phase and penalty-phase juries. *Marshall I, supra,* 123 *N.J.* at 222–23, 586 *A.2d* 85 (Handler, J., dissenting). Employing only one jury fails to account for the different forms of death qualification necessary at each stage to apprise the jury of the legal effect of its decisions, to

emphasize the magnitude of those decisions, and thus to ensure that the jury is impartial. The guilt-phase jury must be "mildly" death-qualified so that it understands the legal effect of its guilt decisions without being so death-qualified as to be conviction-prone. By contrast, the penalty-phase jury must be fully death-qualified so that it understands, in no uncertain terms, the magnitude of its decision. *See Loftin I, supra,* 146 *N.J.* at 411–12, 680 *A.*2d 677 (Handler, J., dissenting) (describing nature and purpose of limited guilt-phase death qualification).

To subject a defendant to a single jury effectively confronts him with a Hobson's choice: either fully death-qualify the jury before the guilt phase, which may result in a conviction-prone guilt jury and an acceptable penalty jury, or do not fully death-qualify the jury before the guilt phase, thus increasing the odds of a fair guilt-phase jury, while allowing hanging jurors to be seated for the penalty phase. *Id.* at 410–12, 680 *A.*2d 677 (Handler, J., dissenting). As I stated in *Marshall I:*

[I]t is unconstitutional to determine the guilt of a capital defendant with a death-qualified jury. But the constitutional offense is infinitely greater if a death sentence is imposed on a capital defendant by a jury that is not death-qualified. The former risks an unfair conviction; the latter risks an unfair sentence of death.

[123 *N.J.* at 224, 586 *A.*2d 85 (Handler, J., dissenting).]

Despite my firm conviction that separate guilt- and penalty-phase juries are constitutionally required, I recognize that the Court does not share this position. *Ante* at 227–228, 690 *A.*2d at 69–70. Fortunately, however, several lesser options are available that alleviate, even if they do not eliminate, the constitutional harm occasioned by restricting a capital defendant to one jury. The first option is to empanel two juries from the outset of the trial, one mildly death-qualified and one fully death-qualified. The mildly death-qualified jury would deliberate at the conclusion of the guilt phase, while the fully death-qualified jury would deliberate at the conclusion of the penalty phase. This procedure would avoid forcing a defendant to choose between a tainted guilt-phase jury and a tainted penalty-phase jury. It also would avoid the expense and inconvenience of empaneling a penalty-phase jury

after the guilt phase is concluded and requiring a rerun of the guilt-phase evidence during the penalty phase.

A second, related, option is to empanel one mildly death-qualified jury for the guilt phase with a significant number of alternates. Before the penalty phase, the trial court could fully death-qualify the jury, replacing any ineligible jurors with eligible alternates. Again, this would reduce the expense and inconvenience of qualifying a new penalty-phase jury and would go a long way in preserving a capital defendant's constitutional rights.

There are alternatives to the present system, including the use of separate juries. In no event should we should abdicate our constitutional responsibility to provide capital defendants with fair, impartial, and fully informed juries by throwing up our hands because separately qualified juries are "too difficult" or "too expensive." When a life is at stake, concerns about the time and expense of empaneling a separate jury become truly petty.

## C.

Given the high degree of interdependence between the two phases and the current use of a single jury, capital counsel must make death-qualification decisions with *both* phases of the proceeding in mind. Failure to fulfill this requirement can be characterized only as ineffective.

In this case, the trial court initiated the constitutionally defective process during *voir dire* by denying defense counsel's motion for a separate penalty-phase jury; defense counsel completed the error-laden process by then requesting that the court not engage in *any* death qualification apart from the superficial juror questionnaires. The court thus committed reversible error by refusing to empanel dual juries, and counsel compounded the court's error by his elimination of all death qualification, an act that clearly constituted ineffective assistance of counsel.

The Court terms defense counsel's decision "a debatable yet reasonable gambit designed to avoid a 'conviction-prone jury'...."

*Ante* at 227, 690 *A*.2d at 69. As I have observed previously, to the extent that the Court views such a decision as reasonable, it embraces the contention that fully death-qualified guilt-phase juries are conviction-prone. *Marshall I, supra,* 123 *N.J.* at 222–23, 586 *A*.2d 85 (Handler, J., dissenting). Obviously, if such juries are conviction-prone, then full death qualification can never be allowed before the guilt phase because the process will yield biased juries. Conversely, to the extent that the Court rejects the contention that fully death-qualified guilt-phase juries are conviction-prone, it affirms the proposition that defense counsel's failure to request death-qualification in this case was abjectly ineffective because, assuming that such juries are not conviction-prone, death qualification before the guilt phase would have had no effect on the guilt phase and would have ensured a more impartial penalty-phase jury. The Court cannot have it both ways, but, in its grim desire to nail down this death sentence, it attempts to do precisely that. I would require a hearing to have counsel explain his "strategy" in forgoing all death qualification rather than have this Court impute to counsel its own flawed conception of proper strategy.

Even if the Court somehow engages in sufficient logical acrobatics to overcome (at least superficially) the paradox inherent in its disposition of this portion of the claim, it must admit that defense counsel's failure before the penalty phase to request that the jury be death-qualified was ineffective. The Court implicitly concedes that this choice was unreasonable by skipping to the prejudice prong of the *Strickland/Fritz* test. *Ante* at 227–228, 690 *A*.2d at 69–70. Such a concession of unreasonableness is unavoidable because no possible strategic choice could justify counsel's failure. While his request that the jury not be death-qualified before the guilt phase arguably may have been "strategic" in its avoidance of a conviction-prone jury, his failure to request that the jury be death-qualified before the penalty phase can only indicate incompetence.

The Court avoids even discussing defense counsel's embarrassingly deficient performance in this respect by arguing that defendant was not prejudiced because the trial court would not and

should not have granted the request. The trial court *should* have granted the motion had it been made because separate juries, or at least fully death-qualified penalty-phase juries, are constitutionally required. Certainly, at a minimum, the trial court, if requested, would have been compelled to question the penalty-phase jurors to determine that no death-prone jurors were sitting at the penalty phase.

Counsel's request that the trial court not death-qualify the jury before the guilt phase and his failure to request death qualification of the penalty-phase jury both constituted ineffective assistance of counsel. Guilt-phase juries must appreciate the legal effect and moral significance of their decisions, while penalty-phase juries must be impartial regarding the death penalty. In particular, defendant was prejudiced by the possibility that jurors predisposed toward capital punishment or otherwise-biased jurors remained on the panel during the penalty phase. Penalty-phase jurors must be able to evaluate aggravating and mitigating factors and to balance them fairly. *Morgan, supra,* 504 *U.S.* at 728, 112 *S.Ct.* at 2229, 119 *L.Ed.*2d at 502–03. Yet, we will never know whether one or more of the jurors who sentenced defendant to die were unwilling or unable to perform this task, because defense counsel did not think to ask them.

### D.

The ineffectiveness of defense counsel's failure to request that the penalty-phase jury be death-qualified takes on even greater significance when viewed in the overall context of this case. Counsel's decision not to death-qualify the jury prior to the guilt phase allowed jurors biased in favor of the death penalty to remain on the jury. Those jurors subsequently convicted defendant of capital murder (implicitly concluding that he had lied in his testimony) and then immediately—without more than a short break and without any type of death qualification—proceeded to the penalty phase. Pro-death jurors were thus propelled by several factors, including their recent and vivid decision to convict,

the lack of adequate *voir dire* to impress on them the magnitude of the penalty-phase decision, and the lack of instructions about the importance of mitigating evidence. On the flip side, jurors with qualms about the death penalty received absolutely no support from either counsel or the court to strengthen their resolve to hold out during penalty deliberations and not to cave in to pressure from pro-death jurors who had the momentum of a fresh murder conviction to aid them in their efforts to persuade. *Cf. Ramseur, supra,* 106 *N.J.* at 300–18, 524 *A.*2d 188 (predicating analysis on the permissibility of pro-life holdout jurors).

Counsel could have attempted to stem this morbid tidal wave and to provide ammunition to jurors with qualms about capital punishment. He could have done so via death qualification before the penalty phase; he could have done so by requesting a continuance—a "cooling off period" of sorts—between the two phases; he could have done so by presenting adequate mitigating evidence and presenting the jury with more than a superficial summation; and he could have done so by encouraging the trial court to provide the jury with adequate instructions on the importance of mitigating evidence. Yet he took none of these steps.

Counsel's utter failure to distinguish between the two phases in his "strategic" death-qualification decisions and his allegedly "strategic" failure to appreciate the impact of the guilt phase on the penalty phase can only be described as a classic case of ineffective assistance of counsel.

IV

The history of this case is a history of discovery violations. These violations are so numerous, continuing, and serious that one must wonder whether the prosecutor purposefully withheld vital information from the defense in an effort to assure a conviction. Over one-hundred separate discovery violations have been identified so far. The violations have so permeated this prosecution that even before the direct appeal, we felt compelled to remand for hearings on the matter. *Marshall I, supra,* 123 *N.J.* at 171–207,

586 *A*.2d 85. Despite this rather astounding background, the Court masterfully avoids disturbing defendant's conviction and death sentence by considering each separate violation in a vacuum, thereby dispelling their cumulative effects and minimizing the impact of the State's persistent course of conduct in violating its discovery obligations.

Admittedly, many of the discovery violations, when viewed in isolation, provide no basis on which to upset defendant's conviction and death sentence. However, several of the specific items not timely disclosed do rise to the level of constitutional violations. Further, the frequency with which our discovery rules were violated in this case generates the strong implication of prosecutorial misconduct. Even more disturbing, the Court's short-shrifting of these rampant discovery derelictions, in a death-penalty case no less, raises the ugly specter of the State bending rules in an effort to obtain a person's execution, and the Court's acquiescence in that effort. The majority's approach, a complete rejection of defendant's claims without any opportunity for an examination of the prosecutors' motives, is unsatisfying and ensures that we will never learn whether these fears—plausibly expressed—are grounded and justified. Its ruling eviscerates post-conviction relief.

### A.

For nearly a decade now, documents have come to light that were in the prosecutor's possession, that were discoverable under New Jersey's broad discovery rules, and that were not turned over to the defense in this case. It seems that with every new hearing on the issue and with every new press report about the case, more information is unearthed establishing the State's violations of its discovery obligations.

Even prior to trial, it was clear that prosecutors were resisting the disclosure of information that was material to the defense. For example, the State refused to supply notes of interviews with the codefendant's alibi witnesses until the month of trial. The

prosecutors even refused to turn over notes regarding defendant's statements to State witnesses until ordered to do so by the trial court. Moreover, reams of documents related to the Marshalls' financial situation were never produced.

During the trial, it became abundantly clear that the State had utterly failed to meet its obligations. Not only did the prosecution use undisclosed notes of its interviews with defense witnesses to cross-examine defendant and his sister, but it used defendant's own statements against him, even though those statements previously had not been disclosed. In one incident, the trial court was forced to preclude the State from eliciting testimony from Sarann Kraushaar regarding defendant's statements to her because the State had not disclosed those statements until the morning of her direct examination. Repeatedly, the State failed to turn over curriculum vitae for expert witnesses and bases of the opinions that those witnesses had formed. For example, the State did not provide a report by George Hickman, the State's tire expert, including statements of all facts and opinions to which Hickman would testify and a summary of the grounds for those opinions as required by *Rule* 3:13-3. The State relied on his testimony to establish that defendant's assertion that he had pulled over to the side of the road because of a flat tire had been false. Moreover, the State did not turn over any of the handwritten notes regarding the examinations conducted by Hickman and his assistant, Gail Tighe.

The extent of the discovery violations and the seriousness of those violations became clear soon after the trial had concluded in this case. In 1989, the New York Times ran an article revealing that prosecutors had promised not to prosecute one of the State's most important witnesses—Sarann Kraushaar—in return for her testimony. This Court ordered a remand to determine the scope and impact of the nondisclosures. During the remand hearing, the State conceded that the immunity agreement had been discoverable and had been in the State's possession. The State, however, maintained that the failure to disclose the documents had not

been willful, and it argued that the prosecutor and investigators who had come into contact with the immunity correspondence had not been involved in the discovery process in this case. Further, the State argued that the documents had been misfiled and placed in the "correspondence file," not the "discovery file." The State contended that all discoverable documents were supposed to be placed in a discovery folder and that the principal case agent then, with the assistance of the prosecutor, would disclose the items to the defense. Appearing to accept the State's explanation, the trial court ordered that the entire contents of the State's discovery and correspondence folders be turned over to the defense. The next day, the State announced that "[t]here was no discovery file." In reviewing the correspondence folder, the defense located two further discoverable documents that had never been turned over. Those documents related to payments made to another key witness, Billy Wayne McKinnon.

Despite the unearthing of yet another violation and the State's misrepresentation regarding the existence of a discovery file, the trial court concluded that the State's actions had not been willful. The court pointed to the State's evidence establishing that Edward Murphy had been the principal case agent responsible for discovery. It concluded that only the county prosecutor and Investigator Mahoney had been aware of the immunity agreement and that the agreement had been misfiled. It also refused to consider any issue regarding the McKinnon financial letters, emphasizing the limited scope of the remand. Moreover, despite the violations, the court declined to order the State to turn over all of its files. This Court upheld those rulings and concluded that the Kraushaar immunity agreement realistically could not have affected the results had it been properly disclosed. *Marshall I, supra,* 123 *N.J.* at 171–207, 586 *A.*2d 85. *But see id.* at 209–11, 586 *A.*2d 85 (O'Hern, J., concurring in part and dissenting in part) (finding that nondisclosure of immunity agreement had violated *Brady* because of the possibility "that had the promise been disclosed to the defense, the result of the proceeding would have been different in the sentencing phase"); *id.* at 228–31, 586 *A.*2d 85 (Handler,

J., dissenting) (finding that nondisclosure was material and potentially affected the verdict).

Many more discovery violations have been uncovered by the defense since the direct appeal, including several that directly impact the testimony of the State's witnesses at the remand hearing just discussed. For example, in an entirely different capital case, the State disclosed the existence of a "death ledger." This ledger listed the principal investigator responsible for each homicide in Ocean County. Investigator Mahoney was named as the investigator responsible for managing the investigation, the evidence file, and all discovery matters in the Marshall case. This flatly contradicted Mahoney's testimony at the remand hearing when he stated that he was neither involved with nor responsible for discovery in this case. The trial court substantially relied on this testimony in determining that the nondisclosure of the Kraushaar immunity agreement was not willful. It should be recalled that Mahoney knew about the immunity agreement, but that the trial court determined that Murphy, not Mahoney, was responsible for discovery in the case.

The defense also unearthed other blatant discovery violations. For example, in 1995, defendant's PCR counsel located an eight-page typewritten statement that State witness James Davis had made to police on December 20, 1984, when Davis was under indictment for the murder of Mrs. Marshall. Despite the fact that this statement was undoubtedly the basis on which the prosecution, on the very same day of Davis's statement, changed Davis's status from a murder defendant to a material witness, the statement was never turned over to the defense. In fact, the statement was not even mentioned during Davis's testimony, and during trial, the prosecutor maintained that Davis's status had been changed only as a result of McKinnon's statement to the police.

Based on this glut of discovery violations, defendant moved prior to the PCR hearing for further discovery. The defense sought specific items that it had come to believe had been withheld

as well as complete discovery of the State's file based on the State's track record of dissembling and nondisclosure. Although the trial court entertained defendant's specific requests for documents, the court repeatedly denied his request for disclosure of the entire file. Basing his requests on interviews with those witnesses who agreed to speak with the defense, documents previously disclosed, testimony adduced at the trial, and statements made by officials in other trials and on "The Phil Donahue Show," defendant was able to identify stacks of undisclosed items. In the end, the State was forced to turn over approximately one-hundred items. However, the trial court refused to permit discovery into alleged attorney work-product and only permitted disclosure of items that the defense could establish likely existed and were material.

Despite the revelation of the State's obdurate refusal to honor its discovery duties, ample evidence exists that the prosecutors to this day have withheld information. For example, the State requested that the FBI compare latent prints lifted from the murder scene with those of a "James Otis Howard." Obviously, any information inculpating another person in the offense must be considered exculpatory of defendant, yet no information on James Otis Howard has been produced.

Included within the newly disclosed items were many vital pieces of information. The belatedly released documents detailed McKinnon's role as an informant for the FBI and the FBI's investigation of him for federal offenses; information related to the investigation of Steve Thompson as a suspect and his alibi in Atlantic City; information and search warrant applications pertaining to Sarann Kraushaar; and information and documents related to the seizure of the "suicide tape." Although all of these documents are potentially *Brady* material, I will only detail here the discovery violations related to the suicide-tape claim.

A key piece of trial evidence against defendant was the so-called "suicide tape," in which he made several statements linking him to McKinnon and expressing his belief that he would be indicted for

his wife's murder. Defendant checked into a motel and attempted to mail the tape to his attorney. He placed the tape in an envelope, on the front of which, he wrote that the envelope was "[t]o be opened only in the event of my death." The police, upon discovering that defendant was at the motel, entered the lobby and seized the envelope containing the tape without having obtained a warrant.

At the suppression hearing for the tape, the main issue was whether defendant had placed it into a closed mailbox in the motel lobby or whether he had left it on an open mail tray. If the tape was exposed on a tray, then the police could have seized it under the plain-view exception to the warrant requirement, because they would have seen the statement printed on the envelope. However, if it was in. a closed mailbox, then the plain-view exception would not apply and the seizure would be invalid. *Cf. State v. Hempele,* 120 *N.J.* 182, 203, 576 *A.*2d 793 (1990) ("The critical issue is whether the container conceals its contents from plain view.").

The nature of the mail receptacle was thus the key issue on the motion to suppress. At the hearing, Investigator Mohel, and Zillah Hahn, the front desk manager, testified that the mail depository had been an open box that sat on the counter. The open box was even admitted into evidence at the suppression hearing. Also testifying was Paul Rokoczy, the motel's night manager. He stated that the only mailbox had been a closed box with a slot. Defendant's testimony conformed with Mr. Rokoczy's. The trial court, however, concluded that the mail receptacle had been an open tray.

During the PCR hearings, defense counsel uncovered an August 23, 1985 memorandum written by Investigator Murphy that detailed statements made by the State's witnesses. The memorandum in question strongly supported the defense's position during the suppression hearing and flatly contradicted the statements of the prosecution witnesses. It was prepared by the investigators one year after the incident in question but prior to the suppression

hearing. In it, the officers stated that they had spoken with Hahn, who had stated that the mailbox currently being used by the motel was a closed box with "a slot in the top and a hindged [sic] door in the bottom to remove the mail." Prior to the installation of the box, the motel had used a tray. Hahn could not recall the date when the tray had ceased being used and the new mailbox had gone into operation. This flatly contradicted Hahn's testimony at the suppression hearing at which she had stated that the tray had been used on the night in question.

The memorandum also stated that the investigators had spoken with the owner of the motel, Mr. Tajfel. Tajfel also had stated that the hotel was then using a closed box but previously had used an open tray. He "stated that to the best of his knowledge the present [closed] mailbox had been in use for approximately 2 years." To confirm that information, the investigators spoke with the person who actually had built the closed box. He stated that he had built it two years earlier and one year before the date in question.

Thus, the only witnesses who consistently professed that the mail receptacle was an open tray were the two officers who had seized the tape. By contrast, defendant and every employee of the hotel had stated, at least initially, that the receptacle was closed. The PCR court nevertheless concluded that the violation was not material.

It is with this litany of unending discovery violations, only a very few of which I have mentioned or detailed, that we must evaluate defendant's PCR claims and defendant's right to review the State's files.

### B.

As a preliminary matter, I take issue with the Court's reformulation of the materiality test for constitutional discovery violations in capital cases to require that there be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ante* at 156, 690 *A*.2d

at 34 (quoting *United States v. Bagley*, 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L.Ed.*2d 481, 494 (1985)). In *Marshall I*, because defendant specifically had requested the withheld information, the Court applied the lower standard enunciated in *United States v. Agurs*, 427 *U.S.* 97, 104, 96 *S.Ct.* 2392, 2398, 49 *L.Ed.*2d 342, 350 (1976), namely, that a discovery violation would be deemed reversible error if the violation "might have affected the outcome of the trial." *Marshall I, supra*, 123 *N.J.* at 199–200, 586 *A.*2d 85. The Court equated this standard with harmless-error analysis. *Id.* at 200, 586 *A.*2d 85 (citing *State v. Carter*, 91 *N.J.* 86, 114, 449 *A.*2d 1280 (1982)). Of particular importance, this Court in *Marshall I* specifically rejected the State's suggestion that it apply the higher *Bagley* "reasonable probability" test to situations in which the defendant specifically had requested the withheld information, instead reserving that standard for unrequested information. *Ibid.*

Recently, we implicitly held in *State v. Knight*, 145 *N.J.* 233, 678 *A.*2d 642 (1996), that the *Bagley* "reasonable probability" standard applied to all discovery violations. *Id.* at 247, 678 *A.*2d 642. Of course, *Knight* was not a capital case, thus justifying its simplification of materiality analysis. However, the Court engaged in a hypothetical discussion of the relevance of *Marshall I*'s rejection of the *Bagley* standard:

> To the extent that *Marshall [I]* is inconsistent with that recognition [i.e., that the *Bagley* standard is simpler and thus preferable], *Marshall [I]* may be understood to reflect our view that the defendant in that case had not established the materiality of the *Brady* violation even under the less demanding standard imposed by *Agurs* in specific-request situations.

> [*Ibid.*]

The Court now converts this dictum into a broad rule governing all materiality inquiries in both capital and noncapital cases. *Ante* at 154–156, 690 *A.*2d at 33–34.

However, despite *Knight*'s hypothetical treatment of *Marshall I*, nothing in *Knight* dictates that the higher *Bagley* standard apply in this case because, unlike *Knight*, this is a capital case. I have stressed on numerous occasions that because capital cases

are qualitatively different from other criminal matters, courts must afford capital defendants heightened procedural protections. *E.g., DiFrisco II, supra,* 137 *N.J.* at 530, 645 *A.*2d 734 (Handler, J., dissenting) (advocating heightened capital standard for ineffective-assistance-of-counsel claims in capital cases); *Davis, supra,* 116 *N.J.* at 400–13, 561 *A.*2d 1082 (Handler, J., concurring in part and dissenting in part) (same); *Ramseur, supra,* 106 *N.J.* at 409, 427–28, 444–45, 524 *A.*2d 188 (Handler, J., dissenting) (urging heightened standard in various contexts in capital cases). I believe that the same rationale applies in the context of constitutional discovery violations by the State. I thus would hold explicitly that although the higher *Bagley* "reasonable probability" standard applies to all noncapital cases, the lower *Agurs* "reasonable possibility" standard applies to capital cases, at least where, as here, the defendant specifically requested the withheld information.

The Court errs by haphazardly extending *Bagley*'s almost insurmountable standard to the capital context. When a life is at stake, we should be truly hesitant to condone prosecutorial withholding of relevant and potentially exculpatory evidence.

## C.

In addition to applying a materiality standard that is too high, the Court underestimates the effect of the nondisclosure of at least two pieces of evidence and disregards the cumulative effect of all of the discovery violations. Both Justice O'Hern and I have already had the opportunity to discuss the impact of the Kraushaar immunity agreement, *see Marshall I, supra,* 123 *N.J.* at 209–11, 586 *A.*2d 85 (O'Hern, J., concurring in part and dissenting in part), 228–31, 586 *A.*2d 85 (Handler, J., dissenting), and I will not repeat that discussion here except to note that items uncovered since that decision, like the "death-ledger," cast grave doubts on the State's position that the withholding of the agreement was not willful.

As serious as the failure to disclose the immunity agreement was the failure to disclose the "suicide tape" memorandum. The Court is forced to engage in logical gymnastics to avoid concluding that the memorandum, which flagrantly contradicts the State's witnesses and positions regarding the type of mailbox, was not material. The Court today applies a new extra-high standard of deference to the PCR court's finding of nonmateriality, according it "special weight" because "[w]e are ... faced with an unusual situation in which the original finder of fact has the opportunity to rule on the materiality of the withheld information...." *Ante* at 186–187, 690 *A*.2d at 49–50.

I strongly disagree with the Court's "special" deference to the PCR court's factual finding. First, the fact that the PCR court was the same court that decided the suppression issue is not cause for *extra* deference; to the contrary, it may merit *less* deference because the court may lack the perspective necessary to make a reliably objective decision. Here, the trial court erroneously denied the defense request to view the memorandum before trial and subsequently discredited the defense witnesses regarding this very subject. The trial court now maintains that credible evidence undermining every aspect of the State's case would not have altered its legal conclusion. That determination is not the type of fact-finding that warrants such special deference because the trial court's finding goes solely to the issue of materiality, a partially legal issue that we are quite capable of evaluating. *See Carter v. Rafferty,* 826 *F.*2d 1299, 1306 (3d Cir.1987) ("[M]ateriality of evidence under *Brady* is a mixed question of law and fact"), *cert. denied,* 484 *U.S.* 1011, 108 *S.Ct.* 711, 98 *L.Ed.*2d 661 (1988); *State v. Landano,* 271 *N.J.Super.* 1, 36 n. 13, 637 *A*.2d 1270 (App.Div.) (citing *Carter v. Rafferty* for proposition that "the Law Division's resolution of questions pertaining to materiality are not entitled to the same degree of deference that is to be accorded its determination of factual issues"), *certif. denied,* 137 *N.J.* 164, 644 *A*.2d 612 (1994); *see also Cornell v. Nix,* 976 *F.*2d 376, 382–83 (8th Cir.1992) (same as *Carter v. Rafferty* ), *cert. denied,* 507 *U.S.* 1020, 113 *S.Ct.* 1820, 123 *L.Ed.*2d 450 (1993); *United States v. Rivalta,* 925 *F.*2d

596, 598 (2d Cir.) (same), *cert. denied,* 502 *U.S.* 875, 112 *S.Ct.* 215, 116 *L.Ed.*2d 173 (1991); *United States v. Buchanan,* 891 *F.*2d 1436, 1440 (10th Cir.1989) (same), *cert. denied,* 494 *U.S.* 1088, 110 *S.Ct.* 1829, 108 *L.Ed.*2d 958 (1990).

Second, under any standard, the PCR court's finding was clearly erroneous. The Court's new materiality standard, mistakenly applied in this capital case, is whether a "reasonable probability" existed that the discovery violation affected the result of the proceeding. *Ante* at 155–156, 690 *A.*2d at 33–34. This standard does not require a defendant to show that the violation *did in fact* alter the outcome, but rather that it simply "undermine[d] confidence in the outcome" of the case. *Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494.

It baffles me how the PCR court could have deemed this violation not material under this standard. The information in the memorandum *directly* contradicted the testimony of the motel employees regarding the mail receptacle. Because impeachment evidence is clearly within the purview of the *Brady* rule, *id.* at 676, 105 *S.Ct.* at 3380, 87 *L.Ed.*2d at 490; *Giglio v. United States,* 405 *U.S.* 150, 154, 92 *S.Ct.* 763, 766, 31 *L.Ed.*2d 104, 108 (1972), and because this impeachment evidence would have severely undermined the State's attempt to prove that the receptacle was an open tray, the Court should reject the PCR court's self-serving finding of nonmateriality. In fact, the memorandum establishes that one of the State's witnesses either lied to the police or lied to the court. That evidence is the most basic form of impeachment material.

The Court's reliance on the existence of other testimony that the memorandum did not impeach is misplaced. Although it is true that, with the production of the memorandum, the State could have presented other uncontradicted testimony relevant to the plain-view inquiry—namely, testimony that the tape would not have fit into the closed mail slot, thus requiring defendant to have placed it on top of the box—this evidence was indirect and not nearly as important as the State's direct (and unimpeached,

because of the discovery violation) testimony that the only receptacle had been a tray. Moreover, the Court's reliance on unchallenged, yet hotly contested, evidence is severely warped when viewed in conjunction with the sharp limitations placed on hearings and fact-findings during the PCR hearings. The PCR court's finding that it still would have admitted the evidence because the memorandum "could not have" affected the decision is simply contrary to reality and should be reversed.

Apart from the materiality of the individual *Brady* violations that I have described, the State's aggregate discovery violations lead to the ultimate conclusion that defendant was denied due process and a fair trial. As the United States Supreme Court recently reminded us,

> the established rule that the state's obligation under *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963), to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government, and ... the prosecutor remains responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention. [Where] the net effect of the evidence withheld by the State ... raises a reasonable probability that its disclosure would have produced a different result, [the petitioner] is entitled to a new trial.
>
> [*Kyles v. Whitley,* 514 *U.S.* 419, ——, 115 *S.Ct.* 1555, 1560, 131 *L.Ed.*2d 490, 498 (1995).]

*See also Landano, supra,* 271 *N.J.Super.* at 36 n. 13, 637 *A.*2d 1270 ("[I]nstances of prosecutorial suppression in this case must be viewed collectively."). Although I agree with the majority that "[t]he task of assessing the cumulative effect of numerous, assorted claims of error ... is daunting," *ante* at 267, 690 *A.*2d at 90, I cannot agree that the State's multitudinous discovery violations did not create a reasonable probability of affecting the outcome.

The State's discovery violations went to every aspect of the case. Only two witnesses—McKinnon and Kraushaar—were able to testify that defendant had spoken about murdering his wife. Yet, the State failed to fulfill its discovery obligations with respect to both of them. The undisclosed documents would have permitted the defense to impeach McKinnon not only by showing he had received financial benefits in exchange for his cooperation, a fact

he denied at trial, but they also would have permitted the defense to cross-examine him on his role as an informant for the FBI and as the target of a federal investigation. *See R.* 3:13–3(c)(6), (8); *State v. Florez,* 134 *N.J.* 570, 592–94, 636 *A.*2d 1040 (1994) (requiring disclosure of fact that material witness was a government informant); *State v. Spano,* 69 *N.J.* 231, 353 *A.*2d 97 (1976) (requiring disclosure of criminal history of material witnesses); *State v. Taylor,* 49 *N.J.* 440, 447–48, 231 *A.*2d 212 (1967) (requiring disclosure of promise of leniency to government witness); *State v. Satkin,* 127 *N.J.Super.* 306, 317 *A.*2d 379 (App.Div.1974) (requiring disclosure of monies paid to material witness). Moreover, by failing to disclose information regarding other suspects who had been investigated but found to have alibis, the State precluded the defense from impeaching McKinnon with his statements inculpating those individuals. *See R.* 3:13–3(c)(6), (7); *Landano, supra,* 271 *N.J.Super.* 1, 637 *A.*2d 1270 (finding *Brady* violation where State withheld evidence linking others to crime). Further, as discussed above, significant impeachment evidence regarding Sarann Kraushaar was withheld. *See Taylor, supra,* 49 *N.J.* at 447–48, 231 *A.*2d 212 (reversing conviction because prosecutor failed to disclose leniency promise made to material witness); *State v. Blue,* 124 *N.J.Super.* 276, 306 *A.*2d 469 (App.Div.1973) (same).

The State's failures infected much of the other evidence as well. As noted, the admissibility of the "suicide type" was rendered suspect by the withholding of a key memorandum. Moreover, many documents related to defendant's supposed financial motive were withheld, including documents apparently in the victim's handwriting that evinced her knowledge of the insurance policies. *See R.* 3:13–3(c)(1), (5). Worse, though, the State withheld documents subpoenaed from defendant's bank that were then used to great effect in impeaching him on the stand. *See R.* 3:13–3(c)(5). The failure to disclose those documents left defendant ill-prepared for cross examination and subject to unfair surprise. *See State v. Zola,* 112 *N.J.* 384, 418, 548 *A.*2d 1022 (1988) ("By enabling each party to be informed of the other's case, our rules of discovery

ensure fairness and avoid unfair surprise."), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989).

The State's violations of its discovery obligations also affected the defense theory of the case. The defense asserted that defendant had pulled his car over because of a flat tire and that he too had been assaulted. Despite the State's knowledge of this theory, prosecutors did not turn over the emergency room report, a medical examiner's report, and the names of persons whom the State knew supported defendant's assertion of injuries. *See R.* 3:13–3(c)(1), (3), (6). Moreover, the State failed to comply with its discovery obligations regarding all of the experts whom it called including the ballistics, firearms, and pathology experts. *See R.* 3:13(c)(9); *Zola, supra,* 112 *N.J.* at 410–12, 548 *A.*2d 1022 (providing broad discovery of documents, materials, and opinions underlying State expert's testimony in capital case). Without obtaining that information pretrial, the defense was seriously hamstrung and did not know whether to hire and to consult its own experts.

The State also impeached defendant on cross examination using information that it had improperly withheld. *Marshall I, supra,* 123 *N.J.* at 133–34, 586 *A.*2d 85 (finding discovery violation, but holding that violation in isolation did not warrant reversal of trial court's refusal to declare mistrial); *see R.* 3:13–3(c)(2) (mandating disclosure of all of defendant's statements), (7) (same for witnesses' statements), (8) (same for police reports and interview notes); *State v. Blake,* 234 *N.J.Super.* 166, 560 *A.*2d 702 (App.Div. 1989) (reversing conviction based on State's failure to disclose defendant's alleged inculpatory statement prior to defendant taking the stand); *id.* at 173–74, 560 *A.*2d 702 (collecting cases holding same).

In sum, by disregarding its discovery obligations, the State converted the trial into an ambush. Our broad discovery rules do not permit such a result. *Ramseur, supra,* 106 *N.J.* at 338, 524 *A.*2d 188 (O'Hern, J., concurring in judgment) ("Our goal has been to produce trials that are fair and result in substantial justice. Thus we have perhaps the broadest discovery rules extant.");

Sylvia Pressler, *Current N.J. Court Rules*, comment 1 on *R.* 3:13–3 (1997) ("The import of [*Rule* 3:13–3] is, in effect, to make the prosecutor's entire file available to the defendant as a matter of the defendant's right and upon the defendant's demand. . . ."). The only limitations on the State's obligation to furnish material to the defense concern attorney work-product, *R.* 3:13–3(e), and material for which the party has obtained a court order of protection. *R.* 3:13–3(f). The latter exception was never invoked here and the former is not applicable to the hundreds of pages of material discussed in this opinion.

The State continuously and flagrantly violated our discovery rules. As Justice Clifford noted in a different case,

A more egregious *Brady* violation than the one presented by this case is difficult to imagine. One need not go so far as to impugn the motives of the prosecution in order to reach that conclusion, for it can just as easily be attributed to an appalling lack of basic communicative skills on the part of the . . . various members of the prosecution team. But whether the circumstances originate in unworthy motives, colossal bungling, or plain dullness of comprehension, the fact remains that the misunderstandings thus created have proven to be costly indeed. . . .

[*Carter, supra,* 91 *N.J.* at 133, 449 *A.*2d 1280 (Clifford, J., dissenting) (footnote omitted).]

Whether or not the infractions amount to a *Brady* violation—I firmly believe that they do—this course of conduct so infected the trial that the principle of fundamental fairness was certainly traduced. *Ramseur, supra,* 106 *N.J.* at 338, 524 *A.*2d 188 (O'Hern, J., concurring in judgment) (explaining that our discovery rules are so broad "out of a fundamental sense of fairness— that this is not a game that is being played but is truly a quest for justice—and because we believe that a criminal trial 'although inevitably an adversarial proceeding, is above all else a search for truth' ") (quoting *State v. Fort,* 101 *N.J.* 123, 131, 501 *A.*2d 140 (1985)). Thus, I would reverse defendant's conviction and vacate his death sentence based on the discovery violations.

D.

I join with Justice O'Hern in concluding that the Court should order the State to disclose its entire file. To be blunt, the Ocean County Prosecutor's Office has proven conclusively that it is not to

be trusted—either because of lack of diligence or due to willfulness—to abide by the discovery rules and to produce relevant, exculpatory material for the defense. Given the State's track record in this case, we can only guess what else lies in its file. And, guess we must, since the Court, displaying an exhausted patience, inexplicably refuses to remand the case to the trial court for proper factual findings, thereby allowing its stamp of approval to be placed on this death sentence.

Justice O'Hern is surely correct in arguing that to allow defendant access only to those documents that he can identify as being in the State's possession has a certain Kafkaesque feel to it. *Ante* at 292, 690 *A.*2d at 103 (O'Hern, J., concurring in part and dissenting in part). That observation is especially apt where the State has displayed such bad faith in producing exculpatory material that defendant specifically requested, let alone exculpatory material that he did not request and about which he could not know.

Although I recognize that the State does not have a federal constitutional obligation to turn over its entire file to defendant, *Bagley, supra,* 473 *U.S.* at 675, 105 *S.Ct.* at 3380, 87 *L.Ed.*2d at 489; *Agurs, supra,* 427 *U.S.* at 111, 96 *S.Ct.* at 2401, 49 *L.Ed.*2d at 354, the Court should hold as a matter of state law—either under the doctrine of fundamental fairness or our general supervisory power—that when the State has engaged in a pattern of discovery violations, it must produce its entire file for inspection by the defense. Of course, such an order properly could be subject to *in camera* proceedings to protect work-product and confidential information. *See R.* 3:13–3(e), (f). Requiring disclosure is the only way that we can be assured that the State has complied with its discovery obligations. *Cf. People v. Feerick,* — *A.D.*2d —, —, 646 *N.Y.S.*2d 810, 811 (1996) (holding that when prosecutor allegedly denies required discovery, trial court can order production of entire file).

V

Today the Court reaffirms Robert Marshall's death sentence. It does so despite the failings of counsel during the penalty phase,

the absence of a death-qualified jury, and the State's abrogation of its discovery obligations. Many other errors infected this case as well; errors that warrant much closer scrutiny than that to which this Court, or I for that matter, have subjected them.

I have previously remarked, for example, that "[p]rosecutorial misconduct was rampant throughout the trial" of this case. *Marshall I, supra,* 123 *N.J.* at 232, 586 *A.*2d 85 (Handler, J., dissenting). Even before we learned of the State's disregard of our discovery rules and its manipulation of the penalty phase, I maintained that "[t]he record reveal[ed] a pattern of calculation on the part of the prosecutor that underscore[d] the offensiveness of his conduct." *Ibid.* That observation rings even truer now that the record is more complete. Interestingly, though, the record is far from being totally complete as the State apparently failed to comply with a court order to preserve evidence and the trial court erred in not conducting full hearings on the claims. Despite those limitations, examples of misconduct abound. Those shortcomings must be reconsidered on post-conviction review in light of their influence on the prejudicial impact of defense counsel's ineffective representations.

Defense counsel's failings, moreover, were not limited to the penalty phase. Specifically, he failed adequately to prepare to cross-examine McKinnon and Kraushaar; he failed to investigate or introduce evidence corroborating the defense; he erred in hiring and retaining Kolins as an investigator despite his alleged involvement in tampering with a vehicle belonging to New Jersey law enforcement authorities in an attempt to hinder their investigation and despite his rather dubious credibility as a witness; he failed to interview and prepare witnesses for the suppression hearing; he failed to argue that the suicide tape was a confidential and protected attorney-client communication; he failed to demand compliance with the State's discovery obligations when noncompliance had become obvious; he failed to consult and utilize experts to offer rebuttal to the State's witnesses; and he failed to advise defense witnesses not to disclose defendant's early retention of

counsel. Those failings lend credence to the conclusion that a hearing on defense counsel's ineffectiveness is likely to produce evidence justifying post-conviction relief.

Although I am deeply disturbed by the State executing anyone under the current constitutionally deficient capital-punishment statute, I am particularly anguished by the Court's stubborn and intractable effort to push Robert Marshall into the execution chamber at the cost of our post-conviction relief jurisprudence. I remarked in the direct appeal that I was stunned by the majority's recognition of so many errors and its conclusion that the acknowledged errors, separately or cumulatively, did not amount to grounds for reversal. *Id.* at 253, 586 *A.*2d 85 (Handler, J., dissenting). I am now dumbfounded that the Court has the temerity to state that this—a capital prosecution—passes muster. Concededly, a trial need not be perfect, but it cannot be reduced to shambles. The majority identified at least a dozen errors during the direct appeal. Many more errors have now been acknowledged, errors that virtually blanket every part of this capital trial.

I cannot and will not join in this Court's conclusion that Robert Marshall can lawfully and constitutionally be executed.

*For affirmance*—Justices POLLOCK, GARIBALDI, STEIN and COLEMAN—4.

*For reversal and remandment*—Justices HANDLER and O'HERN—2.